## Page 1

```
 1           UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF FLORIDA
 2
                CASE NO:  13-cv-23799
 3

 4
     RAMON FERNANDEZ,
 5
                  Plaintiff,
 6
     -vs-
 7

 8   BAL HARBOUR VILLAGE and
     THE BAL HARBOUR POLICE DEPARTMENT,
 9
                  Defendants.
10
     _____/
11

12            Esquire Deposition Solutions
           20801 Biscayne Boulevard, Suite 202
13                  Aventura, Florida
            Thursday, 10:00 a.m. to 3:30 p.m.
14                  May 30th, 2014

15
             DEPOSITION OF RAMON FERNANDEZ
16

17        Taken before Renee D. Waishwell, Notary

18   Public in and for the State of Florida at Large,

19   pursuant to Notice of Taking Deposition in the above

20   cause.

21

22

23

24

25
```

## Page 2

```
 1   APPEARANCES:

 2

 3   ATTORNEY FOR PLAINTIFF

 4
     LOUIS M. BARRIOS-BALBIN, ESQUIRE
 5   Barrios-Balbin, P.A.
     201 Alhambra Circle
 6   Suite 500
     Coral Gables, Florida 33134
 7

 8
     ATTORNEY FOR DEFENDANTS
 9

10   HUDSON C. GILL, ESQUIRE
     Johnson, Anselmo, Murdoch,
11   Burke, Piper & Hochman, P.A.
     2455 East Sunrise Boulevard
12   Suite 1000
     Fort Lauderdale, Florida 33304
13

14   KELLY RAINS JESSON, ESQUIRE
     and JOHN QUICK, ESQUIRE
15   Weiss Serota Helfman Pastoriza
     Cole & Boniske, P.L.
16   200 East Broward Boulevard
     Suite 1900
17   Fort Lauderdale, Florida 33301

18

19

20

21

22

23

24

25
```

## Page 3

```
 1                I N D E X
     WITNESS                          PAGE
 2

 3   RAMON FERNANDEZ

 4   Direct Examination by Mr. Gill        4

 5

 6
     EXHIBIT                          PAGE
 7
     Exhibit No. 1                        10
 8   Exhibit No. 2                        18
     Exhibit No. 3                        27
 9   Exhibit No. 4                        53
     Exhibit No. 5                        80
10   Exhibit No. 6                        89
     Exhibit No. 7                        98
11   Exhibit No. 8                       146
     Exhibit No. 9                       150
12   Exhibit No. 10                      154
     Exhibit No. 11                      158
13   Exhibit No. 12                      159
     Exhibit No. 13                      159
14   Exhibit No. 14                      159
     Exhibit No. 15                      161
15   Exhibit No. 16                      161
     Exhibit No. 17                      166
16   Exhibit No. 18                      168
     Exhibit No. 19                      176
17   Exhibit No. 20                      181
     Exhibit No. 21                      188
18   Exhibit No. 22                      194
     Exhibit No. 23                      197
19   Exhibit No. 24                      198
     Exhibit No. 25                      205
20

21

22

23

24

25
```

## Page 4

```
 1   Thereupon:
 2           RAMON FERNANDEZ,
 3       a witness, having been first duly sworn in
 4   the above-entitled cause, testified under his oath as
 5   follows:
 6           DIRECT EXAMINATION
 7   BY MR. GILL:
 8       Q.  Good morning.  Will you, please, state your
 9   name for the record.
10       A.  Ramon Fernandez.
11       Q.  Officer Fernandez, have you ever given your
12   deposition before?
13       A.  Yes.
14       Q.  Approximately how many times?
15       A.  Twice.
16       Q.  So you're fairly familiar with the process
17   then?
18       A.  I would say so.
19       Q.  I'm going to ask you a series of questions.
20   You need to answer those questions to the best of your
21   ability.  Because it's all being taken down, you need
22   to answer verbally.  You seem a little bit soft
23   spoken, so you may have to speak up a little bit so
24   the court reporter can hear us.  Okay?
25       A.  Okay.
```



Page 5

1    Q.   Also, when I'm asking a question, do your
2    best -- sometimes in conversation people talk over
3    each other.  Try and wait until I finish before you
4    start talking, and I will do the same for you.  That
5    way the court reporter doesn't have to try to take
6    down two people at once, which is hard to do.
7         If you don't understand a question, please,
8    let me know, and I'll do my best to rephrase it so you
9    do understand.  But if you answer the question, I will
10   assume you understood it.  Okay?
11   A.   Okay.
12   Q.   Also, if you need to take a break for any
13   reason, just let me know, and I will do my best to
14   accommodate you.
15   A.   Okay.
16   Q.   What is your current residential address?
17   A.   688 N.E. 71st Street, Miami, 33138.
18   Q.   How long have you resided at that address?
19   A.   I've resided at that address for about six
20   years.
21   Q.   Do you rent or own?
22   A.   I own.
23   Q.   Does anyone else live there with you?
24   A.   Yes.
25   Q.   Who?

Page 6

1    A.   My wife and my kids.
2    Q.   Okay.  How many children do you have?
3    A.   I have three from my first marriage, and I
4    have three stepchildren.
5    Q.   Okay.  How many reside with you at that
6    address?
7    A.   Four.
8    Q.   And of the three biological and -- what is
9    the breakdown of the three that reside with you [sic]?
10   A.   One is biological and three stepchildren.
11   Q.   Can you just take me through your
12   educational background?
13   A.   I have a high school diploma, and I have
14   some college.
15   Q.   Where did you get your high school diploma
16   from?
17   A.   Lindsey Hopkins.
18   Q.   Where is that?
19   A.   Here in Miami.
20   Q.   What year did you graduate from high school?
21   A.   '89.
22   Q.   How old are you today?
23   A.   42.
24   Q.   And how much college credit do you have?
25   A.   I really don't know how many credits.  I did

Page 7

1    attend about a year.  It was a private college.
2    Q.   Was that before you became a police officer?
3    A.   Yes.
4    Q.   And did you obtain any type of degree or
5    certification from that college experience?
6    A.   No.
7    Q.   At some point you attended a police officer
8    school?
9    A.   Yes.
10   Q.   When was that?
11   A.   That was in 2003, September of 2003.
12   Q.   What police academy did you attend?
13   A.   Florida Highway Patrol Academy.
14   Q.   And how long was that course?
15   A.   It's six months.
16   Q.   Now, I know that you worked for the Florida
17   Highway Patrol at some point, correct?
18   A.   Yes.
19   Q.   Were you already hired by them when you went
20   into the Florida Highway Patrol?
21   A.   Yes.
22   Q.   Other than high school, some college, and
23   the Florida Highway Patrol Academy, did you attend any
24   other educational institutions?
25   A.   No.

Page 8

1    Q.   Can you briefly take me through your
2    employment history, I guess, leading up to working for
3    the Florida Highway Patrol?
4    A.   Before I became a state trooper, I was a
5    dispatcher with the Florida Highway Patrol.  Before
6    then I was a victim witness counselor at the state
7    attorney's office -- Miami-Dade State Attorney's
8    Office.
9    Q.   When were you a witness counselor?
10   A.   90 -- I want to say '99 through 2001,
11   approximately.  I'm not sure on the dates.
12   Q.   What did you do before that?
13   A.   I worked for Pep Boys.
14   Q.   And for how long did you work for Pep Boys?
15   A.   Pep Boys I worked about four or five years
16   approximately.
17   Q.   And what were your titles or position at
18   Pep Boys?
19   A.   I was the -- I started off in the parts
20   department, and then I was a service advisor.
21   Q.   When did you become a dispatcher for the
22   Florida Highway Patrol?
23   A.   Right after the state attorney's office, in
24   2001.
25   Q.   How long did you remain a dispatcher?



Page 9

1     A.   Close to three years.
2     Q.   So approximately when did you end being a
3  dispatcher?
4     A.   When I started the police academy.
5     Q.   And then am I correct that when you finished
6  at the police academy, you became a trooper with the
7  Florida Highway Patrol?
8     A.   Yes.
9     Q.   How long were you a trooper?
10     A.   Approximately nine months.
11     Q.   Why did you move on from being a trooper
12  with the Florida Highway Patrol?
13     A.   I was stationed in Monroe County, and they
14  did not allow us to take the patrol vehicles home.  So
15  that was an inconvenience because I lived in Miami and
16  had to take my personal vehicle back and forth.  That
17  was a big inconvenience, so that was the reason.
18     Q.   Is that common practice in the Florida
19  Highway Patrol, that you can't have a take-home
20  vehicle?
21     A.   No.  The thing is that you have to live
22  within a certain area -- within a certain radius, and
23  unfortunately I was outside of that radius.
24     Q.   You didn't want to move to the Keys?
25     A.   No.  Actually I did.  I rented a little

Page 10

1  place over there so I could park my police car, but I
2  had my family in Miami.
3     Q.   Now, when you left the Florida Highway
4  Patrol, did you go directly to Bal Harbour?
5     A.   Yes.
6        MR. GILL:  We're going to mark this as
7  Exhibit 1.
8           (Fernandez Deposition Exhibit No. 1
9        marked as requested.)
10  BY MR. GILL:
11     Q.   Take a moment to review that.  Have you had
12  a moment to review the documents?
13     A.   Yes.
14     Q.   Are you familiar with what those documents
15  are?
16     A.   Yes.
17     Q.   And what are those documents?
18     A.   It appears to be my employment application
19  for Bal Harbour.
20     Q.   Did you prepare this yourself?
21     A.   That looks like my handwriting.
22     Q.   Do you remember preparing this?
23     A.   Yes.
24     Q.   And is all the information contained in the
25  application true, to the best of your knowledge?

Page 11

1     A.   It appears to be correct.
2     Q.   Well, when you filled it out, you intended
3  to provide all accurate information, correct?
4     A.   Yes.
5     Q.   And the application date is
6  October 5th, 2004, correct?
7     A.   Yes.
8     Q.   Do you remember when you were hired as a
9  police officer with Bal Harbour?
10     A.   My start date was December 17, 2004.
11     Q.   Take me through briefly, I guess, what the
12  process was to work for Bal Harbour Village, once you
13  submitted the application?
14     A.   There was a background check.  I had to do a
15  polygraph, drug test, I believe.  I don't remember
16  exactly.  You know, it was almost ten years ago.
17     Q.   Did you interview with someone from Bal
18  Harbour Village?
19     A.   You know, I don't remember.
20     Q.   Do you remember meeting with anyone
21  specifically at Bal Harbour Village before being
22  hired?
23     A.   I don't remember.
24     Q.   What was your position upon being hired by
25  Bal Harbour Village in December of 2004?

Page 12

1     A.   Police officer.
2     Q.   What was your first assignment?
3     A.   Patrol.
4     Q.   Does Bal Harbour Village have different
5  assignments for officers, for example, road patrol,
6  marine, things of that nature?
7     A.   Yes.
8     Q.   Have you ever been on any other assignments
9  other than patrol?
10     A.   No.
11     Q.   And just explain to me generally what a
12  police officer at Bal Harbour Village assigned to
13  patrol does.
14     A.   Well, obviously we're on the road monitoring
15  traffic, deterring crime, and doing different security
16  checks and so forth.  We're given different
17  assignments on patrol depending on what the time of
18  year is.
19     Q.   Describe to me the best you can Bal Harbour
20  Village, I guess, geographically.
21     A.   I don't understand the question.
22     Q.   Okay.  I mean, you know, do you know how
23  many -- how big it is, how many square miles, or how
24  long the main roads are?
25     A.   I haven't measured it myself, but I heard



Page 13
1  that the length of the village is nine tenths of a
2  mile. And I've also heard it's one square mile in
3  width and length, but I haven't measured it myself.
4      Q.   You would agree with me that it's not a very
5  large municipality in terms of geographic space?
6      A.   Yes.
7      Q.   And what are the main roads, I guess, as a
8  patrol officer that you're on?
9      A.   It would be State Road A1A, which is Collins
10 Avenue, and 96th Street, which is State Road 922, if
11 I'm correct.
12     Q.   East/west?
13     A.   That's east/west, and Collins Road is north
14 and south.
15     Q.   Bal Harbour is entirely on the barrier
16 island, correct?
17     A.   Yes.
18     Q.   So I'm guessing you've driven up and down
19 Collins Avenue quite a few times?
20     A.   Yes.
21     Q.   When you were first made a police officer
22 with the village, who was your supervisor?
23     A.   Robert Bliem.
24     Q.   Can you spell his last name?
25     A.   B-l-i-e-m.

Page 14
1      Q.   And what rank did he have?
2      A.   He was an officer, but he was an acting
3  supervisor for the squad on nights. Actually --
4  actually when I first started, I was on their FTO
5  program, and I worked also days, so I had a different
6  supervisor. I don't remember who it was on days
7  because it was a brief period. But my assigned
8  supervisor for my shift at night was Robert Bliem.
9      Q.   And you said FTO. You mean field training
10 officer?
11     A.   Yes.
12     Q.   And you were assigned to the night shift?
13     A.   Yes.
14     Q.   And how does Bal Harbour -- I guess,
15 describe their shifts. Is it an A, B, and C shift?
16     A.   We have them labeled A Shift, B Shift, C
17 Shift, and D Shift.
18     Q.   Has that been the same throughout your
19 employment with the village?
20     A.   As far as I can remember, yes.
21     Q.   And what is A Shift in terms of time?
22     A.   A Shift would be the day shift, which is
23 7:00 a.m. to 7:00 p.m.
24     Q.   And then what is B Shift?
25     A.   B would be the same as A.

Page 15
1      Q.   What is C Shift?
2      A.   C Shift is 7:00 p.m. to 7:00 a.m.
3      Q.   And what is D Shift?
4      A.   The same as C.
5      Q.   Why are there, if you know, two different
6  shifts for the same time period, A and B?
7      A.   Because when one squad is off, the other one
8  is working, so they cover the days off that, you know,
9  the other squad is not working.
10     Q.   So with A Shift -- if you're on A Shift, you
11 will be with the same guys every night of the week,
12 correct?
13     A.   Every day.
14     Q.   I'm sorry. Every day.
15     A.   Yes.
16     Q.   And when A Shift, if you're assigned to
17 that, is off, all of A Shift is off?
18     A.   Yes.
19     Q.   And what were you initially assigned to?
20     A.   You know, I don't remember the squad.
21     Q.   You were assigned to --
22     A.   One of the night squads, but I don't
23 remember if it was C or D.
24     Q.   Approximately how long did you remain on the
25 night shift?

Page 16
1      A.   I don't remember exactly. I want to say
2  about two years.
3      Q.   And was Officer Bliem your supervisor for
4  that whole two-year period?
5      A.   Yes.
6      Q.   And then who did he report to at that time?
7      A.   He reported to Lieutenant Andretti
8  (phonetic).
9      Q.   Were there sergeants at this time?
10     A.   Yes.
11     Q.   Was Bliem like an acting sergeant?
12     A.   He was an acting sergeant.
13     Q.   And who did Lieutenant Andretti report to?
14     A.   Captain Klingman.
15     Q.   So did that remain consistent for that first
16 two-year period?
17     A.   Yes.
18     Q.   So that's recently -- all of 2005 and most
19 of 2006 -- almost all of 2006, right?
20     A.   Yes.
21     Q.   The hierarchy at that time, at least for
22 you, was you had an acting sergeant who was Officer
23 Bliem and you had Lieutenant Andretti and then a
24 Captain Klingman?
25     A.   Yes.



Page 17

1    Q.   And who did the captain report to?
2    A.   To the chief.
3    Q.   Did each shift have a similar arrangement in
4 terms of hierarchy?
5    A.   Yes.
6    Q.   Would the lieutenant oversee more than one,
7 I guess, squad?
8    A.   It's my understanding that lieutenant was
9 over all of the squads.
10    Q.   Would a sergeant oversee more than one
11 squad?
12    A.   No.
13    Q.   So there were either -- when there are four
14 squads, there are at least four sergeants or acting
15 sergeants?
16    A.   Yes.
17    Q.   After your two years -- let me ask you this:
18 Do you know a Sergeant Deitado?
19    A.   Yes.
20    Q.   When did you first meet Sergeant Deitado?
21    A.   I don't know exactly when I first met him.
22 But when I started working as a Bal Harbour police
23 officer, I met him at some point.
24    Q.   He was already working for Bal Harbour?
25    A.   Yes.

Page 18

1    Q.   Do you recall what his assignment was when
2 you first started?
3    A.   He was a detective.
4    Q.   And do you know what his assignment was at
5 that time?
6    A.   No.
7        MR. GILL:  Let me mark this as the next
8 exhibit.
9        (Fernandez Deposition Exhibit No. 2
10        marked as requested.)
11 BY MR. GILL:
12    Q.   Take a moment to review that.
13    A.   Okay.
14    Q.   Have you seen this before?
15    A.   Yes.
16    Q.   What is this document?
17    A.   This is the Bal Harbour Police Department
18 Organizational Chart.
19    Q.   When you started as a police officer, who
20 was the chief of police?
21    A.   Tom Hunker.
22    Q.   Now, this chart says December of 2011; is
23 that correct?
24    A.   Yes.
25    Q.   Now, is the layout, I guess, of the

Page 19

1 department, was that the same about when you started,
2 meaning there were squads with sergeants over them and
3 then a captain; or was this different in 2006, as we
4 were just discussing?
5    A.   Obviously the personnel was different
6 because there are some employees here that were not
7 employed back then.  But the general layout seems to
8 be about the same.
9    Q.   And I'm just noticing on this at least --
10 and I wasn't trying to trick you.  It doesn't seem
11 like there is a lieutenant in between the sergeant and
12 the captain?
13    A.   Yes, there is.  Well, there is a lieutenant
14 here, Lieutenant Merrill, but I guess his designation
15 goes in a different direction.
16    Q.   But your understanding at least in 2004, and
17 2006, was you reported to a sergeant, who then
18 reported to a lieutenant, who then reported to a
19 captain?
20    A.   Yes.
21    Q.   Did you understand that that changed at any
22 point during your employment, I guess, leading up to
23 2011?
24    A.   I really didn't realize that.
25    Q.   Okay.  We'll talk more about this later on.

Page 20

1 How many, if you know, detectives were there in the
2 2004 to 2006 period?
3    A.   I remember there was Detective Deitado and
4 Detective Quinn.
5    Q.   And do you know what their role was in the
6 department at the time?
7    A.   They were detectives.  I mean, I guess they
8 filled that capacity.  I don't know what their
9 assignments were.
10    Q.   Explain for me and other laypersons what the
11 function of the detective is in the Bal Harbour Police
12 Department, from the 2004 to 2006 time?
13    A.   They would investigate crimes.  We as the
14 patrol officers would take the initial reports of
15 these crimes.  And any follow-up investigation that
16 needed to be conducted, the detectives would take
17 over.
18    Q.   As I understand it, at some point some of
19 the detectives were on assignments with task forces
20 that made up of multiple jurisdictions; is that
21 accurate?
22    A.   Yes.
23    Q.   Do you know if that was going on in '04,
24 '06?
25    A.   I believe that at some point these



Page 21

1 detectives were assigned to a DEA task force.
2    Q.  In general, when that happened, would they
3 continue to perform other functions at the village,
4 meaning they investigate the crimes that you guys take
5 reports on or --
6    A.  I'm sorry.  We need to add another name.
7 Detective Eppler.
8    Q.  Okay.
9    A.  I forgot about him.
10    Q.  Not a problem.  Going back to my question.
11 In general, when a detective was on an assignment with
12 the task force, would they still perform functions
13 back at the village, meaning investigating crimes
14 started by patrol officers or reports generated by
15 patrol officers?
16    A.  I believe so.
17    Q.  You said you believe so.  Are you sure, or
18 you're not sure?
19    A.  I'm not sure because I really don't know
20 what their actual assignments were.
21    Q.  You have -- during your employment, which is
22 almost ten years now with the village, you've only
23 held rank of patrol officer, correct?
24    A.  Yes.
25    Q.  And you have always been on assignment of

Page 22

1 road patrol?
2    A.  Yes.
3    Q.  After two years on the night shift, did your
4 shift change then?
5    A.  Yes.
6    Q.  What did it change to?
7    A.  It went to day shift.
8    Q.  So this is approximately the end of 2006,
9 beginning 2007?
10    A.  I'm not really certain on the times.  But if
11 I would have to say, approximately that would have
12 been the time.
13    Q.  When you went to the day shift, who was your
14 supervisor then?
15    A.  Sergeant Merrill.
16    Q.  And do you know who Sergeant Merrill
17 reported to at the time?
18    A.  Lieutenant Andretti.
19    Q.  And then do you recall who the captain that
20 Lieutenant Andretti reported to at the time was?
21    A.  Yes.  Detective Klingman.
22    Q.  Why did you switch from night shift to day
23 shift?
24    A.  I was changed.
25    Q.  Did they -- you just came into work one day,

Page 23

1 and they said, you're now on day shift?
2    A.  Yes.
3    Q.  I mean, is that a better change, worse
4 change, about the same?
5    A.  Well, it's daytime work rather than
6 nighttime work.
7    Q.  At the Bal Harbour Police Department, how
8 are promotions to sergeant handled?
9    A.  Through a sergeant's exam.
10    Q.  And is that covered by the collective
11 bargaining agreement between the police officers'
12 union and the village?
13    A.  Yes.
14    Q.  Going back a little bit with respect to the
15 detectives, where do they fit in on the hierarchy of
16 officers?  What you described to me before, being
17 sergeant, lieutenant, captain, chief, they don't seem
18 to fit in that; is that correct?
19    A.  Well, detective -- the detective position by
20 our policy manual is not a promotion.  It's a lateral
21 change of position.  But they were always -- as far as
22 I can remember, they were always under the
23 investigations captain, which since I started working
24 at Bal Harbour, it has always been Craig Roye.
25        And they did not have to report to

Page 24

1 Lieutenant Andretti.  Lieutenant Andretti was the
2 patrol lieutenant.  So at that particular time, and I
3 believe throughout now, detectives report to the
4 detective sergeant, the detective sergeant reports to
5 the captain of investigations, and the captain of
6 investigations to the chief of police.
7    Q.  Looking at Exhibit 2, which is the
8 hierarchy, that is essentially what's on this
9 hierarchy, if you look to the left, correct?
10    A.  Yes.
11    Q.  Is there always, as far as you know, a
12 sergeant who is also a detective?
13    A.  There wasn't one when I started.  There
14 wasn't one when I started.  Because Sergeant Deitado
15 was a detective at the time.  Former Captain Quinn was
16 a detective at the time.  I don't remember a sergeant
17 there.  It was just detectives and then the captain.
18    Q.  And maybe you don't know the answer to this,
19 but I'm trying to understand how it worked.
20        Could a sergeant -- a person who is already
21 a sergeant become then a detective, also, I guess?
22    A.  I guess.  Because -- well, the officer that
23 was a detective was made a detective sergeant.
24    Q.  But they would still be a sergeant and also
25 could be a detective?  I mean, you can have both those



Page 25

1  titles, be a sergeant and a detective?
2      A.  It's a detective sergeant.
3      Q.  That's how you term it?
4      A.  Well, that's what it is called in the
5  department.
6      Q.  Okay.  Now, you describe that per the policy
7  at the village, a detective isn't considered a
8  promotion?
9      A.  Correct.
10     Q.  And there is no requirement at least per the
11  PBA contract with how the detective exam has to be
12  conducted, is there?
13     A.  Well, as per the PBA policy, I don't
14  remember anything in there that dictates that.  But as
15  per our policy, the chief is the one that makes that
16  decision.
17     Q.  In the PBA contract -- we can pull it out if
18  you want -- there is a section regarding the sergeant
19  exam; is there not?
20     A.  For the sergeant's exam?
21     Q.  Yes.  Sergeant's exam, yes.
22     A.  Right.
23     Q.  There are -- per the contract, it has got to
24  be done a certain way, correct?
25     A.  Yes.

Page 26

1      Q.  Detective is not like that, correct?
2      A.  Not to my knowledge.
3      Q.  The chief ultimately makes that
4  determination, who becomes detective?
5      A.  Yes.
6      Q.  Am I correct in saying that the chief of
7  police, whoever it is, could just decide one day he
8  will make someone detective; can he not?
9      A.  Yes.
10     Q.  Or he could say, I'm going to have an exam,
11  and we're going to go through that process, correct?
12     A.  I would believe so, yes.
13     Q.  How often are these sergeant exams held?
14     A.  Whenever there is a vacancy.
15     Q.  So it's not like an annual thing where they
16  do the test to create a list.  They only do it when
17  there is an opening?
18     A.  Yes.
19     Q.  How many sergeant exams have you sat for?
20     A.  One.
21     Q.  If you recall, how many sergeant exams have
22  there been since you have been working?
23     A.  I want to say three.
24     Q.  Do you recall the date of the one you sat
25  for?

Page 27

1      A.  You know, I don't remember.
2      Q.  Okay.  We'll get to the documents.  I
3  believe in your complaint, it says, October of 2008;
4  does that seem right to you?
5      A.  That sounds about right.
6      Q.  Now, you believe there were at least two
7  other sergeant exams during your time at the village?
8      A.  Yes.
9      Q.  Were those before or after the
10  October of 2008, exam you sat for?
11     A.  You know, I don't remember.  I know there
12  was an exam in 2011.  There was an exam.  And you
13  mentioned the one in 2008.  There was another one.  I
14  don't know when the other one was.
15     Q.  The 2011 one is the one that led to the
16  investigation, correct?
17     A.  It's the one that is mentioned in my
18  complaint, yes.
19     Q.  Then you think there may have been another
20  one, but you're not sure what it was?
21     A.  I'm not sure.  I'm not sure.
22         MR. GILL:  We'll mark this next one as
23  Exhibit 3.
24         (Fernandez Deposition Exhibit No. 3
25             marked as requested.)

Page 28

1
2  BY MR. GILL:
3      Q.  Take a moment to look at that.
4      A.  Yes.
5      Q.  Have you seen that before?
6      A.  No.  I don't remember seeing this document
7  before.
8      Q.  Well, do you recall how you did on the
9  October of 2008 sergeant's exam?
10     A.  Yes.
11     Q.  How did you do?
12     A.  I did the same score that's on this piece of
13  paper.
14     Q.  So this paper, which you don't recall
15  seeing, but for the record it purports to be
16  correspondence addressed to you from Miami-Dade
17  College, and it's got the scores of the sergeant's
18  exam given in 2008; is that correct?
19     A.  Yes, October 10, 2008.
20     Q.  And you did not pass per this, at least the
21  written part of the test; is that correct?
22     A.  Yes.
23     Q.  And describe for me what a sergeant's exam
24  process is in terms of it being -- I think there's a
25  written and an oral part; is that correct?



Page 29

1    A.  Yes.
2    Q.  Can you describe for me how that process
3 works?
4    A.  I can only describe to you the written
5 portion.
6    Q.  Fair enough.
7    A.  There is an announcement.  We advise our
8 interest in taking the exam.  And then we are
9 scheduled for the exam.  There are some test materials
10 that are issued to the officers by the administrator
11 in charge that we look at up until the date of the
12 test.
13    Q.  When you say the administrator in charge,
14 who is that person usually?
15    A.  If I remember correctly, during this test,
16 it was Captain Daddario, if I remember correctly.
17    Q.  Is an outside entity used to conduct the
18 tests in some way?
19    A.  Well, in this case, Miami-Dade College was
20 involved in the test preparation.
21    Q.  You have never been involved, I guess, in
22 the creation of the exams or the administration?
23    A.  No.
24    Q.  And when you say you were provided
25 materials, can you describe for me generally what

Page 30

1 these materials are?
2    A.  It's a textbook.  I forgot the name of the
3 textbook.  It's a textbook.  Preparation to the
4 sergeant's exam.  It's something of that nature.  And
5 we're encouraged to review our policy manual and also
6 the PBA contract because the test is to consist of our
7 policy manual, our contract, and this textbook.
8    Q.  I mean, approximately how many pages is the
9 textbook?
10    A.  I don't know.  I don't remember.
11    Q.  The test covers a lot of material; does it
12 not?
13    A.  It's 100 questions.
14    Q.  You need to -- there is a lot of preparation
15 that goes into it; is there not?
16    A.  I would say so.  You need to study in order
17 to do well.
18    Q.  And then with respect to the written exam,
19 if you receive a passing score of that, then you go
20 onto an oral examination?
21    A.  Yes.
22    Q.  And then those two scores are taken together
23 to determine who gets the promotion?
24    A.  I don't know how they work that formula.  I
25 didn't get that far.  So I really can't answer that

Page 31

1 because I don't know.
2    Q.  You also sat for at least one detective
3 examination; did you not?
4    A.  I sat for two.
5    Q.  Okay.  Do you recall when those were?
6    A.  The first one was in 2006, and the second
7 one was the one held in 2011, I believe.
8    Q.  Was Chief Hunker the chief during both of
9 those examinations?
10    A.  Yes.
11    Q.  With respect to the October of 2006
12 detective's examination, describe for me, I guess, the
13 process leading up to that?  How were you advised?
14 How long in advance?  What were you told?
15    A.  I don't remember.  That was a while back.  I
16 believe there was an announcement.  And whoever was
17 interested in the position would advise of their
18 interest.  And there was a date set for the panel
19 interview, and you would go through the panel
20 interview.
21    Q.  Was there only a panel interview and no
22 written portion?
23    A.  I don't remember a written portion.
24    Q.  Were you advised in advance of what types of
25 things would be discussed in the interview?

Page 32

1    A.  No.
2    Q.  Are you aware of today what the criteria was
3 for promotion to detective in 2006?
4    A.  No.
5    Q.  Do you know if in October of 2006, the
6 detective position, there was a specific assignment
7 for it at the time?
8    A.  I don't remember.
9    Q.  Do you know if at that time the detectives
10 were working on task forces?
11    A.  I believe -- I believe there was a DEA task
12 force assignment for which the detectives that were
13 there at that time, I believe they participated in
14 that.
15    Q.  Did there come a time when the detectives
16 were working on a money laundering task force?
17    A.  Yes.
18    Q.  Do you know when that began?
19    A.  No.
20    Q.  Do you know if it was October of 2006?
21    A.  I don't know.
22    Q.  Who was on the panel when you went for the
23 interview in 2006?
24    A.  I remember Paul Deitado, Jay Smith, and
25 Chuck Merrill -- or Charles Merrill.



Page 33

1    Q.   Jay Smith is now the village manager?
2    A.   No.  I believe he holds a position somewhere
3    in the human resources section.
4    Q.   Okay.  He is still employed by the village
5    but in a non-law enforcement capacity?
6    A.   Yes.
7    Q.   Describe to me, best you can, what occurred
8    during the panel interview of October of 2006?
9    A.   I don't remember.  I don't remember.
10   Q.   Fair enough.  Were there questions
11   regarding, you know, operating procedures and things
12   of that nature or...
13   A.   I remember there were questions.  I don't
14   remember what was asked.  That was a while back.
15   Q.   Officer Fernandez, have you ever declared
16   bankruptcy?
17   A.   Yes.
18   Q.   How many times?
19   A.   Twice.
20   Q.   When was that?
21   A.   You know, I don't remember the exact dates.
22   The first one was back when I was young.  I was very
23   young.  I don't remember.  It was in my early 20s.  I
24   don't remember exactly the year.
25   Q.   So well before you were a law enforcement

Page 34

1    officer?
2    A.   Yes.
3    Q.   And then when was the second one?
4    A.   You know, I don't remember the year.  I know
5    there were two.  I don't remember the year.
6    Q.   Was the second one before or after you
7    became a law enforcement officer?
8    A.   You know, I don't remember.
9    Q.   As best you can recall, what were the
10   results of those bankruptcies?  I mean, did they
11   conclude that some of your debts were excused or --
12   A.   They were discharged.  The debt was
13   discharged.
14   Q.   Did you hire an attorney for both of those?
15   A.   I think the second one I did.  I don't
16   remember the first one.
17   Q.   Have you ever been the subject of
18   foreclosure actions?
19   A.   Yes.
20   Q.   When was that?
21   A.   That was back in 2011, maybe 2012.
22   Q.   Is that still ongoing?
23   A.   No.
24   Q.   Was that over the house you reside in today?
25   A.   Yes.

Page 35

1    Q.   Explain to me briefly what happened with
2    that foreclosure action.  There was actually a filing
3    commenced against you, I believe?
4    A.   I believe so.  I was in the process of a
5    loan modification, and unfortunately it took longer
6    than expected, but we were able to resolve it.
7    Q.   Did you declare bankruptcy during that
8    process, if you're aware?
9    A.   I don't think so.  I don't think so.  I
10   think it was before.
11   Q.   Did you hire an attorney for that?
12   A.   For the?
13   Q.   For the foreclosure action, loan
14   modification in 2011.
15   A.   Initially I did, but then I went with a firm
16   -- well, I guess that would be an attorney.  A firm,
17   one of those services that assist you with getting the
18   paperwork, you know, together to submit for the loan
19   modification.
20   Q.   Do you recall the name of that firm?
21   A.   The Remedy Group, I believe.  Remedy Center.
22   Remedy Group.
23   Q.   And this 2011 foreclosure action, as far as
24   you know, it's resolved?
25   A.   Yes.

Page 36

1    Q.   There is nothing ongoing?
2    A.   No.
3    Q.   You said you didn't think you declared
4    bankruptcy.  Are you sure?
5    A.   Can you repeat the question?
6    Q.   You said you didn't think you declared
7    bankruptcy during the 2011 foreclosure action.  I have
8    seen some documents that may indicate that.
9    Are you certain that you didn't, or you
10   don't know?
11   A.   I don't remember.  I don't remember the
12   date, when it happened.
13   Q.   Okay.  The house you're in today, you
14   purchased it approximately in 2008?
15   A.   Yes.
16   Q.   And that was the time when the market was
17   sort of collapsing and everything was going with the
18   housing market?
19   A.   I guess.
20   Q.   Did Chief Hunker ever offer you an
21   assignment to any of the task forces as an officer not
22   as a detective?
23   A.   Can you repeat that again?
24   Q.   Yes.  Do you recall if Chief Hunker ever
25   offered to assign you to assist with one of the task



Page 37

1  forces that were doing work with the village?
2      A.  I don't remember that.
3      Q.  Was that something you ever pursued?
4      A.  No.
5      Q.  I guess, at the time of the October of 2006
6  detective examination, had you had any problems with,
7  I guess, then Detective Deitado?
8      A.  Not that I can remember.
9      Q.  So at least at that time, as far as you
10  believed, you know, you had no a problem with Deitado
11  being on the panel for the detective interview?
12      A.  No.
13      Q.  So going back, you know, October of 2006,
14  you're on the day shift, you're reporting to Sergeant
15  Merrill; is that correct?
16      A.  I may have, but I -- I'm not sure.  I think
17  at that detective's panel interview, I believe, that I
18  was still on nights.  I believe that I was still on
19  nights.
20      Q.  So you had not made the switch to days yet?
21      A.  I don't think so.  I'm not sure about the
22  dates because, you know, it was a while back.
23      Q.  At some point, though, around that time, you
24  do switch to day shift and you begin reporting to
25  Sergeant Merrill?

Page 38

1      A.  Yes.
2      Q.  How long did you remain on day shift
3  reporting to Sergeant Merrill?
4      A.  I want to say approximately two years, give
5  or take.
6      Q.  And then after those two years, what was
7  your next assignment or change?
8      A.  I was back on midnights.
9      Q.  And who did you report to when you went back
10  on midnights?
11      A.  I remember Sergeant Quinn.  I believe that
12  he was my sergeant throughout its entirety.  We did
13  have some changes.  But I don't remember if someone
14  was there before Quinn.  But I remember Quinn there
15  most of the time.
16      Q.  And then at some point Quinn becomes a
17  captain?
18      A.  Yes.
19      Q.  And then when he becomes a captain, who
20  became your sergeant?
21      A.  I think I went back to days before he became
22  a captain.
23      Q.  Who was your sergeant when you were on days?
24      A.  Sergeant Martinez.
25      Q.  Was Sergeant Martinez your sergeant for a

Page 39

1  good period of time?
2      A.  Yes, I think so.
3      Q.  And that was the case when you were on days?
4      A.  Yes.
5      Q.  When you sat for the October of 2006
6  detective's exam, did you have any belief it wasn't
7  going to be a fair process at the time?
8      A.  No.
9      Q.  And you don't have any knowledge of what the
10  criteria was used at the time to determine who was
11  going to get the promotion or move to detective?
12      A.  No.
13      Q.  With respect to the October of 2008 sergeant
14  exam that you took, do you know how many people took
15  that exam?
16      A.  You know, I don't remember.  I don't
17  remember the exact amount of people that took it.
18      Q.  Do you remember if there was anyone else
19  that didn't make it past the written part, to the
20  panel interview?
21      A.  You know, I don't remember.
22      Q.  Do you remember who was promoted as a result
23  of that sergeant's exam?
24      A.  You know, I don't remember.  I don't
25  remember.  I know -- well, obviously Jack Young became

Page 40

1  a sergeant after that.  And I do remember him taking
2  the test.  But you know what?  I really don't know.
3      Q.  For that 2008 sergeant's exam, did everyone
4  sit in a big room and get the test booklets, or how
5  does that process work?
6      A.  We went to the Miami-Dade Community College.
7  Are you talking about when we took the actual written
8  test?  Is that what you're talking about?
9      Q.  Yes.
10      A.  We were at the Miami-Dade Community College,
11  and we sat in a room where we were given the test
12  materials.
13      Q.  Who was present, if you recall, not taking
14  the test but sort of administering it?
15      A.  I don't remember.
16      Q.  Were there non-law enforcement persons
17  there?
18      A.  Yes.  The people that give out the test
19  materials.
20      Q.  And did you understand them to be from
21  Miami-Dade College?
22      A.  Yes.
23      Q.  And then when the exam finished, you
24  provided your answers back to them?
25      A.  Yes.

Page 41

1    Q.   Is it like a sheet you fill out and bubble
2  in selections?  How does it -- what does the test
3  look like?
4    A.   I don't remember.  I don't remember.
5    Q.   In the complaint, there is an allegation
6  regarding an August of 2009 PBA meeting, where Deitado
7  and you had some sort of interaction over a poll or a
8  petition going around.  Does that sound familiar to
9  you?
10    A.   Yes.
11    Q.   What was the PBA meeting in August of 2009
12  about?
13    A.   I think it was a regular PBA meeting that we
14  have every so often.
15    Q.   And what is generally done at regular PBA
16  meetings?
17    A.   They discuss contractual issues between the
18  PBA and the village for the officers.
19    Q.   Is there an officer, a member of the
20  bargaining unit that is a representative or has a
21  higher position with respect to the union?
22    A.   From our department?
23    Q.   Yes.
24    A.   We have a PBA representative, which is
25  detective Eppler.

Page 42

1    Q.   Was it Detective Eppler in August of 2009?
2    A.   Yes.
3    Q.   Are there any other members of the
4  department that have any other sort of position with
5  respect to the PBA except Detective Eppler?
6    A.   Detective Eppler has been the PBA rep ever
7  since I started with the department.  Somewhere along
8  the line, Hector Gonzalez, one of our officers, became
9  the alternate.
10    Q.   And what does a PBA rep do as far as you
11  understand?
12    A.   I believe he's the voice of the officers,
13  and he's the one that conveys what the officers want
14  or don't want when it comes to negotiations.
15    Q.   What happened at the meeting with respect to
16  you and Deitado?
17    A.   At that particular time, there were
18  discussions about extending the five-year DROP to
19  eight years.  And Deitado was very adamant about
20  getting that eight-year DROP because that meant for
21  him additional compensation.
22        It was a concern to me and other officers
23  because an additional three years to the already five
24  years would have meant less contribution into our
25  pension because the mem bers that are in the DROP

Page 43

1  program don't contribute.  It would have stifled
2  promotions.  And we had some concerns with those
3  issues.
4    Q.   Just to step back because if we have to use
5  this later -- you and I know what that DROP is, but
6  let's go over it.  The DROP is a deferred retirement
7  option plan?
8    A.   Yes.
9    Q.   How many years at the village does it take
10  before you vest in your rights under the pension?
11    A.   Ten years.
12    Q.   So you vest after ten years?
13    A.   Yes.
14    Q.   And if you were to, I guess, retire after
15  ten years, what would you then get as your pension; do
16  you understand?
17    A.   The formula is a three-and-a-half-percent
18  multiplier.  Ideally at 20 years, if you multiply that
19  times three and half percent, 70 percent of your
20  highest three years.
21    Q.   Okay.  So you vested ten years, and then
22  when do you have to enter the DROP?
23    A.   You have to enter the DROP after 20 years of
24  service or I believe when you reach a certain age for
25  retirement.

Page 44

1    Q.   But with respect to you and Deitado, it was
2  about 20 years, not about reaching retirement age?
3    A.   Yes.  We are about the same age.
4    Q.   And then at the end of that 20 years, you
5  can enter what's called the DROP; is that correct?
6    A.   Yes.
7    Q.   And correct me if I'm wrong, but the DROP
8  allows you then to start taking your pension payments
9  but contribute it to a DROP account that then gets
10  interest?
11    A.   Your retirement payment gets deposited in an
12  account where it accrues interest.
13    Q.   Do you know what interest it gets?
14    A.   No.
15    Q.   Is that guaranteed to a certain amount going
16  forward, or is it just whatever the market gets?
17    A.   I have no idea.  I'm not there yet.
18    Q.   And there was discussion in August of 2009,
19  about extending the DROP period another eight years?
20    A.   No.  To eight years.  An additional three
21  years to make it eight.
22    Q.   So that way instead of only having five
23  years in the DROP, you could then put eight?
24    A.   Correct.
25    Q.   At the village, what happens when you -- if



Page 45

1  you reach the end of your five-year DROP period; do
2  you have to retire?
3     A.  Yes.
4     Q.  Can you come back on a contractual basis?
5     A.  I don't know.
6     Q.  Do you know of anyone who has that
7  arrangement?
8     A.  I don't know.
9     Q.  And your concern and some other officers
10  about extending it to eight years was that it would be
11  a drain on the resources of the pension because they
12  are not contributing --
13     A.  Yes.
14     Q.  -- the members in the DROP?  And there
15  wouldn't be any promotions because those guys can stay
16  on the force longer?
17     A.  Yes.
18     Q.  Was Deitado ahead of you in the years to
19  vesting?  Had he worked longer at the village?
20     A.  Yes.
21     Q.  So you've explained to me that there is this
22  discussion going on about the DROP and it possibly
23  changing.  What led to some interaction between you
24  and Deitado over it?
25     A.  Well, I had made a list of all of the

Page 46

1  officers' names in the department, which included
2  Deitado, and I wanted to get a poll of who was
3  interested in the eight-year DROP; so it's something
4  that I could take to the PBA rep, and we can discuss
5  it further.
6        Apparently Deitado was dissatisfied with
7  what I was doing.  And while we were at the meeting,
8  he acted as if he didn't know that I was the one that
9  was conducting the poll.  And I came -- I went -- I
10  went to the other room.  I remember I was getting
11  something to drink or something.  And I hear him
12  talking about somebody is going out there doing a
13  petition and, you know, against the eight-year DROP
14  and so forth.
15        So I step back in the room.  And I say, hey,
16  it's me, and I'm not doing a petition, I just want to
17  get a general consensus of what everybody wants.  And
18  he says, well, you have a list of only certain people
19  and so forth.
20        And there was another officer in the room,
21  Officer Hatcher, who saw the document and signed it.
22  He was one of the officers that signed it and was
23  against the eight-year DROP.  And he saw that there
24  were all of the officers' names.  It wasn't only some
25  officers.  It was all of the officers in the

Page 47

1  department.  So ultimately I was going to have to meet
2  with Deitado and get his input on that.
3        And he became very, very upset and said,
4  well, I went to the city attorney and started -- to
5  start an internal affairs investigation on you.  You
6  know, and that caught me off guard because I didn't
7  believe that that was warranted.  But it was the
8  manner in which he said it.  It was in a very
9  threatening manner as if he was in control and this
10  was actually happening.
11        So I said, okay, well, you do what you need
12  to do, but I can tell you right now that it's not a
13  petition, it's a poll, and everybody's name is on the
14  list.
15     Q.  I didn't want to cut you off.
16        What's the difference between a poll and a
17  petition with respect to the union?  I mean, is there
18  some significance of a petition as opposed to a poll?
19     A.  Well, a petition is when you want to take a
20  certain action.  Okay.  And I didn't want to take an
21  action.  I wanted to obtain a general consensus of
22  where the department was that.
23        Deitado has always had a reputation of
24  calling the shots in the department.  And it's not
25  what the department wants.  It's what Deitado wants.

Page 48

1        So I wanted to get a general consensus of
2  what everybody wanted.  And that's what I was
3  attempting to present.  After that he, you know,
4  started saying some other things.  And I remember that
5  the PBA Attorney Michael Braverman looked over at him
6  and, you know, opened his eyes and gave him the hand
7  signal, like, you know, cut it out.  And he
8  subsequently stopped.
9     Q.  Is there some -- like if I looked at the PBA
10  contract, is there something that talks about
11  petitions in there?
12     A.  No.
13     Q.  Is that something that is used from time to
14  time, though, with the PBA members to decide things,
15  petitions versus polls?
16     A.  I've never used a petition, and I'm not
17  aware of any petitions being used.  I was attempting
18  to get a general consensus, and to me it was a poll.
19  I wasn't attempting to take any action against a
20  certain thing.  I was just trying to get a general
21  consensus.
22     Q.  So you had a piece of paper with all the
23  officers' names on it?
24     A.  Yes.
25     Q.  What else did it say on it?



Page 49

1    A.  That's it.  Eight-year DROP, yes or no.
2  That was it.
3    Q.  So the officers would check yes or no and
4  sign their names?
5    A.  That's it.
6    Q.  And you hadn't met with Deitado yet?
7    A.  I think I only got the two officers.  And
8  you know, when he made those statements, you know, I
9  decided to step back.  You know, he had a lot more
10  power in the department than I did.  And I wasn't
11  about to get wrapped up in anything that he might be
12  doing.
13    Q.  He is a detective at this time?
14    A.  You know what?  I don't remember if he was
15  already a sergeant or not.  I don't remember.
16    Q.  If he or anyone else is just a detective, do
17  they have authority over patrol officers?
18    A.  No, they're not supposed to.
19    Q.  Right.  I guess, per the policy, they don't
20  -- they are not higher than you on the hierarchy?
21    A.  It's a lateral move.
22    Q.  Some of the cases I've dealt with, when
23  there is a crime scene on scene and a certain officer
24  has rank, are you familiar with that?
25    A.  No.  We don't have too many crimes scenes in

Page 50

1  Bal Harbour.
2    Q.  Okay.  Well, I guess, if there is some sort
3  of crime scene where you're taking a report and a
4  detective shows up at the investigation, are they in
5  control of the scene or are you in control of the
6  scene?
7    A.  Well, ordinarily when you're handling a
8  scene and the detective arrives and takes over, it's
9  his scene.  You can assist the detective, but at that
10  point he is the one that is over that investigation.
11    Q.  What if a sergeant is on the scene?
12    A.  I would say that the sergeant is over the
13  detective.  But the sergeant is not going to
14  investigate because the detective would investigate.
15    Q.  Right.  But I guess, if there is some sort
16  of emergency going on, the sergeant is going to be in
17  control; is that correct?
18    MR. BARRIOS-BALBIN:  Objection.  Form.  Go
19  ahead and answer.
20  BY MR. GILL:
21    Q.  Do you know?
22    A.  I don't know specifically.  I would believe
23  so.
24    MR. GILL:  We have been going for a little
25  more than an hour.  Why don't we take a short break.

Page 51

1    (A short break was had.)
2    MR. GILL:  Back on the record.
3  BY MR. GILL:
4    Q.  We were discussing the August of 2009 PBA
5  meeting.  Was an IA investigation, in fact, opened
6  against you?
7    A.  No.
8    Q.  Was this the first time that you had any
9  interaction with Deitado that you and he clashed?
10    A.  You know, I really don't know.  We've had
11  several interactions.  I don't know if that was the
12  first.
13    Q.  Okay.  What became of this discussion
14  regarding extending the DROP period?
15    A.  It never came to fruition.  It just never
16  occurred.
17    Q.  Did you and Deitado have any more
18  discussions about it?
19    A.  No.
20    Q.  Now -- strike that.
21    Do you know a person named Robert Tenzer?
22    A.  Yes.
23    Q.  Who is Robert Tenzer?
24    A.  Robert Tenzer made a complaint -- a false
25  complaint against me.

Page 52

1    Q.  Do you recall when he made that complaint?
2    A.  I know it was sometime in 2010.
3    Q.  Have you ever seen the IA memorandum
4  regarding that?
5    A.  I did have the opportunity to review it.
6    Q.  When did you have an opportunity to review
7  it?
8    A.  Right after the investigation was concluded.
9    Q.  Take me through generally what the IA
10  process is like at the village, how it works.
11    A.  I wouldn't be able to answer that.  I don't
12  know.
13    Q.  Okay.  Do you understand there to be formal
14  IA investigations and informal investigations?
15    A.  I have heard, of course, of formal internal
16  affairs investigations and what is called within our
17  department an inquiry.
18    Q.  But have you ever heard the word informal
19  investigation?
20    A.  I don't remember hearing that term.
21    Q.  What do you understand an inquiry to be?
22    A.  Probably an informal one, but I never heard
23  that term.
24    Q.  Now, I don't want to put the words in your
25  mouth.  How would you describe an inquiry as opposed



Page 53

1 to an IA investigation?
2    A.   Something that is looked into but it's not
3 formal, it's not assigned an internal affairs
4 investigation case number.
5        MR. GILL:  We'll mark this as Exhibit 4, I
6 believe.
7            (Fernandez Deposition Exhibit No. 4
8            marked as requested.)
9 BY MR. GILL:
10   Q.   Go ahead.  Take a moment to look at that.
11   A.   Okay.
12   Q.   Have you seen this before?
13   A.   Yes.
14   Q.   Is this the memorandum regarding the IA
15 investigation following Tenzer's complaint?
16   A.   Yes.
17   Q.   Take me through what happened, how you came
18 to know Mr. Tenzer to begin with.
19   A.   We received a call of a disturbance at
20 Neiman Marcus.  I responded along with Sergeant
21 Martinez, and that's where we came in contact with
22 Mr. Tenzer, and his mother was also present.
23   Q.   Was Sergeant Martinez your supervisor at
24 this time?
25   A.   Yes.

Page 54

1    Q.   So you were on A Shift reporting to
2 Sergeant Martinez then?
3    A.   Probably.  I don't remember, but probably.
4    Q.   Were you on duty at the time, or was this an
5 off-duty detail?
6    A.   I was on duty.
7    Q.   And then what happens when you respond to
8 the mall to see Mr. Tenzer?
9    A.   Mr. Tenzer was somewhat loud and being
10 disruptive on the main floor of the store.  So I asked
11 him to step to the back so we can talk about what had
12 happened, what was bothering him.
13       When we went to the back, the hallway where
14 the store security office is located, Mr. Tenzer was
15 upset.  He had a shirt similar to mine that which I'm
16 wearing now, a long sleeve shirt, and it was outside
17 of his slacks.  I didn't -- I never met Mr. Tenzer
18 before.  I didn't know him.
19       The possibility of Mr. Tenzer having a
20 weapon on him existed.  So I advised Mr. Tenzer I was
21 going to pat him down for his safety and mine, make
22 sure that he didn't have any weapons or anything.  And
23 he obliged.  I patted him down.
24       And then we spoke about what was the
25 problem.  Apparently there was some issue with his

Page 55

1 account and they couldn't find his account number.
2 And it was something very simple in nature, nothing
3 that became an issue.
4    Q.   How did the situation resolve itself that
5 day?
6    A.   I took down his information.  I completed a
7 report on what he had stated.  Also, the -- there was
8 somebody taking care of him who was the person that
9 called the police.  I want to say it was the security
10 supervisor.  And I just documented what had occurred
11 in the report.
12       And he said that he was going to follow up
13 with Neiman Marcus, their headquarters and so forth.
14 That was it.  I didn't think anything of it.
15   Q.   So you left him at Neiman Marcus and went on
16 your way?
17   A.   Yes.
18   Q.   And then did you come to learn that at some
19 point he had made a complaint against you?
20   A.   Yes.
21   Q.   How did you learn that?
22   A.   I believe a day or two later or a couple
23 days later I was advised by my supervisor that he had
24 come in and made a complaint.
25   Q.   And what was the result of that complaint?

Page 56

1    A.   Well, an internal affairs investigation was
2 begun.
3    Q.   Is that -- do you understand that to be the
4 policy of the village, when somebody makes a
5 complaint, there's some type of investigation?
6    A.   Yes.
7    Q.   Were you -- I guess, did you object to an
8 investigation being opened to which you believed to be
9 a false complaint?
10   A.   I knew that it was a false complaint because
11 I never did any of the things that he alleged that I
12 did.  There was video of the interaction between
13 myself and Mr. Tenzer.  And the video clearly showed
14 that Mr. Tenzer's allegations were completely false.
15       So I was concerned because I had been there
16 already in the department for over five years.  I had
17 never received a complaint.  And I knew this one to be
18 false.  So I was concerned that this internal affairs
19 investigation would stay in my file even if it was
20 unfounded, even if I would have been -- you know, if I
21 was exonerated, there would still be a mark on my file
22 that, you know, this happened.
23   Q.   Do IA investigations stay in your file if
24 they are found to be unfounded?  Is that part of your
25 personnel file as you understand it?



Page 57

1    A.  Yes.
2    Q.  As you understand it, even if it's
3  unfounded, is that taken into account down the road?
4    A.  Well, it depends on who reads it and what
5  their interpretation of the investigation is.
6    Q.  When you were advised by your supervisor
7  that this complaint became an investigation, did you
8  take any steps to, you know, object to the
9  investigation being opened or anything of that nature?
10   A.  I wouldn't say object.  I didn't think it
11  was necessary.  I did have a meeting with the chief,
12  and we discussed the investigation.  You know, he told
13  me it was something that he needed to do, so that was
14  pretty much it.  It ran its course.
15   Q.  Did you -- when you had this meeting, what
16  did you say to him?
17   A.  Well, I thought it wasn't necessary because
18  the video pretty much exonerated me.  And I knew that
19  for other things that they had done these inquiries
20  and not an internal affairs investigation.  I mean,
21  that label for a police officer is very strong to have
22  in their personnel file.  But you know, he thought
23  that it was necessary, and he did it.
24   Q.  Did he explain to you why he thought it was
25  necessary?

Page 58

1    A.  He probably did at the time.
2    Q.  Do you recall that explanation as you sit
3  here today?
4    A.  I don't remember exactly what we discussed.
5    Q.  But the results of this is that it was
6  unfounded?
7    A.  Yes.
8    Q.  So you received, you know, no discipline or
9  anything of that nature as a result of this IA
10  investigation?
11   A.  No.
12   Q.  We were focusing on the time period
13  basically, you know, April of 2010, and you said
14  Sergeant Martinez was your supervisor at that time.
15       Looking at Exhibit 2, which is the hierarchy
16  that's December of 2011, do you recall for how long
17  this was about the hierarchy at least with respect to
18  you?
19   A.  That changed quite a bit, so I really
20  wouldn't be able to say.
21   Q.  Okay.  When you say, changed quite a bit,
22  just with respect to you or just in general?
23   A.  In general.
24   Q.  Okay.  What changed about it as best you can
25  recall?

Page 59

1    A.  Well, I had seen a lot of these come through
2  on our email where different people are -- and not
3  necessarily myself but different sheets.
4    Q.  Okay.  What about in terms of the structure,
5  meaning sergeants report to captains, report to chief,
6  to detectives, is that basically the same or did that
7  change?
8    A.  For the most part, it's basically the same.
9    Q.  Okay.  And you can't recall how long you
10  were on Squad A reporting to Sergeant Martinez prior
11  to December of 2011?
12   A.  Prior to December of 2011?
13   Q.  Yes.  Well, this hierarchy is dated
14  December of 2011, and that's who you reported to on
15  there.  I'm just wondering how long that was the case.
16   A.  I don't remember.
17   Q.  Okay.  Did you ever report to Sergeant
18  Deitado?
19   A.  Yes.
20   Q.  When was that?
21   A.  He was put in charge of the squad at times,
22  and he was the supervisor for our squads in
23  intermittent times when the sergeant wasn't there and
24  so forth.  He would step in and cover.
25   Q.  Was he ever officially assigned there for an

Page 60

1  extended period of time?
2    A.  I don't remember -- I don't remember if it
3  was on my squad.  I know that the -- he did come to
4  patrol, but I don't remember what squad he was placed
5  on.  But I do know that when I worked at times -- not
6  many times, but at times he was a supervisor.
7    Q.  With respect to who your official supervisor
8  is, is that the person who writes your evaluation and
9  does those things?
10   A.  Yes.
11   Q.  As you understand it, who has input into
12  your evaluations?
13   A.  Your supervisor.
14   Q.  And then how does that process work at the
15  village?  Your supervisor prepares it, and then do you
16  sit down and meet with him about it?
17   A.  Yes.
18   Q.  Did you ever meet with anyone else about it
19  other than your supervisor up the chain of command?
20   A.  Not that I can remember.
21   Q.  Do you know if people up the chain of
22  command review the evaluation before it gets to you?
23   A.  I don't know.
24   Q.  In the complaint, you make an allegation
25  that in March of 2011, Deitado made false allegations



Page 61

1 against you stating that you had said that Hunker was
2 going to promote Gregg Matthews to sergeant because of
3 his friendship with Officer Matthews' father.
4     Do you recall that incident happening?
5   A.  Yes.
6   Q.  Explain to me what happened.
7   A.  Apparently that was looked into.  I don't
8 remember the mechanics of it.  It did come to my
9 attention, and I don't remember who brought it to my
10 attention now.  But it was looked into by Captain
11 Quinn, I believe, at the time.  And I never made that
12 statement.
13     Can you read that line again, please?
14   Q.  Sure.  This is from your -- the amended
15 complaint, Docket Entry 12.
16     In March of 2011, Deitado made false
17 allegations against Ramon stating that Ramon said that
18 Hunker was going to promote Officer Gregg Matthews to
19 sergeant because of his friendship with Officer
20 Matthews' father.  This was later proven to be a false
21 statement by Deitado.
22   A.  Yes.  I never made that statement.
23   Q.  Did you hear Deitado say that about you?
24   A.  No.
25   Q.  How did you come to learn that Deitado had

Page 62

1 made the statement?
2   A.  Someone told me, and I don't remember who it
3 was at the time.  But someone came up to me and told
4 me about it.  And I believe that I commented to
5 Captain Quinn what was occurring, and it was looked
6 into.
7     I don't know what happened subsequent to
8 that.  But I know that -- I know that I didn't make
9 that statement.  And nothing else came of it.
10   Q.  Someone other than Deitado came to tell you
11 that they heard Deitado say this?
12   A.  Yes.
13   Q.  You don't remember who it was?
14   A.  I don't remember who it was.
15   Q.  Was it around March of 2011?
16   A.  I don't remember.
17   Q.  Was there, like an IA investigation opened
18 into this?
19   A.  No.
20   Q.  Did anyone as far as you're aware suffer any
21 type of disciplinary action as a result of this?
22   A.  Not that I'm aware of.
23     MR. BARRIOS-BALBIN:  I just want to make a
24 quick note.  He stated Roman, but it's Ramon, R-a.
25     MR. GILL:  I apologize.  My pronunciation is

Page 63

1 not very good.
2 BY MR. GILL:
3   Q.  So there is an April 15, 2011, sergeant's
4 exam?
5   A.  Yes.
6   Q.  Did you sit for that exam?
7   A.  No.
8   Q.  Did you initially say you were going to sit
9 for that exam?
10   A.  Yes.
11   Q.  How far in advance was that exam advertised?
12   A.  I can't say the exact date, but ample time
13 was given in order for the officers to be able to
14 study.
15   Q.  And you withdrew yourself from consideration
16 from that sergeant's exam?
17   A.  Yes.
18   Q.  And do you remember when you did that?
19   A.  I want to say maybe a week or two prior.
20   Q.  Why did you withdraw your name from
21 consideration?
22   A.  It came to my attention that the test -- the
23 integrity of the test had been compromised.
24   Q.  How did it come to your attention that that
25 happened?

Page 64

1   A.  Officer Matthews told me that the integrity
2 of the test had been compromised.
3   Q.  Okay.  Did he use those exact words?
4   A.  I don't remember if he did.  But that's what
5 he relayed to me.
6   Q.  What exactly did he relay to you, though?
7   A.  He told me it wasn't worth taking the test,
8 something of that nature; it wasn't worth taking the
9 test because the test was fixed or rigged or something
10 like that.
11   Q.  Did he explain to you why he believed that?
12   A.  No, he didn't want to discuss it any further
13 than that.
14   Q.  Who is Officer Matthews?
15   A.  You mean -- I don't understand the question.
16 He's an officer in our department.
17   Q.  Is he a patrol officer?
18   A.  Yes.
19   Q.  How long has he been there?
20   A.  He's been there less time than me.  He's
21 probably been there about six years, maybe six and a
22 half years.
23   Q.  Is he someone that you consider a friend?
24   A.  Well, we work together.
25   Q.  Do you consider everyone you work with a



Page 65

1  friend?
2      A.  I would believe so.
3      Q.  Have you ever socialized with Officer
4  Matthews outside of work?
5      A.  No.
6      Q.  Are there any officers you socialize with
7  outside of work?
8      A.  No.  Let me -- clarify socialize.
9      Q.  Okay.  Well, are there any officers that you
10  see outside of work?
11      A.  I have seen officers outside of work.
12      Q.  On a regular basis?
13      A.  Not on a regular basis.
14      Q.  What officers have you seen outside of work?
15      A.  I met former Captain Quinn for lunch.  He's
16  done some work on my home.  He is a carpenter also,
17  and he has done some work on my home.
18      Q.  Anyone else?
19      A.  No.  That's pretty much it.
20      Q.  How is it that you and Officer Matthews came
21  to be discussing the upcoming April of 2011 sergeant
22  exam?
23      A.  He came up to me because he knew I was
24  taking the test.  And I believe that he was also
25  taking the test.

Page 66

1      Q.  And he just comes up to you.  What's the
2  first thing you remember him saying?
3      A.  You know, like, hey, it's not worth taking
4  the test, you know, it's fixed or it's rigged or
5  something like that.
6      Q.  Did you ask him why he believed that?
7      A.  I did, and he didn't want to discuss it.
8      Q.  What was his position at this time in the
9  department, road patrol?
10      A.  Patrol officer.
11      Q.  Did he have some sort of special knowledge
12  regarding the test as far as you were concerned?
13      A.  Not as far as I was concerned.
14      Q.  I mean, did anyone else tell you there was
15  going to be some problem with this upcoming sergeant's
16  exam?
17      A.  No.
18      Q.  So because of one person's statement to you
19  where they don't provide you any information, you then
20  conclude that the exam is, in fact, compromised and is
21  not worth taking?
22      A.  Yes.
23      Q.  Did you base that decision on anything else
24  that we haven't discussed?
25      A.  I don't understand the question.

Page 67

1      Q.  Well, you know, I mean, you could have, for
2  example, looked into, you know, where Officer Matthews
3  got this information to determine whether it was, in
4  fact, compromised?
5      A.  Well, he didn't want to discuss it.  I knew
6  who the people involved in the making of the test
7  were, so I took that into account.
8      And to me, Officer Matthews communication to
9  me about there was something wrong with the test, it
10  was something that I felt that I didn't want to be
11  involved in.  And it wasn't worth it to me to be
12  involved in something that may later come out and not
13  be a good thing, so I didn't want to be involved in
14  that.
15      Q.  Who did you understand to be making the
16  test?
17      A.  I knew Sergeant Deitado was involved in the
18  making of the test.
19      Q.  Anyone else?
20      A.  And there were some other -- I believe
21  Captain Daddario, I believe Captain Quinn, and I
22  believe Merrill was also involved in making the test.
23      Q.  Do you -- what do you understand the process
24  to be with how the test was created in leading up to
25  the April of 2011 sergeant's exam?

Page 68

1      A.  I don't know.  I wasn't privy to that.
2      Q.  What about those individuals you just named
3  made you believe that there was going to be something
4  wrong with the test?
5      A.  Well, I just didn't feel right about it.  As
6  a whole I just didn't feel right about it, and I
7  decided not to take it.
8      Q.  I understand that.  But you named a few
9  people, Deitado --
10      A.  Well --
11      Q.  Let me --
12      A.  I'm sorry.
13      Q.  You named a few people that you said were
14  involved in making it that lead you to put credit to
15  Matthews' statement that there was something wrong
16  with the test.
17      What is it about those individuals you
18  named?
19      A.  Well, nothing in particular about the
20  individuals.  I just told you who I knew was involved
21  in the making of the test.  As a whole I just -- I
22  just took it as bad karma, and I just didn't want to
23  get involved in that.
24      Q.  Did you report Officer Matthews' concern to
25  anyone in your chain of command?



Page 69

1    A.   No.
2    Q.   Why not?
3    A.   I just didn't.
4        (John Quick has entered the room.)
5  BY MR. GILL:
6    Q.   Had you received the test materials for that
7  April of 2011 exam?
8    A.   I believe so.  I believe I did receive the
9  textbook.
10   Q.   Had you started studying for it?
11   A.   I did.
12   Q.   How long had you been studying for it before
13  you decided not to do it?
14   A.   As soon as I got the textbook.
15   Q.   Do you recall if that was a couple days,
16  couple weeks, couple months before?
17   A.   I don't remember.  I know we received it
18  with ample time.  As soon as we receive it, it's
19  pretty much a smart decision to start studying right
20  away.
21   Q.   Right.  After April 15th, 2011, when the
22  sergeant's exam is held, what is the next thing you
23  hear regarding some issue with that exam?
24   A.   Apparently some time after the exam, there
25  was a receipt of an anonymous letter alleging that

Page 70

1  there had been cheating on the test.
2    Q.   In between that period of time, had you had
3  any conversation with anyone that anything about that
4  exam came up?
5    A.   No.
6    Q.   How did you come to learn there had been
7  some anonymous letter?
8    A.   Oh.  It was announced throughout the
9  department.  There was an email sent out.
10   Q.   What was the email as best you recall?
11   A.   I don't remember the specifics of the email.
12  Something along the lines that there had been
13  information received that there had been alleged
14  cheating on the sergeant's exam and that anyone with
15  information, to come forward and say anything about
16  it.
17   Q.   By the time you heard that, had the results
18  of the exam already been announced?
19   A.   I believe so.
20   Q.   So who was promoted as result of the exam?
21   A.   Sergeant Vargas and Sergeant Alvarez.
22   Q.   And they were road patrol officers before
23  that?
24   A.   Vargas was a detective, and Alvarez was a
25  patrol officer.

Page 71

1    Q.   So what did you do when you received an
2  email saying that there had been an anonymous letter
3  submitted regarding allegations of cheating and they
4  requested information?
5        Did you go forward with what you knew from
6  Officer Matthews?
7    A.   No.
8    Q.   Why not?
9    A.   I got a bad feeling about it, and I just
10  didn't want to get involved in that.
11   Q.   Well, who did the email come from?
12   A.   Someone in the administration.  I don't
13  remember now exactly who.
14   Q.   Someone up your chain of command?
15   A.   Yes.
16   Q.   So you actually had information relevant;
17  did you not?
18   A.   I don't think it was relevant.
19   Q.   Why didn't you think it was relevant?
20   A.   Because I didn't have any direct information
21  that anybody had cheated.  I just had a hunch of
22  somebody that I know that I work with.
23        And again, I wasn't, you know, forced not to
24  take the test.  I took what he told me with a grain of
25  salt.  I looked at the whole situation as a totality,

Page 72

1  and I decided myself -- myself not to take the test.
2    Q.   Okay.  I understand that.  But when the
3  administration sent out an email, which is basically
4  saying anyone with information should come forward,
5  you had information?
6    A.   I didn't think that I really had any
7  information.  I mean, what information did I really
8  have?
9    Q.   Well, I agree it wasn't the best
10  information, but you knew that Officer Matthews
11  apparently knew something; did you not?
12   A.   Well, everyone was called subsequently after
13  because they did look into the matter, in my opinion,
14  very vaguely.  But they made some futile attempt to
15  look into the matter, and everyone was interviewed.
16   Q.   But there was an IA investigation opened,
17  correct?
18   A.   I don't think it was IA.
19   Q.   Some kind of investigation?
20   A.   There was some kind of investigation, but I
21  don't believe it was IA.
22   Q.   Around the time the anonymous letter comes
23  in, there was a detective exam; was there not?
24   A.   There was one in 2011, right around the same
25  time, I believe.



Page 73

1  Q.  Did you sit for that exam?
2  A.  Yes.
3  Q.  Who was the panel?
4  A.  The panel was Sergeant Alberto from Surfside
5  PD -- excuse me -- Sergeant Deitado from our
6  department, and I don't know what his rank was, but
7  there was an officer from Glades County.
8  Q.  And you felt comfortable enough with the
9  process there to sit for that exam?
10  A.  Yes.
11  Q.  What was different about the detective's
12  exam as opposed to the sergeant's exam?
13  A.  Well, the detective's exam is an oral
14  interview panel comprised of interviewers selected by
15  Sergeant Deitado.  The sergeant's exam is, I would
16  like to think, a more controlled exam.
17  Q.  Right.  But you didn't sit for the
18  sergeant's exam because you were concerned about some
19  sort of impropriety, but a month later you agreed to
20  sit for the detective's exam being run partially by
21  Deitado?
22  A.  Correct.
23  Q.  What is the difference?
24  A.  I don't know.  Is there any difference?
25  Q.  Well, you made a different decision with

Page 74

1  respect to that exam?
2  A.  I did.
3  Q.  Why was that?
4  A.  Because I wanted to.
5  Q.  Other than that, did you have any reason why
6  you felt more comfortable with the detective's exam?
7  A.  No.
8  Q.  Had you heard about the anonymous letter by
9  the time you sat for that exam?
10  A.  I don't remember.
11  Q.  Was the first time you heard about the
12  anonymous letter from the email that was sent out by
13  the administration?
14  A.  Yes.
15  Q.  Now, the investigation that was commenced
16  into finding an anonymous letter, what was your
17  participation in that?
18  A.  I was interviewed along with other officers.
19  I don't remember if every officer was interviewed.
20  But I know that many officers were interviewed.
21  Q.  Did you participate in the investigation as
22  an investigator?
23  A.  No.
24  Q.  So you were only interviewed as an
25  interviewee?

Page 75

1  A.  Yes.
2  MR. GILL:  Why don't we take a short break.
3  (Discussion off the record.)
4  MR. GILL:  Back on the record.
5  BY MR. GILL:
6  Q.  Officer Fernandez, you would agree with me
7  that police departments in general and the village
8  police department are paramilitary organizations; is
9  that a correct characterization?
10  A.  Yes.
11  Q.  Meaning that there is a chain of command
12  that's supposed to be followed?
13  A.  Yes.
14  Q.  And that as opposed to, I guess, other
15  municipal departments, the police department has a
16  more strict chain of command and disciplinary
17  procedures?
18  A.  Yes.
19  Q.  And do you understand it to be against
20  village police, I guess, policy and operating
21  procedures to lodge anonymous complaints?
22  A.  I don't understand your question.
23  Q.  Do you understand that if you are a member
24  of -- sworn officer in the police department, that
25  you're supposed to come forward to your supervisors up

Page 76

1  the chain of command if you have knowledge regarding,
2  you know, violations of policies by other officers or
3  improprieties or things of that nature that affect the
4  ability of the department to function?  Am I not
5  correct in that statement?
6  A.  That an officer -- can you repeat it again?
7  Q.  Sure.  I can rephrase it.  Am I correct that
8  as part of being part of that paramilitary structure,
9  that if you see something inappropriate, some
10  violation of policy, that you're supposed to come
11  forward up your chain of command to report those
12  issues so that they can be corrected?
13  A.  I would believe so.  I would believe so
14  depending on the circumstance.
15  Q.  And do you also understand it to be, I
16  guess, you know, sort of contrary to that structure or
17  those policies, for there to be anonymous complaints
18  against things that aren't related to the functioning
19  of the department internally?
20  MR. BARRIOS-BALBIN:  Objection.  Form.
21  BY MR. GILL:
22  Q.  Did you understand my question?
23  A.  No.
24  Q.  Talking about that paramilitary structure
25  with the hierarchy in the chain of command that are




Page 77

1  important, do you also understand that to be contrary
2  to how that structure functions, for there to be
3  anonymous complaints regarding an internal operating
4  procedure problem within the department?
5       MR. BARRIOS-BALBIN:  Object to the form.  Go
6  ahead and answer.
7       THE WITNESS:  I don't understand your
8  question because in our policy, it states that every
9  allegation that is received by the department via with
10  complainant information or anonymous is to be
11  investigated.
12  BY MR. GILL:
13     Q.  Sure.  And that is referring to complaints
14  about the department, people making complaints about
15  speeding or officers doing something, correct?
16     A.  Correct.
17     Q.  I'm referring to officers having
18  information.
19     A.  I guess.
20     Q.  So you don't see anything inappropriate
21  about it regarding an anonymous complaint or why
22  that's a concern to the department?
23     A.  I don't understand your question.  Are you
24  saying -- are you saying that it's not right for an
25  officer to lodge an anonymous complaint?

Page 78

1      Q.  Per the operating procedures of the police
2  department, yes.
3      A.  Okay.
4      Q.  Do you agree or disagree with that
5  statement?
6      A.  I'll agree with you.
7      Q.  Now, you were interviewed as part of the
8  investigation into the anonymous letter?
9      A.  Yes.
10     Q.  Who interviewed you?
11     A.  Mr. Patrick Franklin.
12     Q.  And who do you understand Patrick Franklin
13  to be?
14     A.  He is a private investigator that performs
15  many of the internal affairs investigations for the
16  department.
17     Q.  Do you know what his relationship is to the
18  village, meaning is he an employee, is he contractual,
19  is he...
20     A.  I believe he is a contracted employee.
21     Q.  Have you ever reviewed his contracts or
22  agreements with the village?
23     A.  No.
24     Q.  Do you recall when your interview took
25  place?

Page 79

1      A.  No, I don't remember.
2      Q.  Did you bring an attorney with you to that
3  interview?
4      A.  No, I don't think so.
5      Q.  Was your interview recorded?
6      A.  Yes.
7      Q.  Was anyone present when the interview took
8  place?
9      A.  I don't remember.
10     Q.  Okay.  How long did your interview last?
11     A.  I don't remember.  It was a while back.
12     Q.  Okay.  When the investigation was concluded,
13  were the results of the investigation or the closeout
14  memorandum, were those disseminated to the officers in
15  the police department?
16     A.  You know, I don't know.  I don't know.  I
17  think that I may have requested a copy of it.
18     Q.  Okay.  So you have reviewed the closeout
19  memorandum?
20     A.  I believe so.
21     Q.  Have you also reviewed the results of
22  Franklin's investigation?
23     A.  Of this particular investigation into the
24  allegations of cheating on the sergeant's exam?
25     Q.  Yes.

Page 80

1      A.  I don't think that I reviewed his
2  investigation.  I believe that I reviewed the summary
3  report on his investigation.
4      Q.  The one prepared by himself?
5      A.  I don't know who prepared it.  I don't know.
6      Q.  When did you request this?
7      A.  I don't remember.  Sometime after.
8      Q.  Why did you request it?
9      A.  I wanted to see what was the conclusion of
10  the investigation.
11     Q.  Was it before or after you sent your letter
12  regarding the hostile work environment issue?
13     A.  It was before.  It must have been before.
14     Q.  Why do you say, must have been?
15     A.  Because my complaint was made in
16  May of 2012, and the -- this investigation, I believe,
17  took place in sometime in 2011.
18         MR GILL:  Let's go ahead and mark that as
19  Exhibit 5.
20         (Fernandez Deposition Exhibit No. 5
21          marked as requested.)
22  BY MR. GILL:
23     Q.  Go ahead and take a look at that.
24         Have you had a chance to look at that?
25     A.  I'm pretty familiar with it.



Page 81

1  Q.  I'll represent that is a copy that was
2  produced to us during discovery.  It's not the one
3  that was filed with the complaint.  I can get that for
4  you, if you prefer it, but that's what we were
5  produced.
6      It's not signed by you?
7  A.  I don't know why because I did sign my copy.
8  Q.  Okay.  Is this something that you have saved
9  on a hard drive or had extra copies of that you were
10 able to provide to your Counsel?
11  A.  You know what?  I did do it on a computer,
12 but I do remember signing it.
13  Q.  And this was submitted May of 2012, correct?
14  A.  Yes.
15  Q.  And it relates to events that occurred
16 leading up to the writing of that letter; is that
17 correct?
18  A.  Yes.
19  Q.  And did you prepare this yourself?
20  A.  Yes.
21  Q.  Did anyone assist you in preparing it?
22  A.  No.
23  Q.  When you prepared this -- I mean, the events
24 portrayed in here are accurate, to the best of your
25 ability, are they not, and the best of your

Page 82

1  recollection?
2  A.  Yes.
3  Q.  When did you first see an actual copy of the
4  anonymous letter?
5  A.  You know what?  I don't remember the exact
6  date.  I know at some point in time it was made
7  available to the officers, but I don't remember
8  exactly when.
9  Q.  During your interview with Franklin, did he
10 show you a copy of it?
11  A.  I don't remember if he did or if he didn't.
12  Q.  Take me through what happened during your
13 interview with Franklin regarding the anonymous letter
14 investigation.
15  A.  He asked me a series of questions, and I
16 answered them, and that was pretty much it.  I don't
17 remember what questions he asked, and I don't remember
18 -- I don't remember what was exchanged between me and
19 Mr. Franklin, but I believe that he did record our
20 interview.
21  Q.  Did you advise him of what Officer Matthews
22 told you?
23  A.  I don't remember if I did.
24  Q.  Well, did you think that was something that
25 was significant in the fact that Officer Matthews had

Page 83

1  told you before this anonymous letter was written that
2  there was something potentially suspicious about the
3  exam?
4  A.  Well, I really didn't see that -- what
5  Officer Matthews had told me had any relevant
6  information.  I took what Officer Matthews told me
7  and, like I said, like I mentioned previously, I took
8  it in the totality of the circumstances; and I made
9  the decision not to take the test.
10      But Officer Matthews didn't give me any
11 names of anyone involved in any improprieties.  He
12 didn't allude to anyone in particular.  He made a
13 comment.  I heard what he had to say, and I made a
14 decision.
15  Q.  Didn't you also have enough information at
16 that time from Officer Goldberg regarding some issue
17 with the cheating on tests?
18  A.  Officer Goldberg brought it to my attention
19 that -- not on that particular test if I remember
20 correctly -- but back in the 2006 detective's
21 interview panel, that apparently there was some
22 impropriety that had occurred involving Deitado and
23 Vargas.
24  Q.  When did Officer Goldberg tell you this?
25  A.  I don't remember exactly.  I know I wrote it

Page 84

1  down here in my complaint.
2  Q.  Okay.  Well, why don't you look through
3  that, and tell me if you can see where that was?
4      It looks like there are some things
5  regarding Officer Goldberg on the second page.  I'm
6  not sure if that's what you're looking for.
7  A.  No.  May 10th, 2011.
8  Q.  What page did you get that from?
9  A.  Page 16.
10  Q.  So this is after the sergeant exam has taken
11 place and after the detective exam, correct?
12  A.  I don't know exactly when those dates are.
13 There are a lot of dates, and they are very close
14 together so I wouldn't be able to tell you exactly
15 what the date is.
16  Q.  So tell me the best you can recall what
17 Officer Goldberg told you?
18  A.  Officer Goldberg told me that he was told by
19 another officer, a former officer, Officer Guillen,
20 that while at a training -- while Officer Guillen was
21 at a training with Officer Vargas, they received a
22 visit from Deitado.  And Deitado apparently pulled
23 Vargas out of the class.  And it was right around the
24 time we were going to take the oral exam for the
25 detective's interview.  He apparently pulled him out



Page 85

1 of the class and talked to him for an extended period
2 of time.
3      When Officer Vargas came back, apparently he
4 told Officer Guillen in disbelief that Deitado had
5 given him the questions that were going to be asked in
6 the interview and how to answer them.
7   Q.  How is that you came to be talking to
8 Officer Goldberg about this issue on May 10, 2011?
9   A.  Well, I stopped by to talk to him because we
10 were work opposite shifts.  Officer Goldberg was one
11 of my FTOs, and I hadn't seen him in a long time since
12 I went to days.
13      So we were talking, and he said, hey, I
14 think that this is something that is important; in
15 light of everything that is going on, I think that
16 this is something that is important.
17   Q.  And he relayed to you something he had been
18 told by Officer Guillen; is that correct?
19   A.  Yes.
20   Q.  So Officer Goldberg wasn't telling you
21 something he saw personally.  It was something he was
22 told by someone else?
23   A.  That's correct.
24   Q.  Was Officer Guillen an officer at this time
25 in 2011?

Page 86

1   A.  No.
2   Q.  What happened to Officer Guillen?
3   A.  Officer Guillen was arrested for child
4 molestation.
5   Q.  When did that happen?
6   A.  Prior to May of 2011.  I don't remember
7 exactly.  I want to say a year or two before.
8   Q.  Can you spell his name for the court
9 reporter?
10   A.  Okay.  G-u-i-l-l-e-n.
11   Q.  Was he incarcerated by this time?
12   A.  I believe so.
13   Q.  As a result of this conversation with
14 Officer Goldberg, what do you do once you get this
15 information?
16   A.  Well, I told him -- I said, well, with this
17 information, I think it's pertinent that you let the
18 chief know about it.  Because there was an ongoing
19 investigation into this allegation of cheating on the
20 sergeant's exam, and I said, well, maybe this is
21 something you might want to bring to the chief's
22 attention.
23   Q.  Did he do that?
24   A.  Yes.
25   Q.  Were you present when that happened?

Page 87

1   A.  Yes.
2   Q.  Was it the same day you had the
3 conversation?
4   A.  I believe so, yes.
5   Q.  How does it come that you end up meeting
6 with the chief that day?
7   A.  Well, we went to the chief's office.  We
8 asked to speak with him, and he told us to come in.
9 And Goldberg told him what he had heard from
10 Officer Guillen.
11   Q.  And did he tell him anything else other than
12 what you just told me?
13   A.  As far as I can recall, that's what he told
14 him.
15   Q.  Did Chief Hunker say anything?
16   A.  Chief Hunker didn't seem surprised.  I
17 probably would have expected him to be upset or
18 concerned about, you know, this information he was
19 received from Officer Goldberg.  But there was no --
20 really no reaction from Chief Hunker.
21   Q.  Did he say anything to you?
22   A.  I do remember him making a comment somewhere
23 through the conversation because we also discussed
24 some issues that were going on between me and Deitado,
25 and he told me that every department has a bully and

Page 88

1 Deitado was this department's bully.
2   Q.  And that's at the same meeting that Goldberg
3 told Chief Hunker what he had heard from
4 Officer Guillen?
5   A.  Yes.
6   Q.  Okay.  How is that you came to be talking
7 about issues between you and Deitado?
8   A.  I don't know.  We were just discussing them.
9   Q.  I mean, how does the conversation go from
10 Chief Hunker -- let me finish my question -- you know,
11 I heard this from someone about a 2006 sergeant's exam
12 to, Officer Fernandez, you and Deitado have problems
13 dealing with each other?  How does that happen?
14   A.  I don't remember.
15   Q.  Did you bring it up?
16   A.  I probably did.
17   Q.  What did you bring up to him?
18   A.  That I was having some issues with Deitado.
19 I don't remember the exact content of the
20 conversation.  But I did bring up that me and Deitado
21 were having some issues, and he just -- that's what he
22 told me.
23   Q.  We discussed the one issue that happened at
24 the PBA meeting in 2009.
25      What other issues were going on between you



Page 89

1 and Deitado at this time, May of 2011?
2 A. I can't say issue per issue with a date.
3 But if we look at my complaint, you will see that I
4 chronologically listed all of the interactions that I
5 had with Deitado and other incidents throughout the
6 department, including the -- my review of the report
7 of the sergeant's -- the investigation to the
8 sergeant's exam.
9 Q. Okay. We will get to that stuff. But what
10 you're telling me, though, is that whatever issues you
11 were having with Deitado are reflected in the
12 May of 2012 letter you wrote to the village manager?
13 A. Yes. They were included.
14 Q. Okay. At some point, Officer Guillen -- or
15 former Officer Guillen wrote a letter; did he not?
16 A. It was a letter received and placed in every
17 officer's mailbox from -- allegedly from
18 Officer Guillen.
19 Q. Do you have -- did you receive a copy of
20 that?
21 A. Yes.
22 MR. GILL: We'll mark this 6.
23 (Fernandez Deposition Exhibit No. 6
24 marked as requested.)
25 BY MR. GILL:

Page 90

1 Q. Have you seen that before?
2 A. Yes.
3 Q. Does that appear to be the letter that was
4 put in everyone's box with Rene Guillen's name on it?
5 A. Yes.
6 Q. Do you know whether or not this was actually
7 from Officer Guillen?
8 A. I have no way of authenticating this letter
9 as Officer Guillen's letter.
10 Q. And the content of this letter speaks for
11 itself, but essentially part of it disputes what
12 Officer Goldberg had said; does it not?
13 A. There was some mention in there about
14 Officer Goldberg, I guess, or the information that
15 Officer Goldberg gave.
16 What surprised me about this letter is the
17 fact that when I went with Officer Goldberg to meet
18 with Chief Hunker, Chief Hunker stated that he was
19 going to have Mr. Patrick Franklin visit Rene Guillen
20 in jail and to get a statement from him. Obviously
21 that never took place.
22 And apparently we received this letter
23 allegedly from Rene Guillen. Now, it has never come
24 to my attention how Rene Guillen ever knew about
25 anything that was going on within the department

Page 91

1 because we were ordered by Tom Hunker at the time,
2 when he got arrested, not to communicate with Rene
3 Guillen and not come into contact with him, that if he
4 found out that an officer went to speak to
5 Mr. Guillen, you know, that they would have to answer
6 to him.
7 So I don't understand why this letter came
8 about or how it came about. I did make a notation on
9 my complaint that if, in fact, this letter was from
10 Mr. Guillen, that there were certain things to be
11 considered. I mean, Mr. Guillen is in jail. His wife
12 is the sole provider at this time for his family. He
13 was in a very vulnerable position.
14 I don't know what transpired, and I'm not
15 going to make any accusations. But the receipt of
16 this letter was very, very out of context.
17 Q. In your police training, have you learned
18 about taking witness statements and things like that?
19 Is that something you were trained in?
20 A. Yes.
21 Q. And I'm sure you have come up with the
22 concept of hearsay, where someone is telling you
23 something that they didn't see with their own eyes or
24 hear with their own ears?
25 A. Absolutely.

Page 92

1 Q. And so, you know, Officer Goldberg is
2 relaying something from -- allegedly Officer Guillen
3 said about something.
4 Do you see how that maybe puts what Officer
5 Goldberg was saying in sort of a questionable light
6 also in terms of its veracity? I mean, people
7 remember things incorrectly. They hear things
8 incorrectly.
9 A. I think that particular comment made by
10 Officer Goldberg is very difficult to confuse.
11 Now, if, in fact, this letter was authentic
12 and it was from Officer Guillen -- and obviously this
13 letter -- someone had to have prompted former Officer
14 Guillen to write this letter.
15 My question is, why wasn't this done during
16 the course of the investigation as Thomas Hunker
17 stated he was going to do? Why did this letter come
18 out of left field? That's just me as a police officer
19 thinking what weight should we give this letter if
20 it's not part of the official investigation?
21 Because I -- I did hear what you said about
22 Officer Goldberg, he could have got something mixed up
23 and so forth. Officer Goldberg volunteered to take a
24 polygraph examination. Now, you and I both know that
25 polygraph examinations are not actually admissible in



Page 93

1   court.  But apparently the police administration felt
2   that it carried some weight, and he volunteered for
3   it.
4          In all of his polygraph examination, with
5   the exception of who authored this anonymous letter,
6   with that exception, everything else -- he was
7   truthful in his polygraph examination.
8          I'm not -- I'm not a man of science.  I'm
9   not a scientist, and I don't purport to be so.  But I
10  would definitely give some weight to
11  Officer Goldberg's statement, especially on the
12  polygraph examination.
13      Q.   Were you there when he gave a polygraph?
14      A.   I was not.
15      Q.   Did you review the actual results of the
16  polygraph?
17      A.   I did not.
18      Q.   You reviewed the summaries provided by
19  Franklin and the closeout memo, is that where you got
20  the information from?
21      A.   Yes.
22      Q.   And really this Goldberg statement regarding
23  what Officer Guillen allegedly told him about what
24  Officer Vargas had told Guillen and then this letter
25  that purports to be from former Officer Guillen, it

Page 94

1   don't even really go to the exam dates at issue, do
2   they?
3       A.   I'm sorry?
4       Q.   They don't go to the 2011 sergeant's exam,
5   right?
6       A.   No.  Apparently this had to do with the
7   2006 --
8       Q.   Right.
9       A.   -- detective's interview.
10      Q.   Also, during the investigation into the
11  allegations of cheating, DNA samples were taken from
12  the officers; is that correct?
13      A.   Yes.
14      Q.   Tell me how that came about.
15      A.   Well, we had a mandatory meeting.  The chief
16  called for a mandatory meeting where all officers were
17  to attend.  And he began by telling us how ungrateful
18  we were, that after everything that he had done for us
19  -- as a matter of fact, I believe, that I put here in
20  my complaint, something to the effect that we were all
21  ball-less wonders, just attacking us and attacking us
22  as a group.
23          About the anonymous letter, that apparently
24  he perceived that someone within the department was
25  the one that wrote this letter and sent it in.  It

Page 95

1   became -- it became common knowledge in the department
2   that I was suspected of having written this letter.
3          In that meeting -- I don't remember right
4   now.  I would have to look at my notes.  But it was
5   either Sergeant Deitado or Captain Roye that jumped up
6   and said, I knew you did it, I knew you wrote the
7   letter or something to that effect.
8          And the chief was putting a lot of pressure
9   on us saying that if we didn't give the DNA, that he
10  was going to go ahead and get it from our uniforms
11  anyway.  And he turned to one of our officers, Officer
12  Febbraio, F-e-b-b-r-a-i-o, that -- apparently Officer
13  Febbraio worked with Chief Hunker in the City of Miami
14  Beach.  He said, you remember, Ernie, how we used to
15  do it on the beach, if guys didn't want to provide us
16  with their DNA, we would go into the locker room and
17  take it from them anyway.
18          It was just accusing us of having been
19  involved with that letter.  And I had nothing to do
20  with that letter.  I did not write that letter.  I did
21  not author that letter.  But many members of the
22  department -- mainly Sergeant Deitado -- and through
23  him a lot of department members felt that I had
24  something to do with that letter.  I was somehow in
25  the crosshairs of that situation.

Page 96

1       Q.   A couple questions.  The chief was referring
2   to the fact that your DNA is on a lot of different
3   items.  Is that what he was referring to when he said,
4   we can get your DNA from uniforms?
5       A.   If you don't provide your DNA, we can get it
6   from your uniforms.
7       Q.   Right.  But to provide DNA testing is part
8   of your law enforcement duties?
9       A.   No.
10      Q.   Do you understand that you can obtain
11  someone's DNA from a water bottle lid that they have
12  been drinking from or something of that nature?
13      A.   I guess.  I'm not too versed in that.
14      Q.   It's okay.
15      A.   I don't know.
16      Q.   How is that you came to learn that some
17  people believed that you were the person who wrote the
18  anonymous letter?
19      A.   Well, everybody started turning their back
20  on me.  People stopped talking to me.  People
21  genuinely believed that I had something to do with
22  that letter.
23      Q.   From reading it, statements were made, like
24  you explained, during that meeting where someone
25  accused you of writing the letter; is that correct?



Page 97

1    A.   If I'm allowed to look at that particular
2  section?
3    Q.   Yes.  I think it's 14 possibly.
4    A.   13.  13.  Deitado -- Deitado jumped up and
5  began yelling at me, I know it was you, we know it was
6  you, I know it was you, we know it was you.
7    Q.   Before that, did anyone directly say to you
8  that they believed you were the one who wrote this
9  anonymous letter before this meeting with the DNA?
10   A.   Chief Hunker was discussing the anonymous
11  letter and the fact that this anonymous letter
12  affected the integrity of the department.  And
13  following those comments, that's when this gentleman
14  here, Mr. Deitado jumped up and said that.
15   Q.   Right.  Before this day -- that day where
16  the meeting takes place, you said that you came to
17  believe people thought you were the one who wrote the
18  letter.
19        That belief -- did anyone actually say to
20  you, Officer Fernandez, I think you're the one that
21  wrote the letter before Deitado says it during that
22  meeting?
23   A.   No, no.  It's just the treatment from the
24  officers had changed from what it was before.
25  Officers that I would talk to on a daily basis stopped

Page 98

1  talking to me.  You know, they just stopped
2  interacting with me.
3    Q.   So when does that begin to happen?
4    A.   I want to say -- God, it's been such a long
5  time that that's been going on.  I want to say
6  sometime around the time that the anonymous letter
7  came into play.
8        MR. GILL:  Since we're discussing it, let's
9  just go ahead and mark it for identification.  No. 7.
10        (Fernandez Deposition Exhibit No. 7
11           marked as requested.)
12  BY MR. GILL:
13   Q.   Take a look at that.  Have you seen that
14  before?
15   A.   Yes.
16   Q.   Is that the anonymous letter you were
17  referring to?
18   A.   This is the anonymous letter that was
19  received by the village manager.
20   Q.   And it's -- Page 1 is the letter itself and
21  Page 2 is a copy of the envelope; is that correct?
22   A.   Yes.
23   Q.   Going back to this July 28th, 2011, meeting
24  that Chief Hunker called, what kind of meeting was it?
25   A.   I don't understand.  What do you mean?

Page 99

1    Q.   I know there are roll call.  There are staff
2  meetings.
3        Was this a meeting that would generally
4  occur once a month or once a week, or was this
5  something that was unusual and out of the ordinary?
6    A.   No.  This meeting was specifically called
7  for the issue with this anonymous letter.
8    Q.   Okay.  Was anything else discussed in the
9  meeting?
10   A.   I can't remember everything that was
11  discussed in the meeting.  But I noted in my complaint
12  the particular parts that stood out to me.
13   Q.   And after Chief Hunker made the comments
14  regarding the integrity of the department being at
15  issue, you said you wanted to be the first one to
16  provide the DNA; did you not?
17   A.   Well, I was being accused.  Practically
18  that's what was happening.  He was demanding that we
19  give the DNA because if we didn't give it, he was
20  going to get it otherwise.
21        And you know, the department was going to
22  frown upon us -- that he and the department was going
23  to frown upon us if we didn't submit the DNA.  So I
24  took that as, you know, my job is at stake.  What
25  happens if I don't give the chief this sample?

Page 100

1    Q.   Okay.  But you were the first one to provide
2  your DNA; were you not?
3    A.   Yes, because I had nothing to hide.
4    Q.   In the letter, it looks like this is a
5  quote.  It says -- this is -- I'm reading on Page 14.
6        You're right about one thing, Chief, the
7  integrity of this department is definitely at stake.
8  And to dispel any concern that I wrote this letter,
9  since it's obvious that Captain Roye's statement was
10  directed at me, I will be the first one to provide a
11  DNA sample.
12        There is no end quotation, but at least -- I
13  mean, is that a quote of what you said?
14   A.   What paragraph is that?
15   Q.   That's the top paragraph on Page 14.
16   A.   Yes.
17   Q.   And as you understood it, Chief Hunker said,
18  look, give us your DNA now, or we will get it off your
19  uniforms, like we used to at Miami Beach?
20   A.   Yes.  What kept going through my mind is
21  that was there an investigation into the allegation of
22  the cheating on the sergeant's exam or what was going
23  on, because it seemed to me that the focus was very
24  strong on who wrote this letter.
25   Q.   This letter at the meeting, the focus was on



Page 101

1  that?
2      A.   Apparently so, if he was demanding our DNA
3  the way that he was demanding it.  You had to have
4  been there at that meeting to hear him, you know,
5  yelling and screaming that he wanted our DNA.
6         Now, breaking away from this for a moment,
7  we're talking about the same investigation, that
8  summary report that I read about this investigation,
9  something that just kept popping up in my mind is,
10  here he is putting all of this effort into collecting
11  our DNA, which obviously -- let's say that someone in
12  the room wrote that letter theoretically.  Someone in
13  the room wrote that letter.  He was conducting an
14  investigation.  Apparently that's what he was doing
15  because he is collecting DNA to find out who wrote
16  this letter.  And if someone in this room wrote this
17  letter, they would be subject to some sort of action,
18  administrative, disciplinary.  Obviously something was
19  going to coming of it.
20         But what I kept thinking about is he is so
21  fixed on who wrote this letter, but how come he didn't
22  take those steps with all of his years with law
23  enforcement experience and investigations, why is it
24  that he didn't have that phone sent out to a qualified
25  forensic expert to check the phone or all of Deitado's

Page 102

1  phones to clear any misunderstanding or any sort of
2  ambiguity as to Deitado's part -- alleged part in this
3  cheating?
4      Q.   How many meetings were there where DNA was
5  discussed?
6      A.   This was the only one.
7      Q.   Okay.  Were there any other times that you
8  were part of where Chief Hunker was saying something
9  about DNA and needing DNA from officers?
10      A.   Not that I can remember, no.
11      Q.   Okay.
12      A.   But apparently he had everything set up.
13  And he was ready to collect the DNA.  Because he had
14  an officer ready to be directed to collect the DNA,
15  which I thought that was rather odd because even
16  though this officer has a private business where he
17  collects these DNA samples, he is not someone from a
18  department or somebody who is specifically trained to
19  collect DNA samples.
20         There was no property receipt issued to
21  anyone for the collection of their DNA.  And I think
22  that this particular action was an investigatory
23  action.  And people should have been given their
24  Garrity Rights.  That's what I believed at that
25  moment.

Page 103

1         There was -- these DNA samples were
2  collected in a paper bag, and they were given to
3  someone in the administration to hold.  And then
4  subsequently they were submitted to two different
5  laboratories.  The first laboratory was a private
6  laboratory.  And the second one, to get a second
7  opinion because the chief was not happy with the first
8  result, they sent it out to the Miami-Dade Police
9  Department.
10      Q.   Okay.  Were you there when they were sent
11  out?
12      A.   No.
13      Q.   How do you know they were sent out?
14      A.   I know because of the report.
15      Q.   Do you know if it is the DNA that was
16  collected from the officers or the letter to obtain
17  DNA from the envelope that was sent out twice?
18      A.   I don't understand.
19      Q.   Well, for the DNA of the officers to be
20  useful, they have to have something to match it
21  against.
22      A.   The -- exactly.  The DNA that was sent out
23  was to make the comparison against supposedly some DNA
24  that they had found on this letter.
25      Q.   Well, you weren't there when it was done?

Page 104

1      A.   I was not.
2      Q.   So you don't have any firsthand knowledge of
3  which thing was sent out for a DNA sample, do you?
4      A.   Well, you're right, I don't.  And the reason
5  for that is, also, because there was no property
6  receipts issued to anyone so there was no chain of
7  custody for any of this DNA.
8      Q.   You haven't been trained on how to collect
9  DNA, have you?
10      A.   No.
11      Q.   What were the results of this investigation
12  into the allegations of cheating?
13      A.   Absolutely nothing.
14      Q.   Right.  They couldn't determine who wrote
15  the letter, and they couldn't determine whether any
16  cheating took place; that was their conclusions?
17      A.   That was their conclusion based on the fact
18  that the phone or phones alleged to have been involved
19  in the cheating were not properly checked.
20      Q.   Well, you're talking about Deitado's phone?
21      A.   Yes.
22      Q.   And why do you think there is important
23  information on Deitado's phone?
24      A.   I think if there is an allegation of
25  cheating and it's specific to his phone, the phone



Page 105

1  should have been checked.
2      Q.  What allegation of cheating was there that
3  you're aware of specific to the phone?
4      A.  Didn't it say something here on the letter?
5      Q.  I mean, read the letter.
6      A.  I want to bring this to your attention.  It
7  is known amongst many in the police department that
8  Sergeant Deitado obtained and provided the questions
9  and answers of the sergeant's test to Detectives
10  Vargas and Alvarez.  This could easily be proven.
11          And this is what led to the investigation.
12  Subsequent to this letter and the interviews that were
13  performed, Officer Matthews divulged that he had
14  received information from a female officer that
15  Sergeant Deitado had this information on his phone.
16      Q.  Right.  You knew that from reading the
17  report?
18      A.  The report.
19      Q.  So you weren't present at the interviews,
20  were you?
21      A.  No, I was not.
22      Q.  Did you listen to the transcript of what was
23  said at the interviews?
24      A.  No, I did not.
25      Q.  You didn't sit for this exam, correct?

Page 106

1      A.  For the sergeant's exam?
2      Q.  The sergeant's exam.
3      A.  No, I did not.
4      Q.  Why are you so concerned about how this
5  investigation was conducted?
6      A.  Well, because if we do have members of our
7  department that are involved in cheating and
8  manipulating exams and promotions, I think that's
9  something that's important, and we need to make it
10  known.  I think --
11      Q.  Continue on.
12      A.  You know, it's a matter of public concern.
13  How can we have officers in our department that are
14  cheating, manipulating investigations, manipulating
15  sergeant's exams?
16          I mean, if the proper investigation would
17  have been performed and the phone -- over the phones
18  -- I don't know how many phones there were -- would
19  have been properly checked -- and we do that all the
20  time.
21          The detective bureau does that all the time,
22  where they have a case, where they have an electronic
23  instrument, and they sent it out.
24          I, myself, made an arrest on a gentleman
25  that had a credit card swiper, that was swiping credit

Page 107

1  cards at one of the restaurants inside the Bal Harbour
2  shops.  And the secret service got involved because
3  they have the technology and the forensic training to
4  look into those devices.
5      Q.  The only information you have, though, about
6  any issues going on with any of the tests were what
7  Goldberg told you, correct?
8      A.  Yes.
9      Q.  And then what Officer Matthews told you
10  before the exam, correct?
11      A.  Yes.  And Officer Matthews' testimony as to
12  the information that he received from another officer.
13  And that was written by Investigator Patrick Franklin.
14      Q.  Right.  But you personally.  The only real
15  information you have that there is some issue in the
16  exam is what Goldberg told you he heard from Rene
17  about a 2006 exam?
18      A.  Yes.  That had nothing to do with the
19  sergeant's exam.  That was the detective panel
20  interview in 2006.
21      Q.  So the only real information you have that
22  there actually was a problem was what Matthews told
23  you, and he never told you why he believed that?
24      A.  Well, I didn't think that there was anything
25  conclusive in what comments Officer Matthews made to

Page 108

1  me.  Like I said before, he told me something.  I
2  analyzed the totality of the circumstances, and I made
3  that decision.
4          Post that comment -- after Officer Matthews
5  had made that comment, then this letter came into
6  play.
7      Q.  Right.  But that's the only information you
8  have that there was actual cheating, whatever Matthews
9  told you?
10      A.  Well, we have the investigation.
11      Q.  Right.  Which you didn't conduct?
12      A.  But I know the outcome.
13      Q.  No.  You read Pat Franklin's summary,
14  correct?
15      A.  Well, did Pat Franklin conduct the
16  investigation?
17      Q.  That's what you base it on, what you read in
18  his summary, correct?
19      A.  Absolutely.
20      Q.  And you don't know how the test was actually
21  created, the questions, do you?
22      A.  But that's not the part that I'm talking
23  about.  I'm talking about the phones that weren't
24  checked.  If you want to go back to the questions, we
25  can go back to those.  I thought we were talking about



Page 109

1 something else.
2    Q.   What is so significant about Deitado's
3 phone?
4    A.   That it wasn't properly checked.
5    Q.   Why does that matter?
6    A.   Because if there was any information in
7 there that indicated that there was some impropriety
8 on the test, we're never going to know.
9    Q.   But how do you know there even could have
10 been information on there that would have been --
11    A.   We will never know because it wasn't
12 properly checked.
13    Q.   I mean, are you aware of a process that was
14 used to create the test, whether it was even possible
15 for some information regarding the test to be on his
16 phone?
17    A.   Yes.  I know that all of the subject matter
18 experts sat at a table discussing the questions that
19 were going to be placed on the test.  That much I
20 know.  I was not there.  I was not sitting there.  But
21 I know that that's how it works.
22    Q.   How do you know that?
23    A.   Well, that's general knowledge.
24    Q.   Okay.  So you don't really know how the
25 process works and what they're actually discussing?

Page 110

1    A.   Well, they discuss the test.
2    Q.   And --
3    A.   This is coming from their own mouth.  This
4 is coming from Deitado's mouth, from Merrill, from
5 Quinn.  That's what they do.
6         They're not allowed to discuss the content
7 of what they're talking about, but that's how it
8 generally works.
9    Q.   So I guess, everything is building with
10 respect to you in the department and leads you to
11 write this May 14, 2012, letter; is that correct?
12    A.   Yes.
13    Q.   Was there any final event or incident that
14 said to you or led you to believe, okay, I need to sit
15 down and write this out?
16    A.   Well, apparently based on all of these
17 investigations that were going on, in my opinion,
18 there were a lot of improprieties, one of them being
19 the phones not being checked correctly.  Things were
20 just being glossed over.
21         And there was a lot of emphasis on who wrote
22 the letter but not enough emphasis, in my opinion, on
23 did somebody actually cheat, do we actually have a
24 problem in our department where something -- some
25 issue here needs to be addressed and someone needs to

Page 111

1 be held accountable.  It was more of who wrote this
2 letter, how dare they.  That was the attitude that the
3 administration took.
4    Q.   Isn't the letter -- this anonymous letter,
5 doesn't it say, there is positive proof and this can
6 be easily proven that there was cheating?
7    A.   That's what the letter says.
8    Q.   So conceivably, if you found who wrote this,
9 they could then tell you what -- how it could be
10 easily proven and what's the proof positive?
11    A.   I guess.
12    Q.   Wouldn't that be a logical conclusion?
13    A.   That would be the logical conclusion.
14    Q.   Other than you getting the results and
15 reading them, was there anything else that led you to
16 say, I need to write this letter, any incident
17 specifically?
18    A.   Well, it was a combination of many things.
19 And there was just a lot of obvious gross
20 mismanagement by our police administration.
21         And even the letter itself, my complaint
22 that I wrote, if you look at the heading on the
23 complaint, it's addressed to the city manager.  Now,
24 the city manager was previously the police chief in
25 the past, many years ago.  So he does have some law

Page 112

1 enforcement experience.
2         And if I read a complaint stating that there
3 had been some improprieties partly by our chief and
4 that our chief has something to do with the
5 improprieties due to the fact that these
6 investigations were not carried out properly, why
7 would you turn around and give it right back to the
8 chief for him to investigate it?
9    Q.   So your concern in this letter was -- when
10 you say improprieties, you're talking about the way
11 the investigation was conducted?
12    A.   Yes.  And the DNA itself.  The collection of
13 the DNA -- I mean, everybody was coerced into giving
14 their DNA.  Everyone was bullied into giving their
15 DNA.
16         And you have to remember, sir, it's a small
17 department.  There are not many opportunities that
18 come along in a small department because of the
19 manpower.  And everybody pretty much adheres to what
20 the chief says.
21         And this particular chief is very vocal, and
22 he could be very intimidating.  And everyone knows
23 that he has a lot of power.  He knows a lot of people.
24 And he's the one that makes the decisions in the
25 department.  He makes the policies.  He makes the



Page 113

1 decisions.  And if you would not have submitted to
2 this DNA test, the sample that he requested, you were
3 going to be in a tough situation with this chief.
4    Q.   Your letter, though, is titled, Hostile Work
5 Environment?
6    A.   Yes.
7    Q.   Why did you title it that?
8    A.   I thought that that title would encompass
9 everything.
10       But as you can see, it's not just issues
11 between me and Deitado or interactions between us.  It
12 has to do with the investigation that occurred, the
13 collection of the DNA, which I believe that it was
14 highly improper.
15       And also, at the end of my complaint, you
16 will see that I made a note that this -- that this is
17 something that should be looked into because it's a
18 matter of public concern.
19    Q.   Your first sentence says, for some time now
20 I have been the subject of a hostile work environment
21 created by Sergeant Paul Deitado and carried out by
22 subordinates and officers loyal to him.
23       Do you mention the investigation and the
24 improprieties anywhere in the first paragraph?
25    A.   Well, I do throughout the complaint.  It's

Page 114

1 mentioned.  Would it be too much to ask for a lunch
2 break?  My stomach is killing me.
3    MR. GILL:  Yes.  It's a good time to stop.
4       (A short break was had.)
5    MR. GILL:  Back on the record.
6 BY MR. GILL:
7    Q.   Officer, before we took a break for lunch,
8 you mentioned Garrity Rights?
9    A.   Yes.
10    Q.   What are Garrity Rights?
11    A.   Garrity Rights are the rights afforded to
12 law enforcement officers when they are subjects of an
13 investigation.
14    Q.   And what do those rights entitle them to as
15 you understand it?
16    A.   The right to be represented, the right to be
17 notified of an impending investigation.
18    Q.   It's in the PBA contract?
19    A.   Yes.
20    Q.   You use the phrase, they should be given
21 their Garrity Rights.  Is there some actual official
22 process where you're handed a document that says, you
23 have Garrity Rights, or how does it work?
24    A.   Well, it was my understanding that at that
25 meeting when Tom Hunker was requesting our DNA, that

Page 115

1 we were subjects of an investigation because obviously
2 he wanted to compare the DNA of the officers with
3 whatever DNA he had on this letter.  So where is our
4 notification?
5    Q.   Speaking in general about Garrity just so I
6 understand how it works, have you ever been given
7 Garrity in another context?
8    A.   Yes.
9    Q.   How were you advised you had your Garrity
10 Rights?
11    A.   I was told -- I was actually advised by
12 email.
13    Q.   So what did the email say, that you have
14 your Garrity Rights?
15    A.   That you're the subject of an investigation,
16 you have the right to seek counsel, have your PBA
17 representative with you, and so forth.
18    Q.   And then the PBA representative is Eppler or
19 someone of your choice?
20    A.   In our department, it would be Eppler.
21    Q.   And Eppler was present at the meeting with
22 the DNA?
23    A.   Yes.
24    Q.   At that meeting, did all officers as far as
25 you're aware provide their DNA or not?

Page 116

1    A.   Well, since I was the first one to provide
2 it, I left immediately after.  I don't know how
3 many --
4    Q.   Fair enough.  I know from reviewing the
5 documents that sometimes the village will use
6 Miami-Dade Police Department and their Professional
7 Compliance Bureau to conduct investigations.
8       Do you understand that to be the case, that
9 they use them sometimes?
10    A.   Well, in the nine and a half years that I
11 have been at the department, the first time that I
12 ever -- that I have ever seen Miami-Dade PBC being
13 used is with my internal affairs investigation.
14    Q.   So as far as you're aware that had never
15 happened before?
16    A.   As far as I'm aware, this is the first time.
17    Q.   Subsequent to that, are you aware that it's
18 been used in other cases?
19    A.   I'm not aware.
20    Q.   Okay.  The Professional Compliance Bureau,
21 is that correct, PBC?
22    A.   Yes.
23    Q.   They are a part of Miami-Dade Police
24 Department?
25    A.   Yes.



Page 117

1    Q.   Okay.  So you submit your letter titled,
2  Complaint of Hostile Work Environment on May 14, 2012;
3  is that correct?
4    A.   Yes.
5    Q.   What's the next thing that happens after you
6  submit this letter regarding the letter?
7    A.   Well, it was -- I submitted it to my
8  supervisor.  He in turn -- which was Sergeant Martinez
9  at the time.  And he then submitted it up the chain
10  through Captain Quinn, and Captain Quinn submitted it
11  to then Chief Hunker, and subsequently Chief Hunker
12  met with the Village Manager Alfred Treppeda and
13  showed him the complaint.
14    Q.   And did you personally send it to the
15  village manager, also?
16    A.   No.
17    Q.   It's addressed to him on the letter, though?
18    A.   Yes.
19    Q.   Why would you do it that way?
20    A.   Well, because I believe that the chief had
21  some involvement with the improprieties that I saw on
22  the investigation, so I don't think it would have been
23  intelligent of me to submit the complaint that
24  mentioned the chief to the chief.
25    Q.   Why didn't you then instead of giving it to

Page 118

1  your sergeant put it in the mail and get it to the
2  village manager?
3    A.   I thought that submitting that complaint
4  directly to the village manager may have brought me
5  some disciplinary consequences due to our policy
6  stating that we should submit everything through the
7  chain of command.
8       So I had already been through enough, and I
9  didn't want to deal with any more, so I submitted it
10  that way.
11    Q.   By this point in time, had you received any
12  discipline yet?
13    A.   I don't believe so.  I don't believe so.
14    Q.   So when you said you have already been
15  through enough, what were you...
16    A.   Well, I had seen enough.  I saw that
17  investigation into the sergeant's exam that, in my
18  opinion, was very weak and, you know, the interactions
19  with the officers and Sergeant Deitado.  Just
20  everything that I documented in my complaint.  You
21  know, I thought it was time.
22    Q.   Okay.  So you submit the letter to your
23  supervisor, it goes up the chain of command, and what
24  happens next as far as you're aware?
25    A.   The complaint was turned back over to then

Page 119

1  Chief Hunker for him to investigate.
2    Q.   How do you know that is what happened?
3    A.   Well, I was told.
4    Q.   At the time?
5    A.   Yes.
6    Q.   So when did you come to learn that?
7    A.   You know, I can't say for sure the exact
8  date.  But I was advised that it was given back to the
9  chief -- to the then chief so he could investigate it.
10    Q.   And then there is an investigation commenced
11  that, as you said, is ultimately conducted by the
12  Miami-Dade Police Department -- well, the Professional
13  Compliance Bureau?
14    A.   It wasn't initially conducted by the
15  Miami-Dade --
16    Q.   Right.  That's why I said eventually.
17    A.   Eventually.
18    Q.   Were you ever told by Chief Hunker why he
19  did that?
20    A.   No.
21    Q.   Have you ever seen any correspondence where
22  Chief Hunker explains his reasoning for doing that?
23    A.   No.
24    Q.   Any kind of written documentation where he
25  explains his reasoning?

Page 120

1    A.   No.  As a matter of fact, he was very
2  adamant about having Investigator Patrick Franklin
3  conduct the investigation.  And the changing point was
4  when Investigator Franklin requested information from
5  the department, some records that he requested and
6  other things, which is outlined in an email.
7       And also, Investigator Franklin requested
8  that certain officers be named as subject officers due
9  to my complaint.  And I think the very next day or a
10  couple days after he was taken off the investigation.
11    Q.   Right.  But there is no email where Hunker
12  says, I'm doing this because of this, correct?
13       MR. BARRIOS-BALBIN:  Objection.  Form.
14  BY MR. GILL:
15    Q.   Have you ever seen an email in response to
16  that email from Investigator Franklin to Hunker with
17  those issues outlined, where Hunker says, because of
18  this I'm changing the way the investigation is being
19  conducted, have you?
20    A.   No.  That's part of -- that was part of the
21  strangeness of that is because there was no reasoning
22  for it.  Everything was moving forward.  It appeared
23  to be moving forward, and suddenly the investigators
24  were changed.
25    Q.   Had you had any interaction before with the



Page 121

1  Miami-Dade Police Department Professional Compliance
2  Bureau?
3      A.   No.
4      Q.   Do you understand them to be an independent
5  entity from the village?
6      A.   Yes.
7      Q.   So what was your involvement in the
8  investigation that followed your hostile work
9  environment complaint letter?
10     A.   I was interviewed by a Sergeant Leon from
11  the Miami-Dade Police Department about my complaint.
12      I'm backtracking a little bit because there
13  is a little more to -- before I meet with
14  Sergeant Leon, I was issued a letter by the village
15  that they decided not to look into all of my -- all of
16  the allegations in my complaint.  They decided to only
17  investigate what they thought was pertinent.
18      And they issued me a letter that stated --
19  I'll never forget this -- even if your allegations are
20  true, we do not find that they were violations of
21  policy, so we're only going to investigate A through H
22  or whatever the letter said.
23      So not everything in my complaint was
24  investigated.
25     Q.   Well, what specifically was not investigated

Page 122

1  in your May 12th -- I mean, May 14, 2012, letter that
2  you believe should have been investigated?
3      A.   I think that the matter of the sergeant's
4  exam investigation should have been addressed, and it
5  wasn't.
6      Q.   The investigation that had just concluded?
7      A.   Yes.
8      Q.   So you wanted -- well, okay.  What else?
9      A.   That and the fact that all of the -- all of
10  the information containing -- or involving rather I
11  would say -- involving Sergeant Deitado, those were
12  never addressed either.
13     Q.   Which things?
14     A.   I have 21 pages worth of information, and
15  they only decided to look at 10 points.
16     Q.   Let's take, for example, Page 2, the second
17  paragraph.  You raise an issue regarding Sergeant
18  Deitado banning your supervisor, Sergeant Martinez,
19  from a fantasy football league in our department
20  because he wanted to punish him for being honest on
21  your behalf of an inquiry by Captain Quinn, in
22  reference to a false allegation by Sergeant Young.
23  That wasn't investigated according to you?
24     A.   No.
25     Q.   And --

Page 123

1      A.   I mean, if you look at the letter -- you
2  should have the letter there.  If not, I'm sure my
3  attorney has the letter on what they decided to
4  investigate.
5      Right offhand, I can't touch on everything
6  that they did not decide to investigate because this
7  was some time ago, and I don't know all of the points.
8  But if we look at the letter, we can definitely see
9  what the offset was.
10     Q.   Referring to that, I mean, didn't you
11  already tell me that when Sergeant Young said you had
12  said something about Officer Matthews, that that had
13  been looked into and nothing was found to be the case?
14     A.   For that particular rumor that was
15  purported, yes.
16     Q.   And then -- I mean, Sergeant Deitado bans
17  your supervisor from a fantasy football league, is
18  that a violation of department policy?
19     A.   Well, the fantasy football thing is not a
20  real important issue when it comes to police work.
21      The fact of the matter was that at that time
22  he was checking all my reports, and he was not my
23  direct supervisor, and he really had no reason to be
24  checking all of my reports.
25      What was happening was that he began a

Page 124

1  campaign to try to look at all of my reports and to
2  determine if there were any errors, to point out
3  anything that he can point out in order to make me
4  look bad.
5      Q.   You don't think that issue was investigated
6  at all?
7      A.   I know it wasn't investigated.
8      Q.   Going back to my question, though, I mean,
9  some of the things in here -- I mean, should the
10  village have investigated whether Sergeant Deitado
11  banned your supervisor from a fantasy football league?
12     A.   Well, I think that it should have been
13  looked into, why was it that he was taking this type
14  of action against a sergeant on my behalf.
15      If the sergeant made a truthful statement on
16  an inquiry that was made about a false allegation that
17  they conjured up, why was it that there was some sort
18  of retaliation against the sergeant?  These questions
19  were never asked.
20      I also mention there in that complaint that
21  there was an officer that told me that he was taken to
22  a conference room by Sergeant Deitado and Captain Roye
23  because they were trying to force him out of the
24  strike force, the task force; and that they told him
25  that if he didn't do what they wanted him to do, that



Page 125

1  he may ask for backup one day and not get it.
2      And nobody even bothered to contact that
3  officer and speak to him about that matter.
4      Q.  Which officer was that?
5      A.  Officer George Waisman, W-a-i-s-m-a-n.
6      Q.  So did you object to the investigation being
7  conducted by Miami-Dade PD as opposed to Pat Franklin?
8      A.  I wouldn't say that I objected.  I gave the
9  benefit of the doubt.  I believed at the time that the
10 Miami-Dade investigators were capable and they were
11 professional individuals.  I have another opinion now.
12     But obviously the Investigator Franklin was
13 taken off the investigation because he was going in a
14 direction that the chief didn't want to go.
15     Q.  Well, part of your complaint in your hostile
16 work environment complaint letter is that Pat
17 Franklin's investigation of the anonymous letter was
18 poorly done, correct?
19     A.  I mentioned that -- I also mentioned that
20 Pat Franklin knew the chief for many years.
21     Q.  So wouldn't it be logical then for -- I
22 mean, you would not want the person investigating your
23 complaint about his poor investigation -- him
24 investigating that.  You would want someone else to do
25 it?

Page 126

1      A.  Well, this is the thing, also.  There was
2  information that came to my attention after, also,
3  which was an email by Patrick Franklin to the chief, I
4  believe, and/or Captain Daddario about the -- that the
5  phone -- or the phones that were involved in the
6  alleged cheating, to have those phones -- or phones
7  sent out to be forensically audited.  And that was
8  never done.
9      So can I say that Patrick Franklin didn't
10 conduct the investigation the way he was supposed to?
11 At the moment it appeared that he didn't.  But when I
12 read that email, he tried to do the right thing.  It
13 just wasn't carried out by the chief or the captain
14 who was in charge of the investigation.
15     I've never known -- I'm sorry -- I've never
16 known Captain Daddario to be a forensic specialist on
17 electronic devices.  And apparently he downloaded a
18 program from the internet and checked his phone with a
19 program from the internet.
20     You know, I'm only a nine-and-a-half-year
21 officer; but I have enough commonsense to know that
22 when you have a device of that nature, you send it to
23 somebody who knows what they are doing.
24     Q.  So who would have been the appropriate
25 person to investigate your hostile work environment.

Page 127

1      A.  Well, it could have been anyone as long as
2  they did the job that they were supposed to do.
3      Q.  Well, in your opinion, they didn't do it?
4      A.  Well, it was obvious that Patrick Franklin
5  was on the right track.  Now what investigation are we
6  talking about?
7      Are we talking about the sergeant's exam
8  allegation, or are we talking about the investigation
9  into my complaint?  I just want to be --
10     Q.  Your complaint.
11     A.  My complaint.  So my complaint apparently
12 started off very well.  He requested a lot of
13 information.  He requested officers to be put on
14 notice as subject officers.
15     And when that was going to happen, the chief
16 shut it down and went somewhere else.
17     Q.  Subject of what?  What would have been the
18 discipline of the officers in your complaint?
19     A.  I don't know that because I'm not the
20 internal affairs investigator and I'm not the chief.
21     But I can tell you that if you're going to
22 investigate a complaint, you have to call on people
23 and you have to make certain things happen.
24     Now, if you look at the flip side to what
25 Investigator Franklin was doing and you look at what

Page 128

1  Miami-Dade did, it's night and day.  Not only did they
2  -- did the investigators stick to the letter that was
3  generated by the village and only investigate certain
4  points that they decided they only wanted to
5  investigate, but the investigator -- the Miami-Dade
6  investigator also minimized that list even more and
7  said, we're not going to do this, we're not going to
8  check this, we're not going to look into this, we're
9  not going to -- and minimized it even more.
10     If you ask me -- if you ask me, the reason
11 why that investigation was taken out of Investigator
12 Franklin's hands and put into the hands of Miami-Dade,
13 it's because Miami-Dade was going to do what
14 Chief Hunker wanted them to do, which was nothing.
15     Q.  What do you base that belief on?
16     A.  Well, I can see from the investigation that
17 took place.
18     Q.  Do you have any document to support that?
19     A.  I'm a police officer, and I looked over
20 everything that happened, and I can tell you that
21 there were a lot of basic elemental things that should
22 have been done and didn't.
23     I'm going to ask you a question about what
24 we're doing here with the depositions, if I may?
25     Q.  You can ask a question.  I can't say I'm



Page 129

1  going to answer it.
2      A.   Okay.  You subpoenaed -- you subpoenaed
3  myself.  You subpoenaed a couple of other officers.
4  How did you -- how did you find former Captain Quinn's
5  address?  How did you get his contact information?
6      Q.   I mean, I'm not going to answer these
7  questions.
8          MR. BARRIOS-BALBIN:  He's not going to
9  answer any questions.  Just answer his questions.
10         THE WITNESS:  It's funny because during the
11 course of my investigation with Miami-Dade, they said
12 they weren't able to get a hold of Captain Quinn as a
13 witness.
14 BY MR. GILL:
15     Q.   Do they have subpoena power?
16     A.   They knew his information.  What I'm trying
17 to get at is that they had his information.  They had
18 his address.  They had his information, but it was
19 convenient for them not to speak to him.
20     Q.   So you're interviewed as part of the
21 investigation into your hostile work environment
22 complaint.
23         What is the next thing that you have
24 personal knowledge of that happens with respect to the
25 investigation into that hostile work environment

Page 130

1  complaint?
2      A.   Not much.  After it went to Miami-Dade, not
3  much.  They really didn't look into anything.
4          As a matter of fact, what happened was after
5  they said that nothing came of it and they found
6  nothing -- absolutely nothing -- out of 21 pages of
7  information that I provided on my complaint, they
8  found absolutely nothing.  What they did find
9  apparently was improprieties on my behalf.
10     Q.   We'll get to all that.
11     A.   Okay.
12     Q.   We're going to work our way through.  I'm
13 trying to stick with a little more -- you know, you
14 are interviewed.
15         What is the next thing you learned at that
16 time regarding the investigation?
17     A.   I don't remember exactly what was discussed.
18 I do know I submitted information to Sergeant Leon,
19 information that showed that Sergeant Deitado was
20 looking into my reports when he really had no business
21 doing so.
22         I also submitted information regarding an
23 incident involving Sergeant Deitado when he was a
24 detective.  Apparently he did not provide correct
25 information on a federal warrant.  And that was

Page 131

1  forwarded to the Miami-Dade Police Department
2  investigator, and that was never made a part of the
3  case.
4      Q.   Okay.  We'll talk about those two things.
5  Deitado in reviewing your records -- at this time what
6  rank was Deitado?
7      A.   Deitado is a sergeant.
8      Q.   What sergeant was he -- was he a detective
9  sergeant?
10     A.   Detective sergeant.
11     Q.   And what do you understand he was reviewing?
12     A.   My reports.
13     Q.   Your reports for what?
14     A.   Everything that I did.
15     Q.   Are these, like police incident reports?
16     A.   Yes.
17     Q.   Are these -- what kind of reports would they
18 be?
19     A.   Sick or injured persons.
20     Q.   On the scene of an incident?
21     A.   Yes.  Reports from incidents that occurred
22 at Bal Harbour.
23     Q.   So would some of these reports lead to
24 subsequent investigations?
25     A.   No.

Page 132

1      Q.   Why not?
2      A.   Because when you have someone who has a
3  stomachache, you don't, you know...
4      Q.   Sure.  But theoretically some of those
5  reports could have been things that resulted in an
6  investigation?
7      A.   If Sergeant Deitado would have been checking
8  everyone's reports --
9      Q.   Would you, please, answer my question?
10     A.   I'm sorry.  Could you repeat the question?
11     Q.   So some of those reports could have led to a
12 subsequent investigation about anything?  I mean,
13 maybe not a sick stomach, but you're filling reports
14 out from scenes where you respond as a police officer,
15 correct?
16     A.   Yes.
17     Q.   Some of those may be potential crimes?  I
18 mean, you could respond to a scene of a crime and
19 write a report, right?
20     A.   If they need further investigation, the
21 officer forwards the case to the investigations unit.
22     Q.   Okay.  So are those different reports from
23 the reports that you fill out?
24     A.   For example -- I'll give you an example.  If
25 I make a narcotics arrest and there is a possibility

1  of furthering -- furthering an investigation through
2  that arrestee where he can become a confidential
3  informant or provide further information, that
4  information is forward to the detective bureau.
5      Q.   By who?
6      A.   By the officer -- by this officer.
7      Q.   If you arrest someone for possession of
8  narcotics, do you automatically forward that to a
9  detective for further investigation or is it a
10  determination based on the facts?
11      A.   Based on the facts.  Based on the facts.  If
12  there is an indication that something else can come of
13  it, absolutely, it's forwarded to the detective
14  bureau.
15      Q.   That's your -- the officer's determination
16  on what occurred at the scene and what he determined;
17  is that how it works?
18      A.   Correct.
19      Q.   How did you come to learn that
20  Officer Deitado was reviewing your reports?
21      A.   Because at the time I was acting supervisor,
22  and I was checking reports of my subordinates.  And
23  when I looked at my reports, I noticed that he had
24  gone in, and he had looked at my report.  And I looked
25  at another report, and I saw his name on there, too.

1  And I kept looking at reports, and his name came up
2  with much frequency on my reports.  And I did not see
3  the same behavior on other officers.  It was mostly
4  towards me.
5      Q.   Did you -- so through the computer system,
6  you can see who accesses the report?
7      A.   Yes.
8      Q.   So did you actually go look at other
9  officers, at all their reports?
10      A.   I looked at a couple on my squad, and I did
11  not see the same activity.
12      Q.   Did you see any activity by Deitado?
13      A.   I don't know.
14      Q.   I mean, if I look at every officer's report
15  from your squad, did Deitado look at some of theirs
16  also and not as many as yours, or was it none and --
17      A.   No.  Some.  He did look at some of their
18  reports, but there was a great disparity between the
19  other officers and myself.
20      Q.   What came of him, as far as you know, of him
21  reviewing your reports?
22      A.   Nothing because it was never investigated.
23  It was never looked into.
24      Q.   No, no.  With respect to you, what came of
25  it?

1      A.   Oh.  I don't know.  I don't really know.
2      Q.   Were you disciplined for it?  Were you given
3  discipline saying your reports weren't appropriate?
4      A.   No.  There was no discipline, but there was
5  a comment to the captain that I was not doing my job
6  as I was supposed to be doing.
7      Q.   Did you hear him make that comment?
8      A.   No.
9      Q.   How did you learn that he made the comment?
10      A.   The captain told me.
11      Q.   What did the captain tell you?
12      A.   He said, that Sergeant Deitado brought it to
13  my attention that you haven't been doing your reports
14  or your job for that matter the way that you're
15  supposed to be doing it.
16      Q.   What specifically was he saying about the
17  reports that were in his opinion problematic?
18      A.   Something about search and seizure.  There
19  was something about search and seizure, that I wasn't
20  following search and seizure procedures properly.
21      Q.   And did you understand what that was about?
22      A.   I don't know.  I never had a problem.  I've
23  never been -- nobody has ever brought it to my
24  attention.  I've never been disciplined for that.
25          As a matter of fact, I have been commended

1  for my reports and my arrests, so I didn't know where
2  that was coming from.
3      Q.   Did you inquire further after that meeting
4  about what the comment was in reference to?
5      A.   He just told me what it was in reference to.
6      Q.   After that, did you say, Captain -- which
7  captain was this?
8      A.   Captain Quinn.
9      Q.   Did you say, Captain Quinn, I don't
10  understand what he is talking about, can you explain
11  to me further?
12      A.   I told him that I didn't see anything wrong
13  with it.
14      Q.   What did Captain Quinn say?
15      A.   I don't remember.  He just brought it to my
16  attention.
17      Q.   Okay.  The other piece of information you
18  reference was something about a warrant that Deitado
19  had issued in some federal --
20      A.   Apparently he was involved in a task force
21  with the DEA.  He was attached with the DEA.  And he
22  gave some information stating that he had information
23  from an anonymous informant about a grill house.  And
24  subsequently it was found out that the person in
25  charge of this grill house or the person that was the



Page 137

1  subject of the grill house was his wife's ex-husband.
2     Q.  How did you learn that information?
3     A.  I was told by Captain Quinn.
4     Q.  Okay.  Did you review any of the documents
5  that are referenced in it?
6     A.  No.
7     Q.  Did you do any further investigation other
8  than getting what Captain Quinn told you?
9     A.  I know that the matter was brought to the
10  attention of Chief Hunker when it occurred and nothing
11  ever happened.
12     Q.  How do you know that?
13     A.  Captain Quinn told me.
14     Q.  So all your information about this incident
15  is regarding Captain Quinn?
16     A.  Yes.
17     Q.  It's from Captain Quinn.  Excuse me.
18        And your opinion is that Miami-Dade in their
19  investigation into your hostile work environment
20  complaint should have investigated whether Deitado
21  while detached on the task force gave false
22  information on a warrant?
23     A.  It was wrong.  It was improper.  And I had
24  no knowledge that at that time that if you report
25  something that's wrong and improper, that it's not

Page 138

1  going to be looked into.  As a matter of fact, it was
2  not even addressed.  No one ever even told me that we
3  are not even going to look into this.  It was just
4  totally ignored.
5     Q.  Well, you filed a complaint about a hostile
6  work environment, about issues you were having or
7  perceived to be having -- listen to my question, and
8  then you can answer how you want.
9        And then you provide information about
10  something Deitado does in another -- while detached
11  that doesn't involve you, but you thought it should
12  have been investigated in your hostile work
13  environment investigation?
14     A.  I included a lot of information in my
15  complaint.  There were issues involving myself, and
16  there were incidents involving the department's
17  behavior with investigations and their procedure for
18  conducting investigations.
19        And I knew that these things were not right.
20  They were improper.  No. 1, the investigation into the
21  sergeant's exam, to me was not done correctly, and it
22  was manipulated, and I felt the need to report it.
23     Q.  Okay.  After you file your complaint in
24  May of 2012, the investigation is going on -- I mean,
25  what is the next event that you consider retaliatory

Page 139

1  against you by someone associated with the village?
2     A.  Well, Chief Hunker initiated an internal
3  affairs investigation on me at the close of the
4  supposed investigation that Miami-Dade was doing into
5  my complaint.
6     Q.  Okay.  We'll get to that.  You make an
7  allegation regarding Officer Vargas or Sergeant Vargas
8  speaking to your wife at her place of employment and
9  speaking to you at an off-duty detail?
10     A.  Yes.
11     Q.  Can you explain to me -- do you know when
12  that occurred?
13     A.  I want to say that was -- you know, I don't
14  remember the exact date.  I think it was in October.
15  I'm not sure.
16     Q.  Okay.  Tell me what happened with that, I
17  guess, that event or that incident.
18     A.  Well, when it comes to working in the
19  department with other officers, I don't have an issue.
20  I'm professional.  I'm respectful.  And I do whatever
21  needs to get done when it pertains to the job.
22        I've never had a social relationship with
23  Sergeant Vargas as to give him the ease to approach my
24  wife and engage in conversation.  And apparently
25  whatever was discussed, my wife didn't appreciate the

Page 140

1  tone.
2        After that -- after that, he approached me
3  at my off-duty employment at Saks Fifth Avenue and
4  started to tell me that no matter what issues I had
5  with the village or with the administration, that it
6  had nothing to do with him and that I was going to
7  have to deal with him whether I liked it or not.
8        Now, I understand his position as a
9  supervisor, and he was a supervisor that day.  And if
10  he had a legitimate reason to approach me to ask me
11  about the off-duty job or anything during the course
12  of the regular shift, anything that had to do with
13  work, I don't have a problem with.
14        Sergeant Vargas was very well aware that he
15  was named in my complaint.  And he really had no
16  reason to approach me with conversation that had
17  nothing to do with the job at hand.
18        So I complained to my supervisor about that,
19  and I wrote an email.  And Sergeant Vargas turned
20  around and reprimanded me for complaining.
21     Q.  How was Sergeant Vargas named in your
22  complaint?
23     A.  He was part of the individuals involved in
24  the investigation with the alleged cheating on the
25  sergeant's exam.



Page 141

1    Q.   Who are the officers you consider to be the
2    ones named, I guess, the subject of your hostile work
3    environment complaint?
4    A.   Well, Sergeant Vargas, Sergeant Deitado,
5    Sergeant Young, Chief Hunker, Captain Roye.  Right off
6    the top of my head --
7    Q.   Take a look.
8    A.   Daddario.
9    Q.   Is that it?
10   A.   I would say that's about it.
11   Q.   I mean, you name other people in here, but
12   you don't consider them targets or subjects of your
13   complaint?
14   A.   Targets?
15   Q.   I think you used the word subjects.  You
16   don't consider them subjects of the complaint?
17   A.   Well, in what capacity did I name them?
18   Q.   Well, Captain Quinn is on the first page.
19   A.   Okay.
20   Q.   Do you consider him a subject of your
21   complaint?
22   A.   He was more of a witness.
23   Q.   Okay.  What about Sergeant Martinez?
24   A.   He was more of a witness.
25   Q.   Okay.  I mean, the reason I ask is because

Page 142

1    you don't say anywhere specifically who is a subject
2    and who is a witness.
3    A.   That's not my job to do.  My job is to -- my
4    job in this whole issue was to forward the complaint.
5    And it was the administration's job to go ahead and
6    make that determination, which obviously it was being
7    made, but it was cut off by Chief Hunker and passed
8    over to the Miami-Dade Police Department.
9    Q.   An independent third-party to investigate,
10   right?
11   A.   I don't know.  I guess.
12   Q.   How many officers are there in the
13   department?
14   A.   Approximately 27, 28.
15   Q.   So one fourth of the department is the
16   subject of your complaint?
17   A.   They are not subjects.  Those are just the
18   officers that were mentioned in my complaint, that I
19   had interactions with.  I never got the opportunity to
20   see anyone named as a subject in my complaint.
21   Q.   Right.  But I thought you said that you were
22   -- that Vargas had approached you because he was the
23   subject to your complaint?
24   A.   He was mentioned in my complaint.  He was
25   part of my complaint.

Page 143

1    Q.   Well, so is Sergeant Martinez.  Would it be
2    appropriate for Sergeant Martinez --
3    A.   Sergeant Martinez, like I said before,
4    filled the capacity as more of a witness officer.
5    Q.   Okay.  Going back to the issue with your
6    wife, tell me everything your wife told you about what
7    occurred at the time where she spoke with Vargas at
8    her work.
9    A.   Well, I don't remember the substance of the
10   conversation.  I know that it was brief.  But she did
11   mention that the tone was somewhat condescending and
12   she felt intimidated by his approach.
13   Q.   Do you recall what she told you he said?
14   A.   No.
15   Q.   Okay.  And then this is one day, and then
16   another day he approaches you?
17   A.   The next day he approached me.
18   Q.   Do you know if Vargas was working as a
19   supervisor at off-duty detail then at the mall?
20   A.   He was not the off-duty supervisor.  He was
21   the supervisor for the shift.
22   Q.   Of the on-duty?
23   A.   Yes.  He would have overseen the off-duty,
24   also.
25   Q.   Just so I understand --

Page 144

1    A.   We don't have a particular -- somebody who
2    is in charge of monitoring.  We have an off-duty
3    coordinator, which is usually a sergeant, and we'll
4    have the regular shift supervisor.
5    Q.   Okay.  So even when you're on off-duty
6    detail, you still report to the sergeant who is the
7    squad sergeant for that shift?
8    A.   He oversees whoever is on the off-duty, in
9    the city that shift.
10   Q.   Do you have any information as to what
11   brought Sergeant Vargas to be at Saks Fifth Avenue,
12   when he spoke to your wife?
13   A.   No, no.  My wife is employed by Neiman
14   Marcus.
15   Q.   It was at the Bal Harbour Mall, though,
16   right?
17   A.   Yes.
18   Q.   So do you have any information that brought
19   him to be in that area to begin with?
20   A.   I don't know.
21   Q.   Another day -- was it the next day?
22   A.   It was either the next day or a couple days
23   after.
24   Q.   Okay.  You're working your off-duty detail
25   at the mall?



Page 145

1   A.  Yes.
2   Q.  And Sergeant Vargas comes to speak to you?
3   A.  Yes.
4   Q.  Would that be unusual in and of itself to
5   come and speak with you?
6   A.  Like I said, we're not socially -- we're not
7   very social with each other, and I regularly don't
8   work with him.
9   Q.  In that case, though, he is the squad
10  sergeant that is on duty, and you're working off-duty
11  detail?
12  A.  At that time, on that day?
13  Q.  Yes.
14  A.  I don't remember if he was assigned to that
15  squad or filling in for another supervisor.  But for
16  that day, he was the supervisor that day.
17  Q.  So would that have brought him into contact
18  with you because of that?  I mean, would that be part
19  of his duties to come by and speak with the off-duty
20  detail officers?
21  A.  It would be part of his duties if the
22  content of the conversation had to do with the job,
23  but it didn't have to do with the job.
24  Q.  We'll get to that.  I'm just trying to make
25  sure I understand what happened and how it fits in.

Page 146

1       Okay.  So he comes -- what is the first
2   thing he says to you?
3   A.  He says, hey, you don't have to say anything
4   if you don't want to, but you're going to have to hear
5   me out anyway; I don't know what problems you have
6   with the administration or with any other officer in
7   this department, but I just want you to know that
8   you're going to have to work with me whether you like
9   it or not.
10      I didn't say anything.  I never replied one
11  word.  I let him say what he was going to say.  And
12  with that, he turned around, and he left.
13  Q.  Okay.  What's the next thing you do with
14  respect to that?
15  A.  Well, I finish my off-duty, and I wrote an
16  email.
17      MR. GILL:  Let's mark this as the next
18  exhibit, Exhibit 8.
19      (Fernandez Deposition Exhibit No. 8
20      marked as requested.)
21  BY MR. GILL:
22  Q.  Have you seen that before?
23  A.  Yes.
24  Q.  Is that the email you're referring to?
25  A.  That's the email that I wrote.

Page 147

1   Q.  And it's from you, it's to Sergeant
2   Martinez; is that correct?
3   A.  Yes.
4   Q.  And why to Sergeant Martinez?
5   A.  Because he was my sergeant.
6   Q.  And then you CC Captain Quinn, Chief Hunker,
7   and then Sergeant Vargas?
8   A.  Yes.
9   Q.  And you CC Captain Quinn and Chief Hunker
10  because that's the chain of command?
11  A.  Yes.
12  Q.  And why do you CC Vargas?
13  A.  I wanted him to have a copy of the email.
14  Q.  If this had been, for example, just an
15  officer you had an issue with, would you have CCd the
16  officer on it, too?
17  A.  Probably.
18  Q.  Is there something specific, I guess, about
19  why you CCd Vargas on this?
20  A.  No.
21  Q.  Then what was your purpose in writing this
22  letter?
23  A.  I wanted to bring it to the administration's
24  attention that he came to my off-duty not to talk
25  about the off-duty or anything work related but more

Page 148

1   so leaning more towards issues involved in my
2   complaint rather than the job at hand.  And I really
3   had nothing to say to him in regards to my complaint.
4       And him as a supervisor and knowing --
5   because I know he was aware of my complaint.  He
6   shouldn't have come over and start discussing things
7   that were not job related.
8   Q.  So you don't think working together was job
9   related?
10  A.  Working together is one thing.  And like I
11  said before, I don't have a problem working with him
12  or anyone else.
13      I've had to work with Sergeant Deitado.  I
14  had to work with Captain Roye.  I've worked with
15  everyone in that department.  It's never been an issue
16  when it came to taking care of business.
17      I don't find myself having conversations
18  about investigations or things that are ongoing that
19  are, you know, not my place to be discussing with
20  people that are involved.  So I thought that he should
21  have a little bit more decorum and not approach me
22  with that type of conversation.
23      And as a matter of fact, when I made this
24  complaint, there was some emails that went back and
25  forth between Captain Quinn and the chief.  And I



Page 149

1 remember seeing an email that stated Captain Quinn
2 mentioned, I believe, that he spoke to Sergeant Vargas
3 and told the chief, I don't know what he was doing
4 there, if he -- he didn't discuss anything that was
5 job related; I don't know what he was really doing
6 there, and he shouldn't have been discussing that.
7    Q.  So what happens when you send this email?
8 What happens?
9    A.  I guess there was some exchange between the
10 captain, Sergeant Vargas, and the chief, and a couple
11 days later I received a reprimand from Sergeant
12 Vargas.
13    Q.  But you weren't privy to those conversations
14 until you read the emails later on through public
15 record?
16    A.  Privy to what conversations?
17    Q.  The emails between Captain Quinn, the chief,
18 and Vargas that you were referring to.
19    A.  Well, not privy to the conversation, but I
20 did see the emails through a public records request
21 later on.
22    Q.  But at the time you didn't know that was
23 going on?
24    A.  No.
25    Q.  You did get a response from Captain Quinn,

Page 150

1 though, correct?
2    A.  I believe so.  I believe I did get a
3 response.
4          (Fernandez Deposition Exhibit No. 9
5           marked as requested.)
6 BY MR. GILL:
7    Q.  Have you seen that before?
8    A.  Yes.
9    Q.  It looks like Captain Quinn responds at
10 10:03 a.m. the same day to your 8:05 a.m. email; is
11 that correct?
12    A.  Yes.
13    Q.  Were you satisfied with Captain Quinn's
14 response?
15    A.  Yes.
16    Q.  Well, your response to Captain Quinn, which
17 is an hour later, 11:03 a.m., ends with the last
18 sentence, I can sense by your response where my
19 concern is going...nowhere.
20    A.  Nowhere.
21    Q.  I mean, to me that does not seem like you
22 are satisfied with Captain Quinn's response?
23    A.  I was satisfied.  I mean, there's -- based
24 on all of the things that occurred prior to me making
25 my complaint and, you know, investigations going

Page 151

1 nowhere, complaints being buried in a sense, and
2 nothing happening because -- you know, some officers
3 can do no wrong.  And I thought, like I stated before,
4 I thought it was inappropriate for him to approach me
5 without any legitimate business conversation.  It was
6 all about, we got to get along, we got to do this, we
7 got to -- I know that.
8          And as Captain Quinn stated in his email,
9 both of you have always acted in a professional
10 manner, which is true.  If I have to work with him or
11 any other officer, I do it in a professional manner.
12 I know what we need to do.
13    Q.  At this time -- as of October 5th, 2012, did
14 you know the results of the investigation into your
15 letter?
16    A.  I don't know.  I don't know.
17    Q.  Don't you agree with me that the last
18 sentence you wrote to Captain Quinn -- it's not
19 insubordination, but don't you think that is a fairly
20 aggressive statement to be putting to your supervisor
21 in a work email?
22          MR. BARRIOS-BALBIN:  Objection to form.
23 BY MR. GILL:
24    Q.  In your opinion?
25    A.  No.  Just like my email to my supervisor

Page 152

1 about Sergeant Vargas, I got a response after I was
2 reprimanded, I aggrieved it, and I got a response back
3 from the city manager stating that, although there was
4 no disrespect, there was no conduct unbecoming, there
5 was nothing wrong with what I said, you know, he was
6 going to lower it to counseling instead of dismissing
7 the reprimand.
8    Q.  Right.  And we'll go through those.  Those
9 are on the list.  Your original letter, I mean, you
10 reference the questionable circumstances surrounding
11 his appointment to detective and then sergeant.  I
12 mean, you don't think that is a fairly aggressive
13 statement to someone who is --
14    A.  It's the truth.
15    Q.  In you opinion it's the truth?
16    A.  It's the truth.
17    Q.  Who else agrees with you on that?
18    A.  When you cover up things and things are
19 buried, there won't be much left to --
20    Q.  Who else is going to testify that Sergeant
21 Vargas' promotion to detective and then sergeant was
22 inappropriate?
23    A.  I'm sure that if the time would have been
24 taken to talk to more officers in my complaint, that
25 if a proper investigation would have been concluded,



Page 153

1  I'm pretty sure that the results might have been
2  different.
3      Q.  Well, you know, we have subpoena power here.
4  I can make people show up for depositions, so I can go
5  after whoever I want.
6          Who should I subpoena to confirm and is
7  going to support your opinion that Vargas' promotion
8  to detective and then sergeant was inappropriate?
9      A.  Well, I think you're already going to talk
10  to two officers.
11     Q.  Okay.  So Quinn and Goldberg are going to
12  support that.  Anyone else?
13     A.  No.  I think they would -- I don't know of
14  anyone else.
15     Q.  Okay.
16     A.  At least that they wouldn't be afraid enough
17  to say anything because there is a stigma of fear in
18  our department that coming forward and saying
19  anything --
20     Q.  Do you know what perjury is?
21     A.  Yes.
22     Q.  They will be under perjury.  Who else should
23  I subpoena?
24     A.  No.  One thing is subpoenaing someone and
25  another thing is someone afraid to say anything.

Page 154

1      Q.  Who else should I ask?
2      A.  I think you're good with those two officers.
3      Q.  In that original letter you sent to your
4  supervisor and CCd Quinn, Hunker, and Vargas, you also
5  say, I would expect that a supervisor who is a
6  detective and scored a "97" on a sergeant's exam would
7  know better than to approach an officer who filed a
8  complaint where they were named, et cetera, et cetera.
9          I mean, you don't agree with me that that
10  sentence is a little bit of a shot at Vargas?
11         MR. BARRIOS-BALBIN:  Objection to form.
12  BY MR. GILL:
13     Q.  In your opinion?
14     A.  No.
15     Q.  I mean, putting the 97 quotes, you weren't
16  trying to tweak him at all?
17         MR. BARRIOS-BALBIN:  Objection.  Form.
18         THE WITNESS:  No.
19  BY MR. GILL:
20     Q.  You mentioned you then received a reprimand
21  from Sergeant Vargas, correct?
22     A.  Yes.
23         MR. GILL:  Let's mark that as the next
24  exhibit.
25         (Fernandez Deposition Exhibit No. 10

Page 155

1          marked as requested.)
2  BY MR. GILL:
3      Q.  Is that the reprimand you're referring to?
4      A.  Yes.
5      Q.  It's dated October 9, 2012?
6      A.  Yes.
7      Q.  And I guess so I can understand, what is the
8  consequence of a reprimand in terms of being a
9  disciplinary action?
10     A.  Well, it stays permanently in your file.
11     Q.  What's the difference between a reprimand
12  and a counseling?
13     A.  A counseling stays in your file for a year.
14     Q.  What is -- is there anything below a
15  counseling in terms of disciplinary action?
16     A.  Not to my knowledge.
17     Q.  Okay.  Nothing official.  I guess if someone
18  talks to you about something to try to correct the
19  issue, but you don't consider that discipline?
20     A.  Not to my knowledge.
21     Q.  What's above a reprimand?
22     A.  Getting fired.
23     Q.  Is that --
24     A.  Suspended.
25     Q.  Suspended and then fired?

Page 156

1      A.  Yes.
2      Q.  So in response to this reprimand, you went
3  through the grievance processes with the village,
4  correct?
5      A.  Yes.
6      Q.  And what are those procedures?
7      A.  You have to write to your -- write your
8  grievance to your supervisor, and then your supervisor
9  reviews it.  And from there, it goes to the captain.
10         If he decides that there is nothing he can
11  do, you move up to the captain.  Then from the
12  captain, it goes to the chief, and then from the chief
13  to the city manager.
14     Q.  You mentioned when he -- if someone decides
15  there is nothing they can do, what do you mean by
16  that?
17     A.  Well, they review it.  And if they -- if
18  they can't do anything about the reprimand, if they
19  can't -- how can I say this?  It goes through the
20  process, and they have to either make a comment about
21  it or give a recommendation on it.
22     Q.  Okay.  That's my question.  Are there, like
23  criteria they look at to see whether it's valid or
24  appropriate?
25     A.  I don't know.  I don't know how they do it.



Page 157

1    Q.   They make a recommendation to who?
2    A.   I guess to the next --
3    Q.   You're not sure exactly who it would be?
4    A.   I'm not sure how that works.
5    Q.   But eventually if it keeps going, it
6   eventually goes to the village manager; is that
7   correct?
8    A.   Yes.
9    Q.   And he is the final decisionmaker with
10  respect to that?
11    A.   Yes.
12    Q.   In this case, you took it all the way to the
13  village manager?
14    A.   Yes.
15    Q.   Did the PBA get involved in this on your
16  behalf?
17    A.   I believe so.
18    Q.   How does that -- how does that process work?
19  When you get a reprimand, how do you get the PBA
20  involved?
21    A.   You contact the PBA.
22    Q.   Is that Eppler?
23    A.   No.  You go to the PBA office.
24    Q.   So when you got this reprimand, is that what
25  you did?

Page 158

1    A.   Yes.
2    Q.   Did they assist you in the grievance
3   process?
4    A.   Yes.
5    Q.   What kind of assistance did they give?
6    A.   They write the response.
7        MR. GILL:  Okay.  We'll mark the first step.
8   Mark this as 11.
9            (Fernandez Deposition Exhibit No. 11
10            marked as requested.)
11  BY MR. GILL:
12    Q.   So this is your first step in your grievance
13  for that?
14    A.   Yes.
15    Q.   And the PBA helped you with this?
16    A.   Yes.
17    Q.   They help you ever every step of the way it
18  goes up, correct?
19    A.   Yes.
20    Q.   So we will just move ahead to the final one.
21    A.   I think it was the PBA.  I'm not sure if it
22  was the PBA.
23    Q.   Do you want to go to Step 2 to see --
24        MR. BARRIOS-BALBIN:  Step 2?
25        MR. GILL:  Yes.  Do you want to go to Step 2

Page 159

1   to see if -- let me mark this as 12.
2            (Fernandez Deposition Exhibit No. 12
3            marked as requested.)
4        THE WITNESS:  Yes.  PBA, yes.
5   BY MR. GILL:
6    Q.   And there is a Step 3, which they helped you
7   with, which is up to the city manager?
8    A.   No.  I think Step 2 was to --
9    Q.   Step 2 is to the chief of police.
10    A.   To the chief.
11        MR. GILL:  Right.  And we can mark Step 3.
12            (Fernandez Deposition Exhibit No. 13
13            marked as requested.)
14        MR. GILL:  And before we start talking about
15  that, let's mark Hunker's response as 14.
16            (Fernandez Deposition Exhibit No. 14
17            marked as requested.)
18  BY MR. GILL:
19    Q.   I know I just gave you a lot of documents,
20  Officer.  Take a moment to review them, and let me
21  know when you're done.
22    A.   Okay.
23    Q.   It looks to me like that's basically most of
24  the -- the complete grievance process for the
25  reprimand.  You work your way up the chain of command;

Page 160

1   is that correct?
2    A.   Yes.
3    Q.   At each stage is there a response given to
4   you by the person you send it to?
5    A.   I believe so.
6    Q.   Okay.  The last one I marked looks like
7   Chief Hunker's response to your grievance; is that
8   correct?
9    A.   Yes.
10    Q.   And then after that, you submitted the
11  document to the village manager, which is marked as
12  13, correct?
13    A.   Yes.
14    Q.   And then eventually the village manager
15  actually accepted -- took your grievance and changed
16  it from a reprimand to a counseling?
17    A.   Yes.
18    Q.   And we'll go ahead and mark them.
19        In the records, there appear to be two
20  different responses with two different dates on them
21  from the village manager.
22        Are you aware of that?
23    A.   No.
24        MR. GILL:  Let's mark both of them 15 and
25  16.

Page 161

1
2        (Fernandez Deposition Exhibit Nos. 15-16
3        were marked as requested.)
4   BY MR. GILL:
5       Q.   Take a moment to look at those.
6       A.   Okay.
7       Q.   They appear to be mostly the same content in
8   the two paragraphs, but there's a difference with --
9       A.   The letterhead.
10      Q.   Yes, the letterhead is different.  Do you
11  understand why there are two different letterheads?
12      A.   No.
13      Q.   The signature on the bottom of Exhibit 15,
14  do you know whose signature that is?
15      A.   No.
16      Q.   It's not your signature?
17      A.   No.
18      Q.   And how about on Exhibit 16, do you know
19  whose signature that is?
20      A.   I think it's fair to say it's the village
21  manager because it's right beside his name.
22      Q.   Do you know that to be the case for sure?
23      A.   I don't know for sure.
24      Q.   But in any event, regardless of the two
25  different documents, they both come with the same

Page 162

1   results, that your reprimand is reduced to a
2   counseling?
3       A.   Yes.
4       Q.   And this counseling after a year has no
5   effect, correct?
6       A.   It's my understanding that after a year it's
7   taken out of your file.  That's my understanding.
8       Q.   Okay.
9       A.   I haven't reviewed my file, so I don't know
10  if it's there or not.
11      Q.   But in any event, it's not supposed to be
12  taken into account in any future action, correct?
13      A.   That's my understanding.
14      Q.   Right.  So if it was still in your file, you
15  would have rights under the PBA contract to deal with
16  it, correct?
17      A.   Right.
18      Q.   Okay.  And were you dissatisfied with the
19  village manager's response?
20      A.   I didn't understand -- if -- he stated that
21  my email to Sergeant Martinez was not insubordinate
22  nor did it depict that was conduct unbecoming of a
23  police officer, but I feel that your comments in that
24  email regarding the qualifications of Sergeant Vargas
25  and noting that he should know better were designed to

Page 163

1   insight a negative response from Sergeant Vargas.
2   I don't agree.
3       Q.   Those were the comments that I kind of
4   focused on.  Obviously your opinion is different.
5       But you know, your village manager looked at
6   it and came to a different conclusion.
7       Do you disagree with that?
8       A.   I don't know why he would say on one end
9   that my email was not insubordinate and my conduct was
10  not unbecoming but I still got the counseling.
11      Q.   Well, insubordination, that is a fairly
12  serious charge in the law enforcement field; is it
13  not?
14      A.   Your email to Sergeant Martinez was not
15  insubordinate.
16      Q.   Right.  But insubordination -- not in
17  respect to this case, but in general insubordination
18  is a fairly significant charge in a paramilitary
19  organization; is it not?
20      A.   I guess, yes.
21      Q.   Right.  So is conduct unbecoming, correct?
22      A.   If someone was reprimanded for being
23  insubordinate --
24      Q.   I mean, you can be insubordinate and be
25  terminated because of it; could you not?

Page 164

1       A.   I don't think so.
2       Q.   You don't think that you could --
3       A.   I don't think so.  It depends on the
4   circumstances.
5       Q.   Right.  So the village manager didn't find
6   those more serious charges, but he did find that your
7   email was somewhat inappropriate?
8       A.   But either it is or it isn't.  In my
9   opinion, either it is or it isn't.  On one side, he's
10  saying that it's not, but I still got the counseling.
11      Q.   You had it reduced to a counseling, which
12  after a year, it doesn't matter.
13      A.   Well, it matters to me.
14      Q.   But per the policy, it doesn't really impact
15  on your employment?
16      MR. BARRIOS-BALBIN:  Objection.  Form.
17  BY MR. GILL:
18      Q.   We just discussed the PBA contract.  We can
19  go through it.
20      A.   It does.  It does in a sense because these
21  counselings and these reprimands have been mentioned
22  later on in my career.  Even in my evaluation, this
23  recent evaluation they were mentioned.
24      Q.   This previous one?
25      A.   Yes.



Page 165

1    Q.  Did you take any action under the PBA to
2  have that grieved?
3    A.  No.
4    Q.  You could have; could you not?
5    A.  I probably could have.
6    Q.  Right.  But per the PBA -- the contract says
7  counselings are gone after a year?
8    A.  Well, they were brought up.
9    Q.  And you could have taken action under the
10  contract; could you not?
11    A.  I could have.
12    Q.  So those documents basically deals with the
13  Vargas reprimand, correct?
14    A.  Yes.
15    MR. GILL:  Let's take a quick break.
16         (A short break was had.)
17  BY MR. GILL:
18    Q.  Officer Vargas, before we broke, we
19  discussed the incident where --
20    A.  Officer Fernandez.
21    Q.  I'm sorry.  Who did I call you?
22    A.  Vargas.
23    Q.  Officer Fernandez, before we broke, we were
24  discussing the incident where Sergeant Vargas
25  approached your wife and you at Neiman Marcus and Saks

Page 166

1  and there was a reprimand that was eventually reduced
2  to a counseling.
3    That incident occurred, though, initially
4  October 4th and 5th, 2012, correct?
5    A.  I believe so.  I'm not sure.
6    Q.  You could look at the records.
7    A.  If that's the date that's on there.
8    Q.  Shortly thereafter, you received the results
9  of the investigation into your hostile work
10  environment; did you not?
11    A.  I don't remember the date.
12    Q.  What did you receive as -- when that
13  investigation concluded?  What were you provided?
14    A.  I was provided a summary report.
15    Q.  Okay.  Is that different from the report
16  prepared by Bal Harbour?
17    A.  I think --
18    Q.  Excuse me.  Is that different from the
19  report prepared by the Miami-Dade Police Department?
20    A.  You know, I'm not sure.
21    Q.  Okay.  I would have to see the document.
22    MR. GILL:  Let's mark this as the next
23  exhibit.
24       (Fernandez Deposition Exhibit No. 17
25          marked as requested.)

Page 167

1
2  BY MR. GILL:
3    Q.  This is actually -- I think I just handed
4  you the wrong document.  Is this the one about the --
5  no, this is the right one.  I'm sorry.
6    Have you ever seen this document before?
7    A.  I believe so.
8    Q.  Was this what you were provided when the
9  investigation concluded into your hostile work
10  environment complaint?
11    A.  Let me look at it a little more.
12    Q.  Take your time.
13    A.  I'm not sure if I received this document
14  after I received something from the Village of
15  Bal Harbour.  I'm not sure in which order I received
16  it.  It does look familiar to me.
17    Q.  Okay.  Is it common practice to receive a
18  closeout memo from the village regarding an IA
19  investigation?
20    A.  Yes.
21    Q.  If you recall, what were the results of the
22  investigation into your hostile work environment
23  complaint as stated in the closeout memo?  We will get
24  to what else occurred.
25    A.  The only thing that I can remember that they

Page 168

1  found was that there was an officer that was counseled
2  for sending me inappropriate text messages with sexual
3  content and there was a dispatcher -- actually it was
4  -- there were two dispatchers.  A male dispatcher and
5  a female dispatcher was given a written counseling
6  based on leaving her [sic] computer unattended where
7  apparently somebody ran my information.
8    MR. GILL:  Let's mark this next one.
9       (Fernandez Deposition Exhibit No. 18
10          marked as requested.)
11    THE WITNESS:  Yes.
12  BY MR. GILL:
13    Q.  Okay.  And so as a result of your hostile
14  work environment complaint sent to the village
15  manager, these three officers received some -- well,
16  two of the officers were disciplined; is that correct?
17    A.  Yes.
18    Q.  And that's Officer Duarte for sending a mass
19  text with inappropriate and possibly offensive
20  photographs and then Dispatcher Jackie Quince
21  (phonetic) for accessing -- not accessing but leaving
22  her computer logged on during her lunch break; is that
23  correct?
24    A.  Yes.
25    Q.  And then it does mention Officer Balikes?



Page 169

1    A.  Balikes.

2    Q.  Balikes.  But he is not disciplined; is that
3 accurate?

4         And then Officer Balikes was not
5 disciplined?

6    A.  No.

7    Q.  Was there any discipline that you're aware
8 of as a result of the investigation into your hostile
9 work environment complaint?

10    A.  I'm sorry.  Can you repeat that?

11    Q.  Was there any discipline other than these
12 two that resulted from your hostile work environment
13 complaint?

14    A.  No.

15    Q.  And you're dissatisfied with this response?

16    A.  Yes.

17    Q.  Who else do you think should have been
18 disciplined based on the investigation?

19    A.  Well, I don't know if it's a matter of
20 discipline.  But I know that not everything that I put
21 into my complaint was investigated.

22    Q.  Okay.  So you're not saying specific people
23 should have definitely been disciplined.

24         You're just saying that the investigation
25 into those allegations was insufficient?

Page 170

1    A.  In my opinion.

2    Q.  Now, as you discussed, there was another
3 investigation opened a result of your hostile work
4 environment complaint; was there not?

5    A.  Yes.

6    Q.  And that investigation pertained to you?

7    A.  Yes.

8    Q.  How did you come to learn about that?

9    A.  Oddly enough I was out on sick leave when I
10 learned that I was under investigation.

11    Q.  With respect to the --

12    A.  I found out sometime in February, I believe.

13    Q.  And you were out on extended sick leave?

14    A.  I was out on sick leave.

15    Q.  Okay.  So you weren't aware that there was
16 an investigation opened until after you were
17 disciplined with respect to the speeding incident?

18    A.  Yes.

19    Q.  Okay.  We'll talk about that.  Chief Hunker,
20 though, gets suspended; is that correct?

21    A.  I believe sometime in 2012, I want to say
22 I'm not sure about the date.

23    Q.  But he definitely was suspended, correct?

24    A.  Yes.

25    Q.  And he definitely was terminated as chief of

Page 171

1 police?

2    A.  Yes.

3    Q.  And I represent to you that his suspension
4 began on December 10, 2012.

5    A.  On or about that time, yes.

6    Q.  So not long after the investigation into
7 your hostile work environment concludes in
8 November of 2012, Hunker is on suspension?

9    A.  December.  Sometime in December.

10    Q.  Not long after the investigation into the
11 hostile work environment complaint ended, which was
12 November of 2012, Hunker is suspended?

13    A.  Yes.

14    Q.  When he is suspended, he has no contact with
15 the department in terms of being the chief of police?

16    A.  Well, I don't know about any contact with
17 the department or its members, but he was -- he was
18 suspended at the time.

19    Q.  It was an inartful question.  As far as you
20 understood, Chief Hunker was not functioning as the
21 chief of police?

22    A.  Correct.

23    Q.  Someone took over that position?

24    A.  Yes.

25    Q.  Who took over the position of chief of

Page 172

1 police?

2    A.  Captain Daddario.

3    Q.  He was acting chief of police; is that
4 correct?

5    A.  Yes.

6    Q.  Also, in December of 2012, there was a
7 speeding complaint lodged against you; is that
8 correct?

9    A.  Yes.

10    Q.  How did you become aware that the speeding
11 complaint had been made?

12    A.  It was brought to my attention by Sergeant
13 Young.

14    Q.  Was he your sergeant at the time?

15    A.  You know, I don't remember.  I don't
16 remember.

17    Q.  How is it that he brought it to your
18 attention?

19    A.  Well, he approached me with the complaint.

20    Q.  Okay.  What was the complaint?  What did it
21 look like?

22    A.  Well, I went into his office.  He is the
23 training sergeant.  I went into his office, and he
24 played for me the phone call of the complainant.

25    Q.  So you heard the recording itself?



Page 173

1   A.  Yes.
2   Q.  Were you given, like any document saying,
3  here is the complaint made, or how does it work when
4  something like that occurs?
5   A.  I don't remember if he gave me any documents
6  or not.
7   Q.  Is this shortly after the time the complaint
8  was made that he called you in?
9   A.  Not shortly after.  Some time had lapsed
10 after the complaint had come in.
11  Q.  What did the complaint say?
12  A.  The complainant said that there was a police
13 vehicle that was speeding and driving -- I remember he
14 said, like a cowboy -- driving like a cowboy.  He
15 didn't give his name.  He couldn't say what type of
16 vehicle it was.  I don't remember if he actually said
17 the vehicle number.  I don't remember if he did or if
18 he didn't.  I know that he wanted to remain anonymous
19 and did not give his information.
20  Q.  Okay.  What's the result of -- what happens
21 after you hear the complaint; what does Sergeant Young
22 say to you?
23  A.  You know, we're going to look into it and
24 you'll be hearing from us.
25  Q.  Is that something unusual?

Page 174

1   A.  No.
2   Q.  Did you think it was inappropriate for them
3  to look into the complaint?
4   A.  No.
5   Q.  Did you say anything back to him when you
6  heard the complaint?
7   A.  No.
8   Q.  Did you know he was talking about your
9  vehicle?
10  A.  No, I really didn't.
11  Q.  Did he -- did you say he said the ID number?
12  A.  I'm not sure if he said the number or not.
13 I'm not sure.  I know that at some point I was shown
14 some stills at the tollbooth, at the Bal Harbour
15 Islands tollbooth of Vehicle 321, which that
16 particular day I was driving.
17  Q.  Okay.
18  A.  But I don't remember if in the complaint, in
19 the recording, if he did mention the vehicle or not.
20 I don't remember.
21  Q.  What was the next thing you heard with
22 respect to that?
23     Well, let me ask you this:  When you heard
24 that, did you say anything back to Sergeant Young?
25  A.  No.

Page 175

1   Q.  Did you say, he's not talking about me, I
2  wasn't speeding?
3   A.  I don't remember saying anything to him.
4   Q.  Okay.  What's the next thing you hear with
5  respect to the speeding?
6   A.  I was shown some stills.  Apparently there
7  was some investigation into my transponder as to when
8  I entered the mall, and there was a counseling for me,
9  along with being suspended from the vehicle take-home
10 program?
11  Q.  Was this -- what kind of investigation was
12 this?  You spoke before about inquiry versus IA
13 investigation?
14  A.  I couldn't tell you.  I don't really know
15 what they did.
16  Q.  Okay.  Did you -- were you ever interviewed
17 as part of it again?
18  A.  I think that was pretty much the interview,
19 when I spoke to him there.  That was it.
20  Q.  Did you ever -- when it concluded, were you
21 given a copy of any investigation with the documents?
22  A.  Like I said, there were some stills, some
23 photographs of the vehicle stopped at the tollbooth --
24 or after the tollbooth because in the picture you
25 really can't tell I was at the tollbooth.  That was

Page 176

1  pretty much it.
2   Q.  Did you ever see any investigation documents
3  that they prepared?
4   A.  No.
5   Q.  Have you ever seen them here today?
6   A.  Have I what?
7   Q.  Have you seen them as you sit here today?
8   A.  No.
9     MR. GILL:  Let's mark this as the next
10 exhibit.
11     (Fernandez Deposition Exhibit No. 19
12      marked as requested.)
13 BY MR. GILL:
14  Q.  Take a moment to look at that.
15  A.  I think these were the papers that I was
16 shown.
17  Q.  Okay.
18  A.  Now looking at it with the stills -- see the
19 stills of the vehicle?
20  Q.  Yes.  What about the memo in the front
21 that's dated January 12, 2013?
22  A.  Yes.
23  Q.  Were you provided this at the time, or did
24 you see this months later?
25  A.  At some point I saw this document.  I



Page 177

1  thought there was more to it. I guess this was it.
2  But I had seen the stills.
3      Q. Okay. And you received a counseling as a
4  result of this?
5      A. And a suspension from the vehicle take-home
6  program.
7      Q. Okay. Who recommended the counseling?
8      A. I don't know.
9      Q. Would it help you to look at a copy of the
10 counseling?
11     A. Yes.
12     Q. Let me ask you this before we do that. This
13 is -- the sergeant that prepares this is Jack Young.
14        Why is Sergeant Young the one investigating
15 this?
16     A. I don't know.
17     Q. Was he your supervisor at the time?
18     A. I don't think so. But I'm not 100 percent
19 sure.
20     Q. You mentioned that he was the -- like the --
21     A. Training sergeant.
22     Q. Right. Would that put him in charge of
23 issues with driving as opposed to your normal
24 supervisor?
25     A. Not to my knowledge, no.

Page 178

1      Q. And also on this form, it says, training and
2  property -- this is Exhibit 2 -- for Sergeant Young.
3        I mean, would property be vehicles? So
4  would he be in charge of vehicles?
5      A. The property --
6      Q. Oh. It says Lieutenant Merrill is fleet and
7  logistics.
8        Did Sergeant Young report to Merrill?
9      A. No. Just when he was my sergeant.
10     Q. Okay. All right. Let's see -- counseling.
11 So after you initially spoke with Sergeant Young and
12 heard the complaint, what was your other involvement
13 up to receiving the counseling?
14     A. That was it. When I -- when I saw these
15 documents at some point during the course of the
16 investigation, I did find it strange that I heard with
17 my own ears the recording that Sergeant Young had
18 played for me, that the gentleman decided that he was
19 not going to give his information, he didn't want to
20 leave his phone number, he didn't want to leave his
21 information, he wanted to remain anonymous, and there
22 was a name placed on the complaint, which I found to
23 have been odd.
24     Q. Right. Did you come to learn how the name
25 got placed on there?

Page 179

1      A. I asked Sergeant Young, and he said that
2  Captain Daddario or acting Chief Daddario had seen
3  that name on the caller ID and he decided to place
4  that name on the report.
5      Q. Okay. Is that inappropriate in your
6  opinion?
7      A. I believe so.
8      Q. Why?
9      A. How could he verify if that is the actual
10 complainant?
11     Q. Well, does it matter one way or the other if
12 the person wants to remain anonymous anyway?
13     A. Well, I think if the person wants to remain
14 anonymous and doesn't want to give their name, why
15 would there be a name on the paper?
16     Q. Does that affect the validity of the
17 investigation, in your opinion?
18     A. Well, in my opinion, there was really no
19 evidence of me speeding. Now, if there would have
20 been a video submitted of me speeding, I can believe
21 that.
22        But the only thing that the investigation
23 turned up was a couple stills at the toll and an
24 anonymous complaint that someone decided to put a name
25 on, and that was pretty much it. So I didn't believe

Page 180

1  very much in this complaint.
2      Q. Did you ever dispute that you were speeding?
3      A. I don't believe that I was speeding, and I
4  told Sergeant Young that I wasn't.
5      Q. That's -- I just asked you if you told him
6  anything, and you said you didn't.
7      A. Well, I mean, I didn't -- it wasn't a
8  lengthy conversation, and we didn't get into a whole
9  lot about the complaint.
10        He showed me the video. I'm not sure at
11 what point did I see these stills. I know saw these
12 stills. Maybe it was after their investigation was
13 over. But I wasn't speeding.
14     Q. Do you admit that you were in that vehicle
15 at that time?
16     A. I don't know if I was at that -- in that
17 vehicle at that time. I know that I had that vehicle
18 that day.
19     Q. Would someone else had been driving it to an
20 off-duty detail at Neiman Marcus?
21     A. Well, I had the off-duty detail at Neiman
22 Marcus, so that's why I know that I had that vehicle
23 that day.
24        These stills, when they were taken, I don't
25 know. There was a discrepancy on the times on these



Page 181

1  stills, so I don't know.  I really don't know.  I
2  don't know how they conducted the investigation.  I
3  don't know exactly what was done.
4        MR. GILL:  Well, here's the counseling.
5  Let's mark this as the next exhibit.
6        (Fernandez Deposition Exhibit No. 20
7           marked as requested.)
8        THE WITNESS:  And also, on this counseling,
9  they mention a similar complaint in 2012, which I was
10  never counseled or reprimanded for.
11        And the complaint had to do with a caller
12  that stated that I had turned my police lights on when
13  I got to the toll and that I got through.  And I
14  didn't have the transponder on my police vehicle at
15  that time.  And I had to turn on my lights, but they
16  were very concerned about the fact that I had turned
17  on my lights when I got to the toll.
18  BY MR. GILL:
19     Q.  Right.  The complainant was?
20     A.  The complainant.  But there was never any
21  investigation, and there was no counseling or anything
22  like that.
23        But although that was the case, they still
24  utilized that and added it onto this counseling.
25     Q.  Within the last year, right, there was

Page 182

1  another complaint made against you regarding your
2  driving?
3     A.  I don't think it was a complaint about my
4  driving.  There was a concern about the fact that I
5  had turned my lights on at the tollbooth.
6     Q.  Did you ever see that complaint?
7     A.  Yes.
8     Q.  What did it say?
9     A.  Well, I heard it from Captain Quinn that
10  someone had called and there was some concern about
11  why did I turn on my lights at the toll.
12        And they were not aware that some of us
13  don't have a transponder and we have to get the
14  attention -- at that time I was in a semi-unmarked
15  vehicle.  I was in a black 2010 Dodge Challenger that
16  had the ghost graphics on it.  And you couldn't
17  distinguish from a marked police unit unless you
18  really got a good look at it.
19        And I had to turn on my lights and sound my
20  siren so they knew I was a police vehicle.
21     Q.  Could you look at the packet of information
22  that has been marked as 19, which is the
23  investigation.  If you turn to the second to last
24  page...
25     A.  Okay.

Page 183

1        MR. BARRIOS-BALBIN:  The second to the last
2  page?  I'm sorry.
3        MR. GILL:  Yes.
4  BY MR. GILL:
5     Q.  It is an email chain that says on top, Re:
6  Complaint, Raul Martinez, and it's dated -- the top
7  one is dated Saturday, April 7, 2012.
8        The bottom email appears to be from Captain
9  Quinn to Sergeant Martinez, and it's dated
10  April 5th, 2012.  So just for reference, that is, you
11  know, six months, seven months before your counseling
12  in January of 2013, for speeding.
13        And it says, Sergeant Martinez, we received
14  a complaint from an individual who stated that on 4-3,
15  between 7:00 p.m. and 7:30 p.m., he observed Vehicle
16  350 speeding through Bal Harbour Islands over the
17  Broad Causeway and then down Sans Souci Boulevard.  He
18  also said the vehicle used its red and blue lights to
19  get through the toll plaza.  Please, look into this,
20  and let me know what you discover so that I may call
21  the individual back.  Captain Quinn.
22        Did I read that correctly?
23     A.  Yes.
24     Q.  So it appears at least according to Captain
25  Quinn that there was a complaint about Vehicle 350

Page 184

1  speeding and going through with its lights on back in
2  April of 2012.  Was that your vehicle number?
3     A.  Yes.
4     Q.  So was that the complaint you were referring
5  to before?
6     A.  Yes.
7     Q.  So it was not just for using your lights to
8  go through it, although that was part of it, but it
9  was also for speeding?
10     A.  Well, that's what the complainant said.  I
11  forgot about that part because I don't remember
12  speeding.
13     Q.  Right.  And this counseling in the future,
14  when they take that into account, it was not just
15  about the light.  It was about speeding, also?
16        MR. BARRIOS-BALBIN:  Objection.  Form.
17        THE WITNESS:  What did Sergeant Martinez
18  reply?
19  BY MR. GILL:
20     Q.  Right.  I mean, if you want to read into the
21  record, we can.  It just says, I checked with Officer
22  Fernandez, who was assigned to Vehicle 350.  He stated
23  that he did hit his lights on to get through the
24  tollbooth because he doesn't have a transponder for
25  the tollbooth and that his vehicle being semi marked,



Page 185

1  the tollbooth attendants do not recognize his vehicle
2  as a police vehicle. I don't see anything wrong with
3  Officer Fernandez' actions to get the attention of the
4  tollbooth attendants to get through the tollbooth.
5  Officer Fernandez told me that he did what he normally
6  does when he goes home, not speeding through Bal
7  Harbour Islands.
8       Right. Well, at least from the village's
9  standpoint, there were two complaints in six months so
10 -- I mean, you weren't disciplined for them, but they
11 exist, right?
12      A. If you want to call that a complaint, yes.
13      Q. Do you think that Captain Quinn was making
14 that up?
15      A. No.
16      Q. With respect to the counseling that's been
17 marked as 20, you signed it under protest; is that
18 correct?
19      A. Yes.
20      Q. Why did you sign under protest?
21      A. Because I did not agree with the counseling.
22      Q. Okay. And what was your disagreement?
23      A. That there was no evidence of me speeding
24 and that the recording that I heard said that there
25 was an anonymous complainant and then there was a name

Page 186

1  on the complaint, and I thought that was rather odd.
2       Q. Okay. Anything else?
3       A. No.
4       Q. Did you grieve this counseling?
5       A. Yes.
6       Q. And what was the result of that grievance?
7       A. I don't remember.
8       Q. Now, in addition to this counseling, you
9  mention that your take-home vehicle was suspended for
10 30 days?
11      A. Yes. And it was taken away from me, too.
12          This vehicle that I was using, the Vehicle
13 350, which is the -- which was the Dodge Challenger,
14 was being serviced at the time, and I was utilizing
15 that other vehicle, 321. And they suspended me from
16 the vehicle take-home program, and they also stripped
17 me of my take-home vehicle.
18      Q. You mean they switched vehicles?
19      A. Yes.
20      Q. What vehicle did you go from, and what did
21 you get?
22      A. That 321.
23      Q. What type of vehicle? I'm sorry.
24      A. SUV. A Ford SUV.
25      Q. What's the difference between having a Ford

Page 187

1  SUV and a Dodge Charger in terms of police work?
2       A. Challenger. It's a two-door Challenger with
3  ghost graphics.
4       Q. With respect to --
5       A. And the reason why I was assigned that
6  vehicle, the Challenger, was because they brought that
7  vehicle in as a traffic unit. And the way that they
8  assigned that vehicle was through the officer's work
9  product, through their productivity. That's how I got
10 assigned the vehicle. But they took it from me.
11      Q. So you got that as a product of how many
12 tickets you wrote?
13      A. Your activity overall, arrests, citations,
14 everything.
15      Q. When were you awarded that, I guess?
16      A. I don't remember. Sometime before.
17      Q. Like a year, two years? How long?
18      A. Maybe a year.
19      Q. Is that an annual thing? I mean, how often
20 do they look at the results of who is the most --
21      A. No. That was just for this particular
22 vehicle because it was a very nice traffic unit.
23      Q. Right. I guess, my question is, would they
24 look at it again in a year and see who the most
25 productive officer was and switch vehicles?

Page 188

1       A. I don't think that is going to happen
2  anymore, especially now with that vehicle, because
3  they -- after that, the car sat parked at the station
4  for months, and they subsequently got rid of the car.
5       Q. Okay. Do you know why they got rid of the
6  car?
7       A. No.
8       Q. Did anyone else drive the car?
9       A. Sergeant Deitado.
10      Q. For how long?
11      A. On and off.
12      Q. I thought you said it sat parked at the
13 village?
14      A. Yes. Nobody was assigned to the vehicle.
15 And the vehicle was taken from me. I was assigned
16 321. But he drove it on and off.
17      Q. But it was never an assigned vehicle as far
18 as you're aware?
19      A. No.
20          MR. GILL: Let's mark this as the next
21 exhibit.
22          (Fernandez Deposition Exhibit No. 21
23          marked as requested.)
24 BY MR. GILL:
25      Q. Have you seen that before?



Page 189

1 A. Yes.
2 Q. Is that the memo regarding the suspension of
3 your take-home vehicle for 30 days?
4 A. Yes.
5 Q. So as a result of this you would have had to
6 drive your own vehicle to work and then switch into
7 your department vehicle; is that correct?
8 A. Yes.
9 Q. Did you disagree with this aspect of the
10 discipline?
11 A. Yes.
12 Q. Why?
13 A. Well, again, I didn't believe it was enough
14 evidence to state that I was speeding.
15 Q. Okay. Now, this is January 22nd, 2013. How
16 did you get home from work that day?
17 A. I believe my wife picked me up.
18 Q. And then did you work the next day?
19 A. I don't think so.
20 Q. Were you scheduled to work?
21 A. I think so.
22 Q. Why didn't you work?
23 A. Because I wasn't feeling well.
24 Q. So you used a sick day?
25 A. Yes.

Page 190

1 Q. Did you work -- were you scheduled to work
2 the day after that, the 24th?
3 A. I don't remember.
4 Q. Okay. Did you then go on extended sick
5 leave?
6 A. Yes.
7 Q. Okay. Why?
8 A. Well, because I wasn't feeling well.
9 Q. Did you go see a doctor?
10 A. Yes.
11 Q. When did you go see a doctor?
12 A. I believe the very next day.
13 Q. What doctor did you see?
14 A. Dr. Valencia, Judith Valencia.
15 Q. I think I've seen her address. What kind of
16 doctor is she?
17 A. She's a general.
18 Q. Did she give you any kind of diagnosis when
19 you saw her the next day?
20 A. Well, I was feeling palpitations. I was
21 having tingling in my left arm. I was under a lot of
22 stress, as you can see.
23 All of these counselings and reprimands came
24 right after I made my complaint. I could do no right.
25 It was a lot of pressure on me. So I had to go see a

Page 191

1 doctor. I just wasn't feeling well. And I was
2 diagnosed with hypertension at that moment in time.
3 Q. Are did she advise you not to return to
4 work?
5 A. She advised me not to.
6 Q. Because of hypertension?
7 A. She said I needed to get that under control.
8 Q. Did she prescribe you any medication?
9 A. Yes.
10 Q. And what did she prescribe you?
11 A. Lisinopril.
12 Q. Was that the first time you had been taking
13 medication, lisinopril?
14 A. Yes.
15 Q. Was that the first time you had been treated
16 for hypertension?
17 A. Yes.
18 Q. Are you still taking that medication?
19 A. Yes.
20 Q. Do you still have hypertension?
21 A. Yes.
22 Q. Is it controlled?
23 A. Right now it is.
24 Q. How long were you out on leave for?
25 A. I want to say approximately 30 days maybe.

Page 192

1 Q. The time of your vehicle suspension?
2 A. Yes.
3 Q. Are you sure it wasn't more like seven
4 weeks?
5 A. It could have been because we work 14 days a
6 month.
7 Q. Okay. So when you said 30 days, you meant
8 30 workdays?
9 A. 30 workdays.
10 Q. With respect to this suspension of your
11 vehicle, when it says 30 days, is that 30 consecutive
12 days or 30 workdays?
13 A. I don't know what they meant.
14 Q. Typically in memorandums with department
15 information, does it specify when it's workdays as
16 opposed to consecutive days?
17 A. This one they didn't specify?
18 MR. BARRIOS-BALBIN: You have to answer yes.
19 THE WITNESS: Oh. Yes. I'm sorry.
20 BY MR. GILL:
21 Q. What were the results of your efforts to
22 grieve the counseling?
23 A. I went to see the PBA attorney. And he
24 stated that although I had been disciplined by being
25 suspended from the vehicle take-home program, that the



1  PBA didn't deem the counseling as something that would
2  have been grievable.
3      Q.  Right.  Didn't you then go through the
4  village's procedures for grieving?
5      A.  I don't remember if I did.  There was so
6  many counselings and reprimands.  I don't remember
7  each and every one of them.
8      Q.  Well, how many have we talked about so far
9  today?
10     A.  I think we've talked about maybe three or
11 four.
12     Q.  Well, I mean, there is the one from Vargas?
13     A.  Vargas.
14     Q.  And then there is the speeding one?
15     A.  The speeding one.
16     Q.  So that's only two?
17     A.  That's only two.
18     Q.  We'll talk about everything that happened.
19 But are there any others that you talked about today
20 that I'm unaware of?
21     A.  No.  I think that's pretty much it.  It's
22 just that each of those has several documents attached
23 to it, so it seems like a lot.
24         MR. GILL:  Let's mark this next one as the
25 next exhibit.

1
2          (Fernandez Deposition Exhibit No. 22
3          marked as requested.)
4  BY MR. GILL:
5      Q.  Have you seen that document before?
6      A.  Yes.
7      Q.  What is that document?
8      A.  This is an email that I wrote to the acting
9  village manager.
10     Q.  And that's Jay Smith; is that correct?
11     A.  Yes.
12     Q.  Is that the Jay Smith you referred to before
13 in being terminated from the police department under
14 ambiguous circumstances?
15     A.  I don't remember mentioning that here.
16     Q.  If you look in your hostile work environment
17 complaint letter --
18     A.  Yes.  I don't remember mentioning that
19 verbally here.
20     Q.  But that's the same Jay Smith?
21     A.  That's him.
22     Q.  Or interim village manager?
23     A.  Yes.
24     Q.  Do you understand him to be the village
25 manager now?

1      A.  No.
2      Q.  You don't think he is?
3      A.  No.  I know he is not.
4      Q.  What is his position?
5      A.  I think he is something in human resources,
6  but I'm not sure.
7      Q.  So you send him an email basically saying --
8  well, what was your purpose in sending this?
9      A.  Let me read this.
10     Q.  Sure.  Take your time.
11     A.  Okay.
12     Q.  Do you recall that?
13     A.  Yes.
14     Q.  And I guess, what was your purpose in
15 writing this email?
16     A.  In this email, I noted what I believed to be
17 several inconsistencies with the speeding complaint.
18 And also, I noted on here when I came back to work,
19 for some reason Sergeant Deitado was my sergeant.
20         And something that had never been done in
21 the department before, he -- I put in a request for my
22 Kelly Day.  A Kelly Day is the extra hours that
23 accumulate after a six-week period.  If you work --
24 it's 44 hours a week, and at the end of the six weeks
25 you get 12 hours of overtime, which they change over

1  into an extra day off.
2          So when I was selecting my Kelly Day on the
3  schedule, he came up to me and told me that I couldn't
4  take that Kelly Day because -- since I had used up a
5  certain amount of sick time, that I had to select my
6  Kelly Day at the end of the six weeks instead of the
7  beginning of the six weeks, something that we had
8  never dealt with before.  That was never -- I had
9  never run into that before.  So I wrote to him about
10 this.
11     Q.  And I guess, the village manager or interim
12 village manager's response is, there is a grievance in
13 place; and as such, I'm forwarding this matter to
14 interim Chief Daddario to review and respond to.  I
15 will review the matter should it reach my level in the
16 process.
17         Did you understand there to be a grievance
18 process through the village procedure, the village
19 manual?
20     A.  I think what he was referring to was the
21 actual grievance process where you go through the PBA.
22         But I wanted to bring it to his attention
23 because there was nothing I could do through the PBA
24 because it wasn't a reprimand, it was a counseling.
25     Q.  Well, do you understand there to be, also, a



Page 197

1  grievance procedure for the village for things not
2  covered by the PBA?
3      A.  I wasn't aware of that.  I don't remember
4  that.
5      Q.  I'm referring to Standard Operating
6  Procedure 05-03, grievance procedures.  Have you ever
7  -- are you familiar with that?
8      A.  Can I take a look at it?
9      Q.  Yes.
10         MR. GILL:  Go ahead and mark it as the next
11  exhibit.
12         (Fernandez Deposition Exhibit No. 23
13          marked as requested.)
14  BY MR. GILL:
15      Q.  Okay.
16      Q.  Have you seen that before?
17      A.  I may have.
18      Q.  So it appears this, there is another
19  grievance procedure for issues that aren't covered by
20  the PBA contract; is that correct?
21      A.  It's made apparent here in this policy.
22      Q.  Right.  So it stands to reason that when the
23  village manager referred to a grievance procedure,
24  that you can grieve something that is not covered by
25  the PBA.  You just don't have PBA help with it, right?

Page 198

1      A.  Yes.
2      Q.  What was the result of your email to the
3  village -- the interim village manager that we had
4  marked Exhibit 22?
5      A.  I don't think anything came of it.
6      Q.  Did you receive a response from Captain
7  Daddario?
8      A.  Yes.
9      Q.  What was the response?
10     A.  I don't remember, but I know there was a
11  response.
12         (Fernandez Deposition Exhibit No. 24
13          marked as requested.)
14  BY MR. GILL:
15     Q.  Have you seen that before?
16     A.  Yes.
17     Q.  Is that the response you received?
18     A.  Yes.
19     Q.  Were you satisfied with this response?
20     A.  Well, I don't know if satisfied is the
21  correct word, but I accepted it.
22     Q.  Okay.  Well, did you take this up at the
23  next step?
24     A.  No.
25     Q.  I guess, at least with respect to the Kelly

Page 199

1  Days, do you now see that there had been a change in
2  policy, in fact?
3      A.  Obviously.
4      Q.  Right.  And during that time, I guess, you
5  were off on sick leave?
6      A.  What time?
7      Q.  When that change in policy came in place,
8  hadn't you been off for seven weeks?
9      A.  Yes.  It had conveniently changed with my
10  absence, yes.
11     Q.  Well, do you think Captain Daddario changed
12  the policy for the entire department just because you
13  were out on sick leave?
14     A.  I don't know.
15     Q.  Did this not impact all officers?
16     A.  It certainly impacted me.
17     Q.  Well, do all officers get Kelly Days?
18     A.  Yes.
19     Q.  And previously they could take it at the
20  beginning of six weeks; could they not?
21     A.  Yes.
22     Q.  And then afterwards, every officer,
23  including yourself could only take the Kelly Day in
24  the first four weeks of the six-week cycle?
25     A.  I guess everybody had to accept the change.

Page 200

1      Q.  Right.  And then with respect to the 30-day
2  suspension, he advised you another officer had been
3  subject to it at the same time -- or around the same
4  time?
5      A.  Yes.  That doesn't really concern me.
6  That's a separate issue.  Whether he took
7  responsibility for his actions or not, that's his
8  issue with the department.
9      Q.  He was out -- he got the same 30-day
10  suspension?
11     A.  Right.  That's got nothing to do with me.
12  Why he mentioned that, I don't know.
13     Q.  Well, I think the inference would be that
14  you're not being singled out with respect to at least
15  the speeding issue in terms of the 30-day suspension?
16     A.  Well, he took responsibility for his
17  actions, and he is telling me here that I didn't take
18  responsibility for my actions.  If I didn't do
19  something, I'm not going to take responsibility for
20  something I didn't do.
21     Q.  So this is the end of any sort of grievance
22  with respect to the vehicle and the suspension of the
23  car, correct?
24     A.  Yes.
25     Q.  Now, before we got back on the vehicle



1  issue, we were talking about your sick leave and being
2  out for 30 days for hypertension.
3      A.  Yes.
4      Q.  Were you ever diagnosed with any other issue
5  during that period of time?
6      A.  The doctor said that I was going through a
7  depression.
8      Q.  What kind of -- is Dr. Valencia a
9  psychologist or a psychiatrist?
10     A.  She's a doctor.
11     Q.  Is she either one of those doctors?
12     A.  I don't know.
13     Q.  Okay.  But did she prescribe any medication
14  for your depression?
15     A.  She did.
16     Q.  What did she prescribe?
17     A.  I don't remember what she prescribed, but I
18  didn't take it.
19     Q.  Did she diagnose you with any other medical
20  issues during those seven weeks?
21     A.  That I can remember, no.
22     Q.  Did you see any other doctors other than
23  Dr. Valencia during that seven-week period of time?
24     A.  I saw a cardiologist.
25     Q.  What cardiologist?

1      A.  I want to say it was Dr. Machado.
2      Q.  If I ask your attorney for that information,
3  that's something he can provide to me?
4      A.  Well, it's going to be on -- the doctor --
5  he has a copy of his report and everything, so it's
6  all a part of my record.
7      Q.  Your attorney previously referred to some
8  medical records.  These are the medical records we are
9  talking about?
10         MR. BARRIOS-BALBIN:  Right.  They will be
11  included.
12  BY MR. GILL:
13     Q.  Other than those two doctors, had you seen
14  any other doctors, I guess, let's start with since you
15  have been employed by the village?
16     A.  No.  Well, wait a minute.  You said employed
17  by the village?
18     Q.  Yes.  Let's start there.
19     A.  I don't remember seeing a doctor, no.
20         Dr. Valencia has been my doctor.
21     Q.  So you had seen her prior to seeing her this
22  time?
23     A.  Yes.
24     Q.  Okay.  Had she ever prescribed any other
25  medication to you that you can recall?

1      A.  No.  Not that I can remember, no.
2      Q.  Would that be something that would be a
3  little bit significant to you?
4      A.  What?
5      Q.  If she prescribes you medication to take.
6      A.  Yes.  I mean, I would know.
7      Q.  So if she had done it previously, you
8  probably would remember it?
9      A.  I probably would have.
10     Q.  Before she prescribed you the medication for
11  your hypertension, you weren't on -- taking any
12  regular medication, were you?
13     A.  No.
14     Q.  Did you advise the village -- strike that.
15         How do you go about going on sick leave with
16  the village for an extended period of time?  What's
17  the process?
18     A.  Well, I went to the doctor, and I got a
19  doctor's note, and I submitted a doctor's note.
20     Q.  What did the doctor's note say?
21     A.  That I was under her care and that I was
22  going to be out for whatever period of time.
23     Q.  Did it provide what her diagnosis of you
24  was?
25     A.  No.

1      Q.  Did you ever provide that to the village
2  during those seven weeks?
3      A.  No.
4      Q.  Why not?
5      A.  Because that information is private.
6      Q.  Did you give -- did you ever give the
7  village any more information other than the fact that
8  you were under a doctor's care and she wouldn't let
9  you work?
10     A.  That's it.
11     Q.  That's all you provided?
12     A.  That's it.
13     Q.  What do you understand the PBA contract to
14  say about that?
15     A.  What does it say?  That I need to -- do you
16  have that part?  Let's take a look at that.
17     Q.  Yes.
18         MR. GILL:  I don't know if we need to mark
19  the entire thing.  I'll read it into the record.  If
20  you want to, we can but...
21         MR. BARRIOS-BALBIN:  If you're going to read
22  it into the record, you want to just cut out the page
23  and put it as an expert?  But if you read it into the
24  record, I think we need something.
25         MR. GILL:  I guess I can just do that.  I'm



Page 205

1  going to provide to you and mark what are Pages 39,
2  40, and 41 of the agreement between Bal Harbour
3  Village, Florida and the Dade County Police Benevolent
4  Association, October 1, 2011, through
5  September 30th, 2013.
6          (Fernandez Deposition Exhibit No. 25
7          marked as requested.)
8  BY MR. GILL:
9      Q.  Take a moment to look at that.  On Page 40
10  is 19.4.
11      A.  Okay.
12      Q.  It says, a medical certificate attesting to
13  the employee's illness and/or disability and/or his
14  lack of fitness for the performance of duties may be
15  required for sick leave absence in excess of three
16  work shifts.  And then it says, if the chief of police
17  has personal knowledge of an employee's illness or
18  disability, it may suffice.
19          Did you ever provide that to the village?
20      A.  I know that I always supplied the doctor's
21  notes.  And I believe my attorney had answered a
22  request from acting Chief Daddario.
23      Q.  Okay.  Then you were required to submit a
24  fitness for duty examination?
25      A.  Yes.

Page 206

1      Q.  Are you claiming that that was retaliatory
2  in some way?
3      A.  What was retaliatory?
4      Q.  The requirement that you submit to the
5  fitness -- I'm not using the right term.
6          Fitness for duty examination, are you
7  claiming that that is in retaliation for your conduct?
8      A.  I don't understand.  I don't understand the
9  question.
10      Q.  So in your case, you have identified a
11  number of acts by the village that you consider
12  inappropriate and a violation of your rights.  Is that
13  one of them, the requirement that you submit to a
14  fitness for duty examination upon your return from
15  sick leave?
16      A.  I don't believe so.
17      Q.  Okay.  I'm just asking.
18      A.  That I remember -- I don't remember.
19      Q.  Do you think that was inappropriate for the
20  village to require you to submit to that?
21      A.  No.  It's at the village's discretion if
22  they want to have one.
23      Q.  In reviewing those records, it seems to say
24  that you didn't provide any information to them.  Why
25  not?

Page 207

1      A.  What information did I not provide?
2          MR. BARRIOS-BALBIN:  Objection.  Form.
3  BY MR. GILL:
4      Q.  Yes.  The information form.
5          MR. BARRIOS-BALBIN:  No, no.  I said
6  objection, form.
7          MR. GILL:  I'm sorry.  I thought you said
8  information form because that's what it's called.
9  BY MR. GILL:
10      Q.  Medical -- for duty examination, it says, I
11  refuse on the front of it?
12      A.  Yes.
13      Q.  Did you write that?
14      A.  Yes.  Well, the reason I did that is because
15  my health information is private.  And whether I
16  disclosed anything on that questionnaire or not, I was
17  still going to have to submit to the fitness for duty
18  examination.  And whether I completed that form or
19  not, my being able to return to work was going to rest
20  on the results of the examination.
21          Now, probably at another time in the
22  department, I would not have minded to complete that
23  form.  But there were some -- there were some reports.
24          Are you familiar with Leoaffairs.com?
25      Q.  Vaguely, yes, but explain it for the record.

Page 208

1      A.  Okay.  Leoaffairs.com is a website
2  apparently where people -- mainly law enforcement
3  officers look at that site, and it gives information
4  as to the departments that are participating on that
5  site that have a commentary.
6          And there were a lot of nasty comments and
7  derogatory comments made about me and other officers
8  in the department that I didn't appreciate at all.
9  And they did note on their things that no one else
10  would have known other than members of my own
11  department.  So I opted not to disclose my personal
12  health information because I didn't want that
13  information -- I didn't know who was posting.  I
14  didn't know how the information was getting out there.
15  I didn't want my health information...
16      Q.  Leoaffairs is something where anyone can go
17  on there and post information, correct?
18      A.  Yes.
19      Q.  And they can do it anonymously, correct?
20      A.  Yes.
21      Q.  And there are all kinds of allegations that
22  get put on there not about you but about everyone in
23  general, correct?
24      A.  Yes.
25      Q.  Is gossip the right word to use for it?



Page 209

1    A.   Probably.  Probably.  But there was -- there
2   were particular comments made that only members of my
3   department would have known because they were
4   particular incidents that pertained to me.
5    Q.   Can you provide me some examples of what was
6   on there?
7    A.   One of them was an incident that occurred
8   with my ex-wife where she physically struck me.  And I
9   came forward to the detective's bureau and advised
10   them of the incident that had occurred because I
11   wanted to come clean.  I didn't want to withhold
12   anything.  I didn't know what she was going to do.
13        We contacted the Miami Police Department
14   Domestic Violence Unit, and they sent an investigator
15   out to speak to her.  Nothing came of that.  There was
16   nothing to pursue because I never touched her.
17        And there were a couple of next door
18   neighbors that were witnesses that saw her strike me.
19        That incident was commented on in
20   leoaffairs.com.
21        There was another one with the score of my
22   sergeant's exam, the one that you previously showed me
23   here.
24        Those are things that no one else really
25   would have known unless they were from my department.

Page 210

1   So I opted not to disclose that information.
2    Q.   Okay.  But I guess, you don't have any
3   objection with the village requiring you to submit to
4   that?
5    A.   To what?
6    Q.   The fitness for duty examination.
7    A.   No.  They have every right to ask me to
8   submit, and I did.  I never refused.
9    Q.   Were you disciplined in any way for your
10   refusal to provide that information?
11    A.   I'm sorry?
12    Q.   Were you disciplined in any way for writing
13   I refuse or not providing this information?
14    A.   No.
15        MR. BARRIOS-BALBIN:  Were you going to
16   introduce that?
17        MR. GILL:  I can if you want to.  If it's --
18        MR. BARRIOS-BALBIN:  I don't want to --
19        MR. GILL:  If it's not a part of the case --
20   if we have to use it later, we can redact it.
21   BY MR. GILL:
22    Q.   You did receive discipline for something
23   that occurred while you were on sick leave with
24   respect to not being at your home during work hours?
25    A.   Yes.  I went to the doctor, and I did not

Page 211

1   call the department to let them know that I was going
2   to the doctor.
3    Q.   Is that a requirement of the policy?
4    A.   Yes.
5    Q.   Are you claiming that that discipline was
6   improper?
7    A.   Well, I wouldn't say improper.  It's
8   something that is not enforced, but they enforced it.
9    Q.   Did you have any knowledge of the village --
10   of anyone else being not at their home that are on
11   sick leave that the village is aware of?
12    A.   What I can tell you is that -- not that
13   particular situation, but while I was on sick leave, I
14   also had officers visit me in the morning and in the
15   evening to make sure that I was home.
16        And this continued throughout my tenure on
17   sick leave.  And I do know for a fact that there was
18   another officer that had been on sick leave longer
19   than I had been, approximately for three months, and
20   he was never visited at his residence until I said
21   something about it.  And then they sent somebody over
22   to his house.
23    Q.   Didn't they start coming to your house twice
24   a day after they had gone there and you weren't there?
25    A.   Well, they were already coming to serve me

Page 212

1   documents that captain or acting Chief Daddario at the
2   time wanted delivered to me personally.
3    Q.   So then they --
4    A.   They already had been coming to the house
5   already.
6    Q.   Not for that reason, though, to deliver
7   documents, correct?
8    A.   Well, I think for both.
9    Q.   Well, what documents were they delivering?
10    A.   I think it had something to do with the
11   internal affairs investigation that was ongoing.
12    Q.   Okay.  So they would deliver these documents
13   personally?
14    A.   Personally.
15    Q.   And one of those times they were there, and
16   you weren't there?
17    A.   I was arriving when the officer was there.
18    Q.   And I mean, is it unusual for them to
19   deliver documents to someone who is out for an
20   extended period of time?
21    A.   Yes.  Because they could have sent it
22   through the mail.  They know were where I live.  They
23   have my address and all my contact information.
24    Q.   But had --
25    A.   And they also knew that I was being



Page 213

1  represented by the PBA.  They could have definitely
2  sent it to my PBA attorney or my personal attorney.
3  But they opted to come in person to make sure that I
4  was there anyway.
5      Q.  What kind of documents were they related to
6  the IA investigation?
7      A.  I don't remember.
8      Q.  Did you have a PBA representation by that
9  time?
10     A.  I believe so.
11     Q.  Well, when you went out on sick leave, you
12  weren't aware that you were on investigation, correct?
13     A.  I think there were other issues that may
14  have been running concurrent.  The thing is that there
15  has been so many things in close proximity, and I
16  couldn't tell you which is which.
17     Q.  Are you aware -- I mean -- strike that.  I
18  may have already asked this.  I apologize.
19         The reprimand you received for not being
20  home on sick leave and not contacting the village when
21  you were out, are you claiming that was improper
22  somehow?
23     A.  No, no.
24     MR. GILL:  Why don't we take a real brief
25  break, and then we'll go to 4:00 and get as far as we

Page 214

1  can?
2      (Discussion off the record.)
3      MR. GILL:  Per our agreement that we reached
4  previously, we're going to suspend the deposition at
5  this point so that Officer Fernandez can get a little
6  bit of sleep and get cleaned up before his shift.
7      We'll reconvene at a date as soon as
8  possible but agreed upon by all the parties.  And
9  that's it.
10  (Thereupon, the Deposition adjourned at 3:30 p.m.)

Page 215

1                 CERTIFICATE OF OATH
2  STATE OF FLORIDA      )
   COUNTY OF MIAMI-DADE  )
3
4         I, the undersigned authority, certify that
5  RAMON FERNANDEZ personally appeared before me and was
6  duly sworn.
7         WITNESS my hand and official seal this
8  21st day of June, 2014.
9
10
11
12
13  _____
    RENEE D. WAISHWELL
14  NOTARY PUBLIC, STATE OF FLORIDA
    COMMISSION NO:  FF 104122
    EXPIRATION:  APRIL 08, 2018

Page 216

1                 CERTIFICATE OF REPORTER
2
   STATE OF FLORIDA     )
   COUNTY OF MIAMI-DADE )
3
4
5         I, RENEE D. WAISHWELL, a Court Reporter and
6  a Notary Public, duly commissioned and qualified in
7  and for the State of Florida at Large, do hereby
8  certify that I was authorized to and did
9  stenographically report the foregoing Deposition under
10 oath; and that the transcript is a true record of the
11 testimony given by the witness.
12        I FURTHER CERTIFY that I am not a relative,
13 employee, attorney, or counsel of any of the parties,
14 nor am I a relative or employee of any of the parties'
15 attorneys of counsel connected with the action, nor am
16 I financially interested in the action.
17        Dated this 21st day of June, 2014.
18
19
20
21  _____
    RENEE D. WAISHWELL
22  NOTARY PUBLIC, STATE OF FLORIDA
    COMMISSION NO:  FF 104122
    EXPIRATION:  APRIL 08, 2018

