Page 1

```
 1            UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF FLORIDA
 2
                 CASE NO:  13-cv-23799
 3

 4
     RAMON FERNANDEZ,
 5
                 Plaintiff,
 6
     -vs-
 7
 8   BAL HARBOUR VILLAGE and
     THE BAL HARBOUR POLICE DEPARTMENT,
 9
                 Defendants.
10
     _____/
11
12            Esquire Deposition Solutions
              20801 Biscayne Boulevard, Suite 202
13                  Aventura, Florida
              Thursday, 10:00 a.m. to 12:00 p.m.
14                 June 12th, 2014
15
              DEPOSITION OF RAMON FERNANDEZ
16
17        Taken before Renee D. Waishwell, Notary
18   Public in and for the State of Florida at Large,
19   pursuant to Notice of Taking Deposition in the above
20   cause.
21
22
23
24
25
```

Page 2

```
 1   APPEARANCES:
 2
 3   ATTORNEY FOR PLAINTIFF
 4
     LOUIS M. BARRIOS-BALBIN, ESQUIRE
 5   Barrios-Balbin, P.A.
     201 Alhambra Circle
 6   Suite 500
     Coral Gables, Florida 33134
 7
 8
     ATTORNEY FOR DEFENDANTS
 9
10   HUDSON C. GILL, ESQUIRE
     Johnson, Anselmo, Murdoch,
11   Burke, Piper & Hochman, P.A.
     2455 East Sunrise Boulevard
12   Suite 1000
     Fort Lauderdale, Florida 33304
13
14   JOHN QUICK, ESQUIRE
     Weiss Serota Helfman Pastoriza
15   Cole & Boniske, P.L.
     200 East Broward Boulevard
16   Suite 1900
     Fort Lauderdale, Florida 33301
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1                  I N D E X
     WITNESS                              PAGE
 2
 3   RAMON FERNANDEZ
 4   Continued Direct Examination by Mr. Gill      4
     Cross-Examination by Mr. Barrios-Balbin      65
 5
 6
 7   EXHIBITS                             PAGE
 8   Exhibit No. 26                        12
     Exhibit No. 27                        22
 9   Exhibit No. 28                        30
     Exhibit No. 29                        32
10   Exhibit No. 30                        46
     Exhibit No. 31                        49
11   Exhibit No. 32                        51
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1   Thereupon:
 2         RAMON FERNANDEZ,
 3      a witness, having been previously duly sworn
 4   in the above-entitled cause, testified under his oath
 5   as follows:
 6         DIRECT EXAMINATION
 7   BY MR. GILL:
 8      Q.  Officer Fernandez, this is a continuation of
 9   your previous deposition.  The same rules that I
10   explained to you apply.  I will try not to be
11   redundant of what we have already gone over.  But if I
12   do, I apologize.
13      I believe last time you were testifying, you
14   stated that you weren't advised that an internal
15   affairs investigation had been started with respect to
16   the Tenzer complaint, the use of the information
17   systems, and several other issues until you were out
18   on sick leave; is that correct?
19      A.  That is correct.
20      Q.  How did you become aware of that IA
21   investigation?
22      A.  I received a letter that was personally
23   delivered to my residence.
24      Q.  Okay.  What did the letter say as best as
25   you can recall?
```



Page 5

1    A.  The letter actually was sort of ambiguous
2  because it said that I was a witness initially.  And
3  then after further clarification with the Miami-Dade
4  Police Department, they stated that I was the subject.
5    Q.  Okay.  And did the letter come from the
6  Miami-Dade Police Department?
7    A.  You know, I don't remember if it did or if
8  it didn't.
9    Q.  I believe you just testified that through
10  some clarification with Miami-Dade PD, you learned
11  that you were a subject; is that correct?
12    A.  Yes.  I don't remember -- I don't remember
13  if the letter came from the Bal Harbour Police
14  Department or from Miami-Dade's department.
15    Q.  Okay.  Eventually, though, you received some
16  confirmation from Miami-Dade that you were, in fact, a
17  subject?
18    A.  Yes.  The reason why we contacted Miami-Dade
19  is because I was supposed to report to the Miami-Dade
20  Police Department and speak to their investigators.
21    Q.  Is that what the letter said?
22    A.  Yes.  To the best of my recollection, yes.
23    Q.  So in essence, it was scheduling an
24  interview with Miami-Dade PD investigators?
25    A.  To the best of my recollection, yes.

Page 6

1    Q.  You said, we.  Are you referring to you and
2  your attorney?
3    A.  Yes.
4    Q.  Which attorney are you referring to there?
5    A.  My attorney who is here with me today.
6    Q.  Were you also represented through the PBA at
7  that time?
8    A.  Yes.
9    Q.  Okay.  Did the letter advise you of what the
10  charges were or the allegations were?
11    A.  No.
12    Q.  Did you ever learn what the allegations
13  were?
14    A.  Yes.
15    Q.  How?
16    A.  Did I ever wonder?
17    Q.  No.  Did you ever learn what the allegations
18  were?
19    A.  I ultimately learned what the allegations
20  were when I arrived the day of the interview.
21    Q.  And this interview was conducted by
22  Miami-Dade PD Professional Compliance Bureau?
23    A.  Yes.
24    Q.  And that, as far as you understand, is an
25  independent entity from the Bal Harbour Village?

Page 7

1      MR. BARRIOS-BALBIN:  Objection.  Form.
2      THE WITNESS:  As far as I know, it's a
3  different department.
4  BY MR. GILL:
5    Q.  Right.  Who conducted that interview?
6    A.  God, I don't remember the investigator's
7  name right off the bat.  I don't remember.  I don't
8  remember his name right now.
9    Q.  Do you know what agency he was with?
10    A.  It was Miami-Dade.
11    Q.  Was anyone from the Bal Harbour Village
12  Police Department or the village, itself, present
13  during the interview?
14    A.  Not that I can remember, no.
15    Q.  Was anyone else present other than yourself
16  and the interviewer?
17    A.  My PBA attorney was present, and there were
18  two Miami-Dade investigators.  I don't remember their
19  names right now.
20    Q.  Okay.  And what was your attorney's name
21  from the PBA?
22    A.  Jim Casey.
23    Q.  What did the Miami-Dade PD investigators
24  advise you when the interview was beginning?
25    A.  Advised me?  Could you be a little more

Page 8

1  specific?
2    Q.  Sure.  Well, tell me what the Miami-Dade PD
3  investigators told you when the interview started?
4    A.  I don't remember exactly what they told me.
5  I'm sure at that point they told me about what the
6  allegations were.  I do remember that they gave me
7  some paperwork to review, and I want to say -- I'm not
8  100 percent sure, but I want to say the allegations
9  were in those papers.
10    Q.  Do you recall what the allegations were?
11    A.  They were -- they were -- there were many
12  allegations.  I think something to the effect that I
13  didn't -- I didn't notify the chief of police of a
14  civil lawsuit that I had filed, and there were some
15  violations of -- that had to do with the computer
16  system of the department.
17    Q.  Anything else that you can recall?
18    A.  No.  Not right offhand, no.
19    Q.  Was that interview recorded?
20    A.  You know, I don't remember if it was.
21    Q.  Do you recall the date of that interview?
22    A.  No, I don't.
23    Q.  Do you --
24    A.  There is documentation.  And I -- we had the
25  letter somewhere.  Right offhand, I don't know.



Page 9

1    Q.   You were out on sick leave, though, when the
2  interview took place?
3    A.   Yes.
4    Q.   Were you only interviewed once?
5    A.   You know, I don't remember if I went back a
6  second time.
7    Q.   Do you recall any of the details of the
8  allegations regarding use of the information systems?
9    A.   There were several allegations of the
10  computer system.  Apparently I was being accused of
11  running different individuals within the department
12  and my daughter.
13    Q.   Just so it's clear for the record, when
14  we're referring to the computer system, information
15  system, we're talking about the DAVID system, correct?
16    A.   I'm not sure if it was the DAVID system.  I
17  think it's more of the FCIC and NCIC, the Florida
18  Crime Information Center and the National Crime
19  Information Center databases.
20    Q.   And explain for the record how those systems
21  work as far as you understand it?
22    A.   Well, I guess the only thing I can tell you
23  about those systems is that they contain criminal
24  information and personal information.
25    Q.   And you can search a person's name through

Page 10

1  that information to see whether they have been
2  arrested or things of that nature?
3    A.   You could, but you need their information in
4  order to process it through the system.  You just
5  can't put in a name without the actual date of birth
6  and, you know -- sometimes even without their Social
7  -- you would need a Social and date of birth in order
8  to get the correct information.
9    Q.   If you only put in a name, for example, does
10  it not work at all, or does it just come back with so
11  many results that it's not useful?
12    A.   It doesn't work at all.  You need to put
13  certain information in.
14    Q.   Is a driver's license No. 1 on that
15  information?
16    A.   Yes, yes.
17    Q.   What is the DAVID system?
18    A.   The DAVID system is the Driver And Vehicle
19  Information Database.  And what that does is it gives
20  you a photo image of the driver from the Department of
21  Highway Safety and Motor Vehicles in the State of
22  Florida.
23    Q.   And are there policies and procedures for
24  the use of those information systems?
25    A.   Yes.

Page 11

1    Q.   Do you know where those policies and
2  procedures come from?
3    A.   I would think that they were established by
4  the State of Florida, the agency that particularly
5  governs those databases.
6    Q.   Okay.  After the interview that we have been
7  discussing, what was the next -- I guess your next
8  involvement with that internal affairs investigation?
9    A.   You know, I don't understand the question.
10    Q.   Okay.  Did you -- for example, I know there
11  is a closeout memo that gets issued.  Was that the
12  next thing you saw?  What was the next thing you saw
13  when you were advised on what was going on with the
14  investigation?
15    A.   I would guess it was the closeout memo.  You
16  know, I don't remember all of the steps.
17    Q.   That's fair enough.  Have you ever seen the
18  report that was prepared by Miami-Dade PD with respect
19  to this investigation?
20    A.   I believe I did.
21    Q.   Do you believe you saw it around the time it
22  was completed?
23    A.   Yes.
24    Q.   Do you recall how it is that you came to see
25  it?

Page 12

1    A.   I don't remember.  It may have been
2  presented to me by the department, when they were
3  reprimanding me for it.
4        MR. GILL:  Mark this as Exhibit 26.
5            (Fernandez Deposition Exhibit No. 26
6            marked as requested.)
7  BY MR. GILL:
8    Q.   Okay.
9    A.   Yes.  I remember this document, and there is
10  the investigator's name, Heath Denovar (phonetic).
11    Q.   And is this the report issued by Miami-Dade
12  PD following their investigation into the IA
13  investigation commenced by Chief Hunker?
14    A.   Yes.  I see here that --
15        MR. BARRIOS-BALBIN:  There is no question.
16        THE WITNESS:  I just want to make a
17  statement.  On the third page, that the complainant
18  alleges that, and there is numerations?
19  BY MR. GILL:
20    Q.   Right.
21    A.   I don't know at what point in the
22  investigation, if it was during or after, I don't
23  remember if it was during the grievance process, but
24  these allegations, for example, the one -- No. 1,
25  where it alleges that I -- that I failed to notify the



Page 13
1  chief about the civil lawsuit, that was -- that was
2  proven to be --
3      MR. BARRIOS-BALBIN:  Stop the statement.
4  Let him ask the questions.
5  BY MR. GILL:
6      Q.  Looking at that, which is the Allegation
7  No. 1, which is regarding your civil lawsuit against
8  Tenzer, it alleges that you didn't first notify the
9  chief of your actions.
10     A.  That is correct.  That was proven to be a
11 false allegation.
12     Q.  Right.  It was unfounded; was it not?
13     A.  Correct.  I did have the email that I had
14 sent to the chief.
15     Q.  Right.  Which we reviewed before?
16     A.  Yes.
17     Q.  Did you ever provide the chief a copy of the
18 complaint?
19     A.  I'm sorry.  Can you repeat the question?
20     Q.  Did you ever provide the chief or anyone
21 from the village a copy of the actual complaint you
22 filed against Mr. Tenzer?
23     A.  No.  It was never requested of me.
24 Following my email, it was never requested.
25     Q.  But you never provided it one way or the

Page 14
1  other?
2      A.  It was never requested one way or the other.
3      Q.  So the answer to the question was no?
4      A.  What was the question again?
5      Q.  You didn't provide a copy of the complaint?
6      A.  No.
7      Q.  Other than the email, did you provide any
8  other information regarding your complaint against
9  Tenzer?
10     A.  I did not, because it wasn't necessary.
11     Q.  So just so I'm clear, Chief Hunker makes
12 this allegation that you didn't advise him properly,
13 correct?
14     A.  Yes.
15     Q.  And it's then investigated by Miami-Dade PD,
16 correct?
17     A.  Yes.
18     Q.  And then it is determined to be unfounded,
19 correct?
20     A.  My opinion is it's false because he did know
21 about it.
22     Q.  Is that a choice for -- at the end of any
23 kind of IA investigation, how many choices are there
24 with respect to what the results of the IA
25 investigation can be?

Page 15
1      A.  I don't know.  I don't know.  I heard --
2  I've heard that it depends on the circumstances, so I
3  don't know.  I heard that from my own former chief.
4      Q.  Which former chief?
5      A.  Chief Hunker.
6      Q.  What are the allegations -- No. 4 on that
7  list pertains to an inquiry into your daughter using
8  one of the information systems through the department?
9      MR. BARRIOS-BALBIN:  Objection to the form.
10     THE WITNESS:  That's incorrect.  My daughter
11 did not use any information system for the department.
12 That's the way you asked the question.
13 BY MR. GILL:
14     Q.  I'm sorry.  I misspoke.  I meant to say the
15 allegation of you putting your daughter's name through
16 the information system, is that the allegation that
17 was made against you?
18     A.  That is the allegation.
19     Q.  Did you, in fact, put your daughter's name
20 through one of those systems?
21     A.  I did after I asked for permission from my
22 supervisor.
23     Q.  Who was your supervisor that you asked
24 permission from?
25     A.  Sergeant Raul Martinez.

Page 16
1      Q.  Do you know -- were you present during
2  Sergeant Martinez' interview?
3      A.  No.
4      Q.  And then with respect to the allegations
5  brought by Chief Hunker, Nos. 2 and 3 pertain to
6  searches of yourself and a Robert Estrada through the
7  computer system; is that what the allegations were?
8      A.  That's what the allegation was.
9      Q.  What was your response to the allegations?
10     A.  Well, the fact that I ran myself --
11 allegedly ran myself and Mr. Estrada on the same date
12 would only lead me to believe that he was there
13 performing some sort of service on the system.  It was
14 common for him to say, run yourself or I'll run myself
15 while I was logged on.  He may have entered his own
16 information in order to test the system.
17     Q.  Did you -- do you remember one way or the
18 other whether you actually ran yourself and
19 Mr. Estrada on the day of question?
20     A.  I don't remember.  But I would have had to
21 have had Mr. Estrada's date of birth in order to enter
22 his information into the system, and I don't have that
23 information.
24     Q.  And that's what you advised the
25 investigator?



Page 17

1    A.  Yes.

2    Q.  No. 5 is an allegation regarding you

3  divulging information pertaining to an active Bal

4  Harbour Police Department internal investigation.  Is

5  that the allegation that was made by Chief Hunker?

6    A.  That was the allegation, yes.

7    Q.  What was your response to that?  Let me ask

8  you this:  Do you know what the allegation was

9  pertaining to?

10    A.  I have no idea.

11    Q.  Do you recall what they asked you about

12  during the interview?

13    A.  I believe I was shown an audiotape of a

14  meeting or something.  But it was a meeting where

15  apparently these residents were saying something in a

16  meeting, but it had nothing to do with me.

17    Q.  Do you know who Brian Mulheren is?

18    A.  Yes.

19    Q.  Who is he?

20    A.  He is a resident of the village.

21    Q.  Okay.  Have you ever met him?

22    A.  Yes.

23    Q.  How have you met him?

24    A.  He's been living in Bal Harbour ever since I

25  became a police officer there.

Page 18

1    Q.  Is he, if you know, the member of any groups

2  of citizens that have complaints regarding the police

3  department?

4    A.  No, I'm not aware of that.  Having

5  complaints against the police department?  I know he

6  was close to the chief -- Chief Hunker.

7    Q.  How do you know he was close to Chief

8  Hunker?

9    A.  He would always visit him at the station.

10    Q.  Okay.  Were you present in those meetings?

11    A.  Not at the meetings, but I did see him go

12  into the administration building.

13    Q.  Okay.  You don't know what the substance of

14  those meetings were?

15    A.  I do not.

16    Q.  Right.  How about Dena Chaleney; do you know

17  who she is?

18    A.  Dena Chaleney, yes.

19    Q.  How do you know Dena Chaleney?

20    A.  She is also a Bal Harbour resident.

21    Q.  How have you met her?

22    A.  Well, she's active in all of the meetings,

23  and she attends all of the meetings that I have been

24  there in the capacity of a police officer.  She is a

25  very nice lady.

Page 19

1    Q.  Have you spoken to her outside of meetings?

2    A.  No.  Well, I greeted her.  I've said hello

3  in passing.  I don't know if you would constitute that

4  as speaking outside the meeting.

5    Q.  Have you ever provide her or Mr. Mulheren

6  any documents?

7    A.  No.

8    Q.  Did you ever provide them your written

9  complaint regarding a hostile work environment?

10    A.  No.

11    Q.  Do you know if that's what they referenced

12  during the meeting that you reviewed the audiotape of?

13    MR. BARRIOS-BALBIN:  Objection.  Form.

14    THE WITNESS:  I don't remember what it was

15  about.  I believe -- to the best of my recollection, I

16  believe it was a meeting -- it was sort of a council

17  meeting or something like that, that they showed me an

18  audio recording of.  But it had nothing to do with me.

19  It was a council meeting of sorts.

20  BY MR. GILL:

21    Q.  Did you -- do you remember what you heard on

22  that audio recording?

23    A.  I don't remember.

24    Q.  Was your name mentioned?

25    A.  I want to say, yes, maybe, but I'm not sure.

Page 20

1  I'm not sur in what context my name was used.

2    Q.  Do you have any opinion on why either

3  Mr. Mulheren or Ms. Chaleney would be mentioning your

4  name during a commission meeting?

5    A.  I have no idea.

6    Q.  Were any other officers names mentioned that

7  you recall?

8    A.  Not that I -- not that I recall.  I do know

9  that they attend -- these residents attend most, if

10  not, all of the meetings.  And they also attended my

11  officer of the year awards, which was twice and

12  multiple officer of the month awards.  And they know

13  who I am because they attend the meetings.  And they

14  read the newsletters, and all of that information

15  comes out in the newsletter for the village.

16    Q.  Is it a policy and procedure of the Bal

17  Harbour Village Police Department, for internal

18  affairs investigation to remain confidential until

19  they are concluded?

20    A.  Could you repeat the question?

21    Q.  Sure.  Do you know it to be a policy or

22  procedure for the Bal Harbour Police Department for

23  internal affairs investigations to remain confidential

24  until they're completed?

25    A.  As far as I know, that's the rule, but



Page 21

1 that's not always followed in the department.
2     Q.   Why do you say it's not always followed in
3 the department?
4     A.   I can tell you for a fact that the
5 investigation into the alleged cheating on the
6 sergeant's exam, Sergeant Deitado knew who was being
7 interviewed next, what time, and he had information
8 that only an administrator should have known that was
9 handling the investigation, only information that the
10 chief would have known.
11     Q.   How did you know that he had information
12 regarding who was being interviewed next?
13     A.   He was saying it.  He was saying it in the
14 roll call room.
15     Q.   Was he advising you of who was going to be
16 interviewed next?
17     A.   He was saying it out loud.  He was talking
18 to other officers saying, oh, so and so is going to be
19 interviewed next.  I don't know how he learned of that
20 information.
21        But the only person that had that
22 information was the chief or the captains that were --
23 captains or captain that were in charge of the
24 investigation.
25        MR. GILL:  I will mark this next exhibit as

Page 22

1 Exhibit No. 27.
2          (Fernandez Deposition Exhibit No. 27
3           marked as requested.)
4 BY MR. GILL:
5     Q.   Have you seen this document before?
6     A.   Yes.
7     Q.   What is this document?
8     A.   This is the closeout memo for the internal
9 affairs case where I was the subject.
10     Q.   Okay.  And this is from Captain Roye to
11 acting Chief Daddario; is that correct?
12     A.   Yes.
13     Q.   You laughed over it.  Is there something
14 funny about that?
15     A.   Well, I mean, these two individuals were
16 complicit in the retaliation against me, after I filed
17 my complaint.  It was just funny that they were the
18 ones that were the administrators at that point.
19     Q.   What administrators -- other administrators
20 were there at this point?
21     A.   I think on this date, in April, I think
22 Thomas Hunker had already been fired.  I believe
23 Captain Quinn had already retired.  Yes, it was --
24 Daddario was the acting chief, and Captain Roye had
25 been placed -- he was formerly the investigations

Page 23

1 captain, and he had been also tasked with the patrol
2 division.
3     Q.   Okay.  How was Captain Roye at all involved
4 previously in any sort of retaliation that you
5 described?
6     A.   Well, Captain Roye is very good friends with
7 Sergeant Paul Deitado.  And pretty much his position
8 was a name only because the person who is actually
9 running the investigation unit was Sergeant Deitado.
10     Q.   What investigation?
11     A.   The investigation unit, the VIN unit.
12     Q.   Okay.  But how did he participate in any
13 retaliation?
14     A.   He was complicit in whatever Sergeant
15 Deitado wanted to happen.  He would just go along with
16 it, and so did acting Chief Daddario.
17     Q.   So I mean, what information other than you
18 just saying they were complicit do you have to support
19 that they are complicit in whatever Deitado wants
20 done?
21     A.   That's common knowledge throughout the
22 department.
23     Q.   Okay.  Do you have any documents to support
24 that?
25     A.   Well, all of my reprimands and my

Page 24

1 evaluations.  As a matter of fact, the last evaluation
2 that I received for 2013, as you know, because we have
3 gone through all of my reprimands, I got a negative
4 review because Captain Roye and Sergeant Deitado
5 advised my Supervisor Edwin Vargas that I had done --
6 that I had acted inappropriately or been insubordinate
7 to some extent, and that was a comment made.
8        Mind you, I never received a reprimand or a
9 counseling, but they had to get a shot in there.  So
10 they went ahead and made a negative comment on my
11 review through Sergeant Vargas.
12     Q.   Okay.  Who was your reviewer in that year?
13     A.   Well, ultimately it was Sergeant Vargas.  He
14 was the one that wrote the review.  But I had several
15 supervisors.  I had Sergeant Vargas.  I had Sergeant
16 Alvarez who resigned.
17     Q.   Does it say on the evaluation that Sergeant
18 Deitado said this?
19     A.   Yes.
20     Q.   Okay.  So if I look at that, that's what's
21 on there?
22     A.   I'm sure you have it there, and it will come
23 up now.
24     Q.   What about Sergeant Martinez, was he one
25 that was also complicit?



Page 25

1    A.   Sergeant Martinez was more of a go-along
2  guy.  He would go along with whatever they say.  He
3  didn't really initiate any type of retaliation.  But
4  he didn't stand up for what was right.  And he went
5  along with whatever they said.
6         As a matter of fact, the 2012 and 2013
7  reviews were definitely a big contrast from my
8  previous reviews, right after I filed my complaint.
9    Q.   With respect to the closeout memo -- well,
10  before we do that, you said previously you didn't
11  provide Ms. Chaleney or Mr. Mulheren a copy of your
12  written complaint; is that correct?
13         MR. BARRIOS-BALBIN:  Objection to form.
14         THE WITNESS:  That's correct.
15         MR. GILL:  What's wrong with the form?
16         MR. BARRIOS-BALBIN:  That way you stated it.
17  You said, you previously didn't provide, so it sounds
18  like you're saying that he has provided.  I don't know
19  if your previously were stating --
20  BY MR. GILL:
21    Q.   Was my question unclear to you?
22    A.   I answered it to the best of my ability.
23    Q.   We will try again so there is no
24  uncertainty.  We discussed several minutes ago two
25  individuals, Ms. Chaleney and Mr. Mulheren.  Do you

Page 26

1  recall discussing them?
2    A.   Yes.
3    Q.   I believe you testified that you did not
4  provide them a copy of your written complaint; is that
5  accurate?
6    A.   Ever?
7    Q.   Ever.
8    A.   I have not.
9    Q.   Okay.  Other than passing it up the chain of
10  command, did you provide that written complaint to
11  anyone else?
12    A.   To my attorney.
13    Q.   Anyone else?
14    A.   No.
15    Q.   Did you ever send it to the media?
16    A.   Hang on.  No, I did not send it to the
17  media.  And at some point I did show that to my PBA
18  attorney.
19    Q.   Anyone else other than who we talked about?
20    A.   No.
21    Q.   And why did you give it to your PBA
22  attorney?
23    A.   Because it was during the course of my
24  grievance.  So he -- either I gave it to him.  I know
25  he saw it.  Either I gave it to him or it was provided

Page 27

1  to him throughout the grievance process.  But I know I
2  would have discussed it with him and would have shown
3  it to him.
4    Q.   And don't tell me anything you discussed
5  with your attorney, but you gave it to your attorney
6  as part of this litigation?
7    A.   This litigation right now, the one that
8  you're deposing me for?
9    Q.   Litigation in general.
10    A.   For my grievance?
11    Q.   Yes.  You mentioned -- you said you gave
12  Mr. Barrios-Balbin a copy of the complaint?
13    A.   Yes.
14    Q.   And you gave it to him as a part of his
15  representation of you?
16    A.   Yes.
17    Q.   Now, looking at Exhibit 27, it lays out the
18  allegations and then also has recommendations in it;
19  is that accurate?
20    A.   Yes.
21    Q.   Are those recommendations from Captain Roye?
22    A.   Well, the memo is from Captain Roye.  I
23  couldn't say who the recommendations are from.
24  Although, I can tell you that the ultimate
25  recommendation, whatever it may be, has to go through

Page 28

1  the chief of police.
2    Q.   Okay.  Maybe my question wasn't clear.  This
3  purports to be a memo prepared by Captain Roye.  Is
4  that what you understand it to be?
5    A.   That's what it appears to be.
6    Q.   It contains recommendations regarding the
7  allegations that were part of the internal affairs
8  investigation; is that correct?
9    A.   That's what it appears to be.
10    Q.   And then it appears that Captain Roye
11  provided the memo to acting Chief Daddario?
12    A.   Yes, that's what I was going to next here.
13    Q.   And as you understand it, is that the proper
14  procedure for the IA investigation to follow?
15    A.   I would believe so.
16    Q.   Okay.  And then as I think you said, the
17  chief of police is the one that makes the ultimate
18  determination what to do with those recommendations?
19    A.   That's the way it is.
20    Q.   Okay.  And some of the allegations were
21  unfounded, some were sustained, and some were
22  inconclusive; is that correct?
23    A.   That is correct.
24    Q.   For example, the allegation that you failed
25  to provide Chief Tenzer with notice of a lawsuit, that



Page 29

1 was unfounded?
2 A. Chief Hunker?
3 Q. I'm sorry. Yes. That was unfounded; is
4 that accurate?
5 A. Yes.
6 Q. And then with respect to some of the
7 allegations regarding use of the computer systems,
8 those were sustained and some were inconclusive?
9 A. Yes. Allegations 7, 8, and 9, my laptop
10 computer was not in my possession.
11 Q. Right.
12 A. And No. 6, this officer that was hired by
13 the police department in late 2011, I didn't even know
14 this officer. So my laptop was used to run this
15 officer during his background investigation.
16 Q. Right. And that was found inconclusive as
17 was 5?
18 A. Right. I think those things should have
19 been looked at before filing this complaint against
20 me.
21 Q. So your objection to those is simply that
22 they were investigated at all?
23 A. Well, I mean, in my opinion, the whole
24 complaint -- the whole internal affairs complaint
25 against me was a farce. It's obvious retaliation from

Page 30

1 my complaint.
2 Q. Well, you did, in fact, search your
3 daughter's name, correct?
4 A. I asked permission to do that.
5 Q. Is that what Sergeant Martinez said?
6 A. He didn't remember. It was convenient for
7 him to say that because he was in a difficult
8 position. He didn't want to go against the
9 administration and tell the truth.
10 Q. You ultimately received a written reprimand
11 as a result of this closeout memo?
12 A. Yes.
13 MR. GILL: Let's mark that as 28.
14 (Fernandez Deposition Exhibit No. 28
15 marked as requested.)
16 BY MR. GILL:
17 Q. Have you seen that before?
18 A. Yes.
19 Q. What is that?
20 A. It is the reprimand issued to me following
21 the internal affairs investigation lodged against me
22 by former Chief Thomas Hunker.
23 Q. And you ultimately grieved that reprimand;
24 did you not?
25 A. Yes.

Page 31

1 Q. It was ultimately rescinded; was it not?
2 A. Yes.
3 Q. So what do you understand rescinding to
4 mean?
5 A. It was taken away. It was taken off my
6 file.
7 Q. And did you lose any pay as a result of this
8 reprimand?
9 A. No.
10 Q. Were you ever suspended as a result of this
11 reprimand?
12 A. Not that I can remember.
13 Q. Okay. Other than having your take-home
14 vehicle suspended for 30 days, were you ever suspended
15 any other time?
16 A. Not that I can remember.
17 Q. Were you ever docked in your pay because of
18 reprimand or discipline by the village?
19 A. I was not. But I think that all of these
20 reprimands cumulatively were definitely detrimental to
21 my career as a police officer.
22 And the bottom line is that you can see that
23 by all of these reprimands so close to each other, it
24 was definitely an effort by the administration to get
25 enough paperwork on me to be able to fire me.

Page 32

1 Q. You are still employed by the village; are
2 you not?
3 A. I am.
4 MR. GILL: Let me mark this next one as 29.
5 (Fernandez Deposition Exhibit No. 29
6 marked as requested.)
7 BY MR. GILL:
8 Q. What is Exhibit 29?
9 A. The memorandum referenced my grievance --
10 the response to my grievance.
11 Q. And this is the memorandum that rescinds the
12 written reprimand that we have been discussing?
13 A. Yes.
14 Q. And this is from at the time interim Village
15 Manager Jay Smith, correct?
16 A. Yes.
17 Q. So the village manager, whoever is filling
18 that role, do you understand him to be the final
19 decisionmaker with respect to grievances?
20 A. Yes.
21 Q. You stated a few minutes ago that all of
22 these reprimands -- and please correct me if I'm wrong
23 -- impacted your future as a law enforcement officer?
24 A. Well, all of these reprimands cumulatively
25 would definitely affect my career as a police officer.



Page 33

1 Any type of consideration for position, these would
2 definitely be looked at.
3   Q.  Have you reviewed any other personnel files
4 of police officers from the village?
5   A.  No.
6   Q.  How do you know a rescinded reprimand would
7 be considered for any future advancement in the law
8 enforcement field?
9   A.  I'm not talking particularly about this
10 rescinded reprimand.  I'm talking about all of them as
11 a whole.  If you look at all my reprimands, they all
12 came in after I submitted my complaint.  Luckily and
13 by the grace of God, the city manager -- the former
14 city manager resigned or disappeared, Mr. Alfred
15 Treppeda.  And a new village manager was appointed,
16 and he appointed a new chief.  What a coincidence that
17 after new administration came in, I have no more
18 reprimands.
19     It was just during this period of this
20 administration and after my complaint that all of
21 these reprimands came about.
22   Q.  How many reprimands are we talking about?
23   A.  How many do we have?  We have a lot of them,
24 counselings and reprimands.
25   Q.  Well, we have this one we just talked about.

Page 34

1 That's one.  And then we have what has been marked as
2 Exhibit 10, which is the reprimand regarding the
3 Vargas incident?
4   A.  Okay.
5   Q.  So that's two.
6   A.  Okay.  That's the first one.  That's one.
7   Q.  Okay.  We just talked about one that's
8 rescinded?
9   A.  Okay.  Two.
10   Q.  And then we discussed previously the
11 speeding incident.  Are you claiming now the speeding
12 incident was part of retaliation?
13   A.  Absolutely.
14   Q.  You didn't testify to that last time we
15 talked.
16     MR. BARRIOS-BALBIN:  Objection.  Form.
17     THE WITNESS:  Absolutely.
18 BY MR. GILL:
19   Q.  Okay.  Well, why do you think that's
20 retaliation?
21   A.  Well, I explained previously -- I don't know
22 if it was to you or to the person when I got
23 reprimanded -- the complainant wished to remain
24 anonymous, didn't give his name, didn't give any
25 contact information.  But yet somebody had assigned

Page 35

1 the name to the complaint.  And when I asked, how did
2 that occur, I was told that Daddario -- I don't know
3 if at that point he was acting chief or captain or
4 whatever.  But he looked at the caller ID and saw
5 there was a name on there, and he assigned that name.
6     Now, he doesn't know if that name -- if that
7 person who made the complaint used somebody else's
8 phone to call it in.
9     Also, there were a lot of stills of my -- of
10 the police car that I was allegedly using on that day
11 at the tollbooth.  That doesn't constitute speeding.
12     But it was just very convenient to go ahead
13 and accumulate all of this information and make a big
14 deal out of nothing to write me up.
15     On the same token, I believe that on the
16 same -- right around the same time there was a
17 complaint made on Sergeant Martinez the same thing,
18 for speeding.  And his complaint was made, I believe,
19 on 69th Street or 70th Street and Collins.  And he was
20 heading to an off-duty job at 102nd and Collins.  And
21 they called in the same thing for speeding, and there
22 was never any investigation conducted.
23   Q.  Do you have any documents to support that?
24   A.  That's part of the record at the police
25 department.  They never investigated anything.  They

Page 36

1 didn't look at the cameras.  They didn't look at
2 anything.
3   Q.  Do you have any documents to support that?
4   A.  I know it for a fact.  I don't have any
5 documents, but I know it for a fact.
6   Q.  Do you deny that a citizen called in about
7 your driving?
8   A.  I don't know that.
9   Q.  Didn't you hear the recording?
10   A.  Yes.  But I don't know who made the call.
11 It was an anonymous call.
12   Q.  But somebody called in?
13   A.  Right.
14   Q.  And said, I'm a citizen of Bal Harbour?
15   A.  I don't know if they said that.  I don't
16 know that they said they were a citizen of Bal
17 Harbour.  You're saying that.  I'm not saying that.
18   Q.  You dispute that a citizen called in and
19 made a complaint about your driving?
20   A.  I don't know if that was a valid complaint.
21 To this day I don't know if that was a valid
22 complaint.  They could have sent someone to call and
23 make that false complaint.
24   Q.  Do you have anyone to support that -- what
25 your assertion is, that somebody could have fabricated



Page 37

1  the call?
2     A.  It could have been.  Look at all these
3  reprimands and all this retaliation after my
4  complaint.  It could have been.
5     Q.   So that's a speeding one.  We talked about
6  that.  That's three types of disciplinary action,
7  whatever they are.  Then we have the sick leave --
8  when you're out on sick leave, correct?
9     A.  Correct.
10    Q.  Do you dispute that you were not at home?
11    A.  I was at the doctor.
12    Q.  Right.
13    A.  And I brought documentation for that.  We've
14  had an officer that's been out for six, seven months
15  and has been out to the doctor a number of times.
16  Nobody has ever visited her at her residence to find
17  out if she was home or not.  Nobody has ever figured
18  out or tried to figure out if she has gone to the
19  doctor and hasn't called the department.
20       I know for a fact nobody called the
21  department.
22    Q.  How do you --
23    A.  For the ten years I have been there, nobody
24  has called the department to say, I'm going to the
25  doctor.  That's common knowledge within the

Page 38

1  department.
2       But of course, since I made the complaint it
3  was necessary to come visit me twice a day for the
4  duration of my sick leave, which didn't help my
5  situation any in the recovery of my health.
6       And on top of that, give me the speeding
7  write-up.  There was no evidence of speeding.  What
8  evidence was there?  An anonymous complainant and a
9  still of me stopped at the booth.
10    Q.  Okay.  So didn't you go on sick leave the
11  day they suspended your vehicle?
12    A.  Yes.
13    Q.  Didn't they come to deliver documents and
14  you weren't home?
15    A.  Yes.
16    Q.  And then after that --
17    A.  Actually I was home.  I was just pulling
18  into my driveway when Sergeant Vargas was there.
19    Q.  Did you advise them before you left that you
20  weren't going to be there?
21    A.  No, I did not.
22    Q.  Do you understand that to be the written
23  policy of the village?
24    A.  Yes.  But it's not carried out on everyone.
25  It was solely carried out on me because they were

Page 39

1  upset that I made a complaint and retaliating against
2  me.
3     Q.  They didn't start checking up on you --
4     A.  They were --
5     Q.  Let me finish the question.
6     A.  I know what your question is going to be
7  because you asked the same question before.  You asked
8  the same question before.  They were delivering
9  documents before --
10       MR. BARRIOS-BALBIN:  Let him ask the
11  question.
12       THE WITNESS:  All right.  I'm sorry.  I
13  apologize.  I apologize if I stepped over your line of
14  questioning.  I apologize.
15  BY MR. GILL:
16    Q.  It makes it difficult for her.  I'm trying
17  to finish up my questioning.  The less we talk over,
18  the sooner we get out of here.
19       Isn't it true, though, that they didn't
20  start sending someone to your house until they
21  delivered documents in person and you were coming back
22  from the doctor?
23    A.  No, that's not true.
24    Q.  So what is accurate then?
25    A.  They delivered documents before.  I told you

Page 40

1  this before.  They were already delivering documents
2  before.
3     Q.  Okay.  But one time they delivered the
4  documents you weren't home, correct?
5     A.  Yes.
6     Q.  And that's when they started then sending
7  someone to check if you were home at the beginning and
8  end of your shift, correct?
9     A.  In my opinion, they were already checking me
10  when they were sending people to deliver documents to
11  my home.  They knew my attorney's information.  They
12  could have sent it through the mail.
13       They had no reason to deliver documents
14  personally to me at my home unless they were checking
15  on me.
16    Q.  Okay.  I understand that.
17    A.  They were already checking on me.
18    Q.  But at some point didn't you say they were
19  coming to your house twice a day to check on you?
20    A.  Yes.
21    Q.  Okay.  Did that start at least timing wise
22  after they came to deliver documents to you and you
23  were coming back from the doctor?
24    A.  I don't know what the reasoning for that
25  was.



Page 41

1    Q.   I'm not asking the reasoning.  I'm just
2  trying to get a timeline down so it's clear.  As I
3  understand the timeline, they deliver documents to you
4  several times -- how many times did they deliver
5  documents to you?
6    A.   Once or twice before.
7    Q.   How long were you out for?
8    A.   I want to say about -- maybe about a month.
9    Q.   One of those times when they delivered it,
10  you were coming back from a doctor's appointment,
11  correct?
12    A.   Yes.
13    Q.   After that they then begin to have someone
14  come to check if you're home without delivering any
15  documents?
16    A.   Well, they amped up the visitation.  But
17  they were already coming to visit me with the excuse
18  of delivering documents, but they were already
19  checking on me.
20    Q.   Okay.  You said once or twice they delivered
21  documents?
22    A.   Yes.
23    Q.   So they checked up on you once or twice with
24  documents?
25    A.   And they continued because they came back

Page 42

1  that third time and I was coming back from the doctor.
2    Q.   After that they just started coming at the
3  beginning and end of the shift?
4    A.   Absolutely.  And they have never done that
5  to anyone before.
6    Q.   Was this only days you were scheduled to
7  work?
8    A.   Yes.
9    Q.   So if it's a day off they don't come to
10  check on you?
11    A.   No.  At the same time I was on sick leave,
12  there are was another officer, Officer Neil who was
13  off for over a month prior to me being out on sick
14  leave.  And they never visited him once until I
15  complained that they were coming on a daily basis to
16  my residence, that they went over and picked up his
17  car a month after they were supposed to pick up his
18  vehicle ten days after he was on sick leave.
19    Q.   You did haven't your vehicle because your
20  vehicle had been suspended, correct?
21    A.   Yes.
22    Q.   Okay.  So that is, I think, four basic
23  disciplinary matters?
24    A.   And the internal affairs investigation.
25  Let's not forget about that.

Page 43

1    Q.   What internal affairs investigation?
2    A.   The one that prompted the final -- this one
3  here that got rescinded by the Village Manager Jay
4  Smith.  The investigation itself was retaliation.
5    Q.   Okay.  But because of that investigation you
6  didn't lose any pay, did you?
7    A.   I don't know what you mean by that.
8    Q.   They didn't say, we're suspending you
9  without pay because of this investigation, did they?
10    A.   Well, they couldn't.
11    Q.   Did they or did they not?
12    A.   They did not, but they couldn't.  That's why
13  they didn't.  If they could, they would have.
14    Q.   Other than your written complaint that's
15  already been marked as an exhibit, Exhibit 5, have you
16  put down in writing any other -- any other complaints
17  about the village at any time?
18    A.   Not that I can remember.
19    Q.   So this is your only written complaint?
20    A.   As far as I know, yes.
21    Q.   Well, I mean, would you recall if you sent
22  other complaints?
23    A.   Would you consider the email a complaint?
24    Q.   Which email are you referring to?
25    A.   The email I sent about Sergeant Vargas

Page 44

1  approaching my wife and then approaching me at my
2  off-duty employment for no reason at all.  You can say
3  that -- and the email I sent the village manager --
4  the acting village manager at the time when I
5  circumvented the chain of command because everyone was
6  complicit.
7    Q.   Which one was that?
8    A.   It was an email that you went over in our
9  previous -- an email that I sent the village manager
10  that he said I should have gone through the chain of
11  command.
12    Q.   This has been previously marked as
13  Exhibit 22 and it's to acting village -- interim
14  Village Manager Jay Smith?
15    A.   That's correct.  I don't know if you
16  constitute that as a complaint, but that could be
17  interpreted as a complaint.
18    Q.   Is Jay Smith someone you considered
19  complicit?
20    A.   Jay Smith was part of that circle of
21  administrators and officers right up until the point
22  he got fired.  I know they've worked together for many
23  years.  I don't know the extent of their relationship.
24  All I can tell you is that he was in that circle up to
25  the point that he was fired by former Chief Hunker.



Page 45

1  And he was given an opportunity of employment within
2  the village by his good friend then City Manager
3  Alfred Treppeda.
4     Q.  In your written complaint letter, you
5  describe his circumstance of his termination as
6  somehow -- I don't want to take the word -- but
7  possibly inappropriate; is that correct?
8     A.  I don't know.  I don't remember what I wrote
9  in there.  I would have to look at it again.
10    Q.  Let me ask you this:  I know I asked the
11  question, but I'm not sure I got a yes or no answer.
12  Do you believe that Jay Smith was somehow complicit in
13  the retaliation that you claim?
14    A.  I don't know.
15    Q.  How about the previous village manager,
16  Alfred Treppeda, do you believe he was somehow
17  complicit?
18    A.  I don't know.
19       (A short break was had.)
20  BY MR. GILL:
21    Q.  Officer Fernandez, I'm going to go back to
22  something you mentioned before we took a break.  There
23  is a new chief of police now?
24    A.  Yes.
25    Q.  And there is a new village manager now?

Page 46

1     A.  Yes.
2     Q.  Are things better now?
3     A.  I would like to think so, yes.
4     Q.  Did you -- is that what you were, I guess,
5  hinting at before we took the break?  You said
6  something, you know, thank God there is a new manager
7  and a new chief of police?
8     A.  Yes.
9     Q.  Okay.
10    A.  That's what I said.  I don't know what I was
11  hinting at.  That's what I did say, that there is a
12  new city manager and a new chief of police.
13    Q.  Has the retaliation then stopped?
14    A.  Of course.
15    Q.  We discussed a little bit this morning the
16  issues that came up about sick leave and you being
17  reprimanded for that.  Do you recall discussing that?
18    A.  What was it exactly I discussed?
19    Q.  It was just generally.
20    A.  I remember discussing it, yes.
21    MR. GILL:  I'm going to go ahead and mark
22  the next exhibit since we discussed it.
23       (Fernandez Deposition Exhibit No. 30
24         marked as requested.)
25  BY MR. GILL:

Page 47

1     Q.  Have you seen that document before?
2     A.  Yes, I have seen this document before.
3     Q.  And this is a written reprimand for
4  violating the sick leave policy; is that correct?
5     A.  Conduct while on sick leave.  That's the
6  violation.
7     Q.  And it listed a standard operating
8  procedure, correct?
9     A.  It lists Directive 10-05.
10    Q.  And this was as a result of Sergeant Vargas
11  delivering documents to your house and you returning
12  from the doctor's office?
13    A.  Yes.
14    Q.  And you signed this and it says under
15  protest?
16    A.  Yes.
17    Q.  What do you mean by under protest?
18    A.  I didn't agree with it.
19    Q.  Okay.
20    A.  Nobody else was being visited.  I was the
21  only one being visited.
22    Q.  Did you sign the other reprimands under
23  protest?
24    A.  Yes.
25    Q.  If you signed one and you don't put under

Page 48

1  protest, does that mean anything different?
2     A.  I don't know.
3     Q.  Sometimes you --
4     A.  It means something to me.  I don't know what
5  it means to them, but it means something to me.
6     Q.  If you don't sign under protest, what does
7  it mean to you?
8     A.  That I agree with it.  That's not to say
9  that I did agree with everything that I signed that
10  didn't say under protest because, you know, sometimes
11  when you are being -- when you're being, you know,
12  attacked and attacked and attacked, sometimes you run
13  out of gas.
14    Q.  Did you grieve that?
15    MR. BARRIOS-BALBIN:  Objection.  Form.
16    THE WITNESS:  Yes, I did.
17    MR. GILL:  What was wrong with the form?
18    MR. BARRIOS-BALBIN:  I don't know what that
19  referred to.
20  BY MR. GILL:
21    Q.  Did you grieve the reprimand we were just
22  discussing?
23    A.  Yes.
24    MR. GILL:  Let's mark that as the next
25  exhibit.



Page 49
1      (Fernandez Deposition Exhibit No. 31
2        marked as requested.)
3  BY MR. GILL:
4    Q.  Have you seen at least a portion of that
5  before?
6    A.  I may have seen it.
7    Q.  And this appears to be an email chain with,
8  I guess, the middle email in the first page from Jay
9  Smith to R. Fernandez at Bal Harbour Police dot org.
10  Is that an accurate description at least of it -- it
11  purports to be?
12    A.  My email address?
13    Q.  What I just stated, is that accurate that
14  that's what it is?
15    A.  Can you repeat that again?
16    Q.  The middle email appears to be from Jay
17  Smith and addressed to R. Fernandez at Bal Harbour
18  Police dot org?
19    A.  Yes.
20    Q.  Is that your email address?
21    A.  It is.
22    Q.  Do you think you have seen this before?
23    A.  Probably.
24    Q.  Okay.  Is this the response to the step of
25  your grievance regarding the sick leave reprimand?

Page 50
1    A.  Yes.
2    Q.  And that's from Jay Smith?
3    A.  Yes, that's what it appears to be.
4    Q.  And I guess the third email on there, which
5  is on the first page and carries over to the second,
6  is from Jim Casey to Jay Smith; is that correct?
7    A.  Yes.
8    Q.  And Jim Casey was the PBA attorney you
9  mentioned previously?
10    A.  Yes.
11    Q.  Did he represent you in the grievance of
12  your sick leave reprimand?
13    A.  Yes.
14    Q.  And Jay Smith was -- according to this
15  email, his response to your reprimand was that he was
16  "unwilling to alter the disciplinary action taken in
17  this matter"; is that accurate?
18    A.  Where are the quotes?
19    Q.  It was for the record so she knows I'm
20  reading quotes --
21    A.  I'm sorry.  That's what it says here.
22    Q.  Did Chief Hunker when he was still employed
23  by the village ever ask you to be on the US marshal
24  fugitive task force?
25    A.  I don't remember him asking me that.

Page 51
1    Q.  Did you -- were you ever supposed to be
2  attached to any kind of task force?
3    A.  No.  Not that I can remember, no.
4    MR. GILL:  Let's mark this next one as
5  Exhibit 32.  It's interrogatories and the answers.
6      (Fernandez Deposition Exhibit No. 32
7        marked as requested.)
8  BY MR. GILL:
9    Q.  I'm going to first ask you to look at
10  Page 11.  Is that your signature?
11    A.  Yes.
12    Q.  And I'll represent to you these are the
13  interrogatories we served on you and the answers
14  provided to us by your attorney.
15      Have you ever seen these before?
16    A.  The interrogatories?
17    Q.  And the answers attached thereto.
18    A.  Yes.
19    MR. BARRIOS-BALBIN:  You don't use the ones
20  without Page 2 on it?
21    MR. GILL:  I'm looking at that.  I thought
22  it was in there.  It might not be in there.  Mine was
23  Page 2 --
24    MR. BARRIOS-BALBIN:  Interrogatory Answer
25  No. 2.  And I think there was another one missing,

Page 52
1  too.
2    MR. GILL:  Right.
3    MR. BARRIOS-BALBIN:  But you did receive
4  those?
5    MR. GILL:  Yes.  I'm not disputing we have
6  not see received the answers.  There was a copying
7  issue.  This one didn't come through apparently.  I'm
8  not going to focus on that anyway.
9  BY MR. GILL:
10    Q.  I have a few questions about these.
11      If you look at your answers and response to
12  Interrogatory No. 3 --
13    A.  Page 3?
14    MR. BARRIOS-BALBIN:  Up here it says
15  response to Interrogatory No. 3.  These are the
16  questions they asked and then after your signature --
17  after your --
18    THE WITNESS:  Okay.
19  BY MR. GILL:
20    Q.  And just so it's clear, I'll read
21  Interrogatory No. 3 into the record.  List the names
22  and addresses of all persons who are believed or known
23  by you, your agents, or attorneys to have any
24  knowledge concerning any of the issues in this matter
25  and specifically the subject matter about which each

Page 53

1 such person has knowledge.
2      And you identify first Leo Quinn and then
3 Greg Matthews, and you identify two areas that Greg
4 Matthews has information.  One is regarding Sergeant
5 Deitado urging Sergeant Vargas to make a complaint
6 against you while in the holding cell.  What are you
7 referring to there?
8    A.  I had -- I had backed up Officer Matthews on
9 a call that subsequently lead to an arrest.  And I was
10 trying to call out for a -- for a supervisor to
11 respond, and no one answered the radio.  No supervisor
12 answered the radio.  So we proceeded to take the
13 arrestee to the holding cell for the processing.
14      And subsequently Sergeant Vargas arrived,
15 Sergeant Deitado, and Sergeant Alvarez.  I don't know
16 in which order, but they were all there.  And I was
17 assisting Officer Matthews because it was his arrest.
18      And in during the processing, the paperwork,
19 I stepped out of -- a second out to my vehicle to
20 retrieve my laptop.  And when I came back, I was told
21 shortly after by Officer Matthews that Sergeant
22 Deitado was urging Sergeant Vargas to make a formal
23 complaint against me that I failed to raise a
24 supervisor on the radio.
25      And then Sergeant Alvarez told them not to

Page 54

1 make that formal complaint because I did go over the
2 air and nobody answered.
3    Q.  You didn't hear any part of the conversation
4 between Alvarez, Vargas, and Deitado, correct?
5    A.  That is true.
6    Q.  So the information was relayed to you by
7 Matthews?
8    A.  Yes.
9    Q.  But what he relayed to you was Deitado
10 believed you hadn't properly raised a supervisor?
11    A.  That I did not -- that I failed to raise a
12 supervisor.
13    Q.  And Alvarez says, no, he did.  And was there
14 ever a complaint made against you?
15    A.  No.
16    Q.  If you look at No. 4 -- and just so it's
17 clear for the record, the interrogatory asked with
18 respect to each claim for damages being claimed in
19 this matter, including without limitation, wages,
20 compensation, insurance benefits, health benefits,
21 accrued leave time, pension benefits, out-of-pocket
22 expenses, compensatory damages, et cetera, state the
23 date each item was incurred and the methods that you
24 used in driving and calculating such damages.
25      Now, with respect to the -- the last

Page 55

1 sentence says, the cost of my damages would be my
2 annual salary multiplied by the years necessary to
3 retired.  Do you see that?
4    A.  Yes.
5    Q.  Why do you think you're entitled to the cost
6 -- your annual salary multiplied by the years
7 necessary to retire?
8    A.  I believe that those would be the cost of my
9 damages, No. 4.
10    Q.  So I mean, can you continue to work for the
11 village?
12    A.  Hopefully.
13    Q.  We discussed there is a new manager and a
14 new chief of police, correct?
15    A.  Yes.
16    Q.  And as far as you know there is no more
17 discrimination or retaliation going on?
18    A.  Hopefully.
19    Q.  Going back to -- actually on Page 4,
20 No. 4 --
21      MR. BARRIOS-BALBIN:  Page 4 or No. 4?
22      MR. GILL:  Both.  Page 4 -- No. 4 is on Page
23 4.  I'm not actually talking about the question.
24      MR. BARRIOS-BALBIN:  Okay.
25 BY MR. GILL:

Page 56

1    Q.  Have you lost any wages or compensation from
2 the village?
3    A.  Well, that depends on how you look at it.
4 When it comes to -- when it comes to promotion or a
5 lateral movement, let's say the detective's position,
6 I believe, in my opinion, that the way that that
7 detective's interview process was conducted back in
8 2006, where it later came out that there was alleged
9 cheating, I think that that cost me.
10    Q.  Okay.
11    A.  The sergeant's exam, itself, although I did
12 sign up for the sergeants exam and then withdrawal my
13 name, I think the fact that there had been alleged
14 cheating or a letter received, that that whole
15 investigation went on.  And in my opinion -- and only
16 in my opinion, based on what I saw during the course
17 of that investigation, I believe that it was handled
18 incorrectly.  I believe it was a coverup.  And I
19 believe not only myself but other officers in the
20 department were cheated out of the possibility of a
21 promotion.
22    Q.  Okay.  Other than those have you ever --
23 actually ever taken away two days' pay or reducing
24 your salary, anything of that nature?
25    A.  Luckily not.



Page 57

1  Q.  When you were out on medical leave, how is
2  it you went out on leave for an extended period of
3  time?
4      A.  I provided a doctor's note.
5      Q.  Were you paid for that time?
6      A.  Yes, I was.
7      Q.  Did you use sick leave for that time?
8      A.  Yes, I did.
9      Q.  Is there a special sick leave for extended
10  leave?
11     A.  Not to my knowledge.
12     Q.  Did you have enough sick leave accrued to be
13  out for that long?
14     A.  We don't accrue sick leave.
15     Q.  Explain to me how the village's policies and
16  procedures work with respect to sick leave.
17     A.  If you're out on sick leave, you get paid
18  for sick leave.
19     Q.  You don't accrue sick leave?
20     A.  No.
21     Q.  So after you return from that medical leave,
22  if you needed to go out again for sick leave for
23  another reason you could have done that and gotten
24  paid?
25     A.  Yes.  Just like Officer Mederos was out on

Page 58

1  maternity leave, she used sick leave and used a lot of
2  time, and she got paid for it.
3      Q.  I'm not saying there's anything unusual.  I
4  just want to make sure I understand so it's clear?
5      A.  And she was never visited.
6      Q.  Was there any question she wasn't pregnant?
7      A.  That's not the question.  The question is
8  whether she was home -- whether she was home within
9  the designated hours.  Of course her -- her baby's
10  father was a sergeant in the police department, so
11  that helps.
12     Q.  It also would have been visibly apparent if
13  she was pregnant, would not?
14     A.  Right.  But no one checked to see if she was
15  home during the hours she was supposed to be home.
16     Q.  Did you lose any pension benefits?
17     A.  In regard to what we discussed prior about
18  the detective's position and the sergeant's exam,
19  definitely because when you have one of those
20  positions your salary is higher and the possibility of
21  overtime exists, and there is a difference.  If you
22  compare my salary to those that were promoted or got
23  the lateral position, there is a pretty significant
24  disparity in salaries.
25     Q.  Since the, I guess, 2011 sergeant's exam,

Page 59

1  have there been any other sergeants' exams at the
2  village?
3      A.  No.
4      Q.  Have there been any other detectives' exams
5  at the village since 2011?
6      A.  No.
7      Q.  And is that because there is no opportunity
8  to advance at that time -- no opening?
9      A.  I don't know why.
10     Q.  You haven't seen any psychiatrist or
11  psychologist in the last five years, have you?
12     A.  No.
13     Q.  Other than seeing Dr. Valencia, have you
14  sought any other type of medical care for the stress
15  related to your job?
16     A.  I went to a cardiologist.
17     Q.  That was through Dr. Valencia, correct?
18     A.  Yes.  To another doctor.
19     Q.  Other than that have you gone to anyone else
20  that we haven't discussed?
21     A.  No.
22     Q.  Are you claiming that Chief Hunker had any
23  influence over the investigations conducted by
24  Miami-Dade PD once they were turned over to Miami-Dade
25  PD?

Page 60

1      A.  I would believe so.
2      Q.  What is the basis for your belief?
3      A.  Well, he took the investigation away from
4  Patrick Franklin and made the decision to turn it over
5  to Miami-Dade.  And that was right after Patrick
6  Franklin had requested that five officers be named
7  subject officers and made a rather large request of
8  records and documents.  I guess that didn't fit into
9  the scheme of things for Chief Hunker and he
10  conveniently had it moved over to Miami-Dade.
11     Q.  I understand that.  Do you have anything
12  else to support --
13     A.  Well --
14     Q.  Let me finish.
15     A.  I'm sorry.
16     Q.  -- to support your belief that he had some
17  kind of influence over what Miami-Dade PD Professional
18  Compliance Bureau does?
19     A.  I know that he knows administrators there at
20  the Miami-Dade Police Department.  He knows Major
21  Stolzenberg.
22     Q.  How do you know that?
23     A.  It's common knowledge.
24     Q.  How does he know him?
25     A.  From years of working as a police officer.



Page 61
1  Q. Do you know in what context he and Officer
2 Stolzenberg -- how do you spell that so it's clear for
3 the record?
4  A. S-t-o-l-z-e-n-b-e-r-g.
5   MR. BARRIOS-BALBIN: He's not an officer.
6 He is a major.
7 BY MR. GILL:
8  Q. It's Major Stolzenberg?
9  A. Major Stolzenberg.
10  Q. Other than common knowledge do you know if
11 they worked together?
12  A. No.
13  Q. Do you know how long they have known each
14 other?
15  A. Former Chief Hunker has been in law
16 enforcement for about 40 years, so probably many
17 years.
18  Q. Do you have any documents to support that?
19  A. No.
20  Q. Okay. Anything else that supports your
21 belief that he had some kind of influence over those
22 investigations conducted by Miami-Dade PD?
23  A. Just the fact that he took Patrick Franklin
24 off of the investigation and immediately went to
25 Miami-Dade police. Obviously, in my opinion, it shows

Page 62
1 that he has control over the investigation and
2 influence of where it goes to.
3  Q. Did you ever raise any objection to
4 Pat Hunker conducting the IA investigation into the --
5 excuse me -- the IA investigation into your written
6 complaint because he just recently conducted an IA
7 investigation regarding the Tenzer incident?
8  A. Pat Hunker?
9  Q. Yes.
10  A. Or Franklin?
11  Q. I meant Pat Franklin.
12  A. I did note in my complaint that Patrick
13 Franklin knew the chief and that they have known each
14 other for many years. And that's also common
15 knowledge in our police department. I did -- I did
16 note that.
17   Upon review of the investigation, that
18 memorandum of the sergeant's exam investigation, I
19 only saw Pat Franklin's final report. It was only
20 until after public records requests were made that I
21 came across an email where Investigator Franklin
22 requested from Captain Daddario at the time to have
23 Sergeant Deitado's phone audited. I was not aware of
24 that when the final report came out.
25   So it appears that Investigator Franklin was

Page 63
1 on the right track and trying to do the right thing.
2 But that was never carried out by our administration.
3  Q. With respect to the alleged cheating on the
4 2011 sergeant's exam, what information did you
5 personally have, if any, that there was actually
6 cheating on the exam? And I'm not -- I know you
7 reviewed all the reports and seen that. But try to go
8 back to around the time it happened.
9   Did you have any specific knowledge
10 personally that there had been cheating on that exam?
11  A. Well, like you said, I did review the
12 reports and the interviews. I did not listen to the
13 audio. And the report was summarized, what -- the
14 context of the interviews, it was summarized. I
15 didn't have any definitive proof. If I would have, I
16 would have brought it forward.
17   But definitely the way that the
18 investigation was handled, in my opinion, it wasn't
19 correct. And you know, you don't need 40 years of law
20 enforcement to know the common thing s that you do
21 during a course of an investigation, especially when
22 you have evidence.
23  Q. Well, you personally didn't have any
24 evidence of cheating on the 2011 sergeant's exam,
25 correct?

Page 64
1  A. Correct.
2  Q. And I guess, as you sit here today with
3 everything you've read and learned, what, in your
4 opinion, is the evidence of cheating on that exam?
5  A. Well, obviously, there is no evidence of
6 cheating at this time because the evidence that came
7 out during the course of the investigation or the
8 alleged evidence was never properly checked.
9   Any first line investigator will tell you
10 that if you have information stating there is an
11 electronic device that may or may not have some
12 information that is pertinent to the investigation,
13 the first thing you do is retrieve it and send it out
14 for proper analysis. If that had been the case and it
15 would have been sent out, you know, and it would have
16 come out that nothing was on the phone, then,
17 obviously, whoever wrote that letter didn't know what
18 they were talking about. But the fact of the matter
19 that it wasn't done according to basic investigatory
20 guidelines just leaves a lot to doubt.
21  Q. So, as I think I understand your answer, the
22 evidence that you think -- potential evidence really
23 is the phone. That's the only potential evidence
24 there is?
25  A. Or phones. There were several phones.



Page 65

1    Q.   But there is nothing else outside of what
2  may or may not be on the phones what you consider
3  evidence -- actual evidence of cheating on the 2011
4  sergeant's exam?
5    A.   I was not part of the investigatory team.  I
6  did not conduct the investigation.  I could only -- I
7  could only tell you what I know from the summary
8  reports.
9        MR. GILL:  I have no further questions for
10  the witness.
11       MR. BARRIOS-BALBIN:  I just have real quick
12  follow-up.  I should be done in ten minutes.
13       MR. GILL:  Sure.
14       MR. BARRIOS-BALBIN:  Do you have the old
15  exhibits?
16       MR. GILL:  Yes.
17           CROSS-EXAMINATION
18  BY MR. BARRIOS-BALBIN:
19    Q.   During today's questioning, Mr. Fernandez,
20  you were provided Exhibit 26; is that correct?
21    A.   Yes.
22    Q.   And Exhibit 26 is the memorandum from
23  Miami-Dade Police Department to Bal Harbour regarding
24  investigation into Miami-Dade Police Department's
25  IA No. 12-280, correct?

Page 66

1    A.   Yes.
2    Q.   Anywhere in this report, and it's
3  approximately 20 pages long, do you see any
4  recommendations made by Miami-Dade as to what the
5  discipline should or should not be?
6        MR. GILL:  Object to the form of the
7  question.
8  BY MR. BARRIOS-BALBIN:
9    Q.   You can take your time reviewing the
10  document.
11    A.   No.
12    Q.   So this document does not say, we found a
13  violation with regard to Allegation No. 1?
14       MR. GILL:  Object to the form of the
15  question.
16       THE WITNESS:  No.
17  BY MR. BARRIOS-BALBIN:
18    Q.   Does the document say they found any
19  violations?
20       MR. GILL:  Object to the form of the
21  question.
22       THE WITNESS:  No.
23  BY MR. BARRIOS-BALBIN:
24    Q.   In your experience or in your knowledge at
25  Bal Harbour Police Department, does the chief of

Page 67

1  police review the complaint and determine what
2  discipline, if any, is required?
3        MR. GILL:  Object to the form of the
4  question.
5        THE WITNESS:  Yes.
6  BY MR. BARRIOS-BALBIN:
7    Q.   In Exhibit 26, Page 10, I believe, towards
8  the bottom of Paragraph No. 5 or Section No. 5, I
9  believe that's Sergeant Raul Martinez' summary of what
10  he testified to.  In the second paragraph under No. 5
11  there, can you read that first sentence -- the second
12  sentence I mean?
13    A.   The one beginning that starts with Deitado?
14    Q.   I'm sorry.  Paragraph No. 5 -- second
15  paragraph, Section 5, the second starts with Sergeant
16  Martinez.
17    A.   Sergeant Martinez advised that he does not
18  recall working on Saturday, April 21st, 2012, and that
19  he does not recall granting Officer Fernandez
20  permission to conduct an NCIC, FCIC, DHSMV, or any
21  type of police inquiry of his daughter, Ms. Fernandez.
22    Q.   Did Sergeant Martinez deny granting you
23  permission?
24    A.   No.
25    Q.   Do you -- as part of your employment at Bal

Page 68

1  Harbour, is there a sign-in sheet every time you go to
2  work?
3    A.   Yes.
4    Q.   So there is an independent way to verify if
5  Sergeant Martinez was at work Saturday, April 21st,
6  2012?
7    A.   Yes.
8    Q.   Did Captain Roye ever visit you at your
9  house during your time out on sick leave?
10    A.   Yes.
11    Q.   We went over a list of several reprimands,
12  counseling, or other forms of discipline.  And I think
13  we listed October of 2012 as one reprimand regarding
14  Sergeant Vargas.  We listed January, 2013, the
15  speeding incident as some sort of discipline.  There
16  was the suspension of yourself in the vehicle
17  take-home program, correct?
18    A.   Yes.
19       MR. GILL:  Object to the form of the
20  question.
21  BY MR. BARRIOS-BALBIN:
22    Q.   Do you know if the suspension of an officer
23  from the vehicle take-home program is discipline
24  pursuant to the PBA agreement?
25       MR. GILL:  Objection to the form of the



Page 69

1  question.
2        THE WITNESS:  Yes, it is.
3  BY MR. BARRIOS-BALBIN:
4     Q.   And my final question to you, Officer
5  Fernandez, is -- let me look at my documents here.  In
6  Exhibit 28 -- if you turn to Exhibit 28, there is a
7  reprimand dated April 16, 2013.  Now this is one
8  document.  Pursuant to your policies or your PBA
9  agreement -- I'm not certain.  I'm just asking here.
10        I have Violations No. 1, 2, and 3.  Pursuant
11  to your policies at Bal Harbour or your PBA agreement,
12  are those three separate reprimands or is this just
13  one reprimand encompassing three violations?
14        MR. GILL:  Object to the form of the
15  question.
16        THE WITNESS:  One reprimand encompassing
17  three violations.
18        MR. BARRIOS-BALBIN:  No further questions.
19        MR. GILL:  Officer Fernandez, you have the
20  right to read your deposition once it's been
21  transcribed to confirm that it has been transcribed
22  accurately and make any corrections with an errata
23  sheet; or you can waive that right and assume that
24  everything has been taken down accurate.  It's your
25  right with your attorney to put on the record --

Page 70

1        MR. BARRIOS-BALBIN:  We'll read.
2        MR. GILL:  And we'll order.
3        MR. BARRIOS-BALBIN:  We'll take a copy.
4  (Thereupon, the Deposition concluded at 12:00 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 71

1                Deposition Errata Sheet.
2
3  Our Assignment No.    153141
4  Case Caption:   FERNANDEZ v. BAL HARBOUR VILLAGE,
                   et al.
5
6          DECLARATION UNDER PENALTY OF PERJURY
7
8        I, RAMON FERNANDEZ, declare under penalty of
9  perjury that I have read the entire transcript of my
10  Deposition taken in the captioned matter or the same
11  has been read to me, and the same is true and
12  accurate, save and except for changes and/or
13  corrections, if any, as indicated by me on the
14  DEPOSITION ERRATA SHEET hereof, with the understanding
15  that I offer these changes as if still under oath.
16
17
18        Signed on the _____day of _____, 20__.
19
20
21  _____
22  RAMON FERNANDEZ
23
24
25

Page 72

1            CERTIFICATE OF OATH OF WITNESS
2
3  STATE OF FLORIDA    )
                       ) SS:
4  COUNTY OF MIAMI-DADE )
5
6        I, Renee D. Waishwell, Shorthand Reporter
7  and Notary Public in and for the State of Florida at
8  Large, certify that the witness, RAMON FERNANDEZ,
9  personally appeared before me on June 12th, 2014 and
10  was duly sworn by me.
11        WITNESS my hand and official seal this
12  25th day of June, 2014.
13
14
15
16                         Renee D. Waishwell
17  _____
    RENEE D. WAISHWELL
    NOTARY PUBLIC, STATE OF FLORIDA
18   COMMISSION NO:  FF 104122
     EXPIRATION:  APRIL 08, 2018
19
20
21
22
23
24
25



Page 73

1     REPORTER'S DEPOSITION CERTIFICATE
2        I, Renee D. Waishwell, Shorthand Reporter,
3  certify that I was authorized to and did
4  stenographically report the deposition of RAMON
5  FERNANDEZ, the witness herein; that a review of the
6  transcript was requested; that the foregoing pages
7  numbered 1 to 75 inclusive is a true and complete
8  record of my stenographic notes of the deposition by
9  said witness; and that this computer-assisted
10 transcript was prepared under my supervision.
11       I further certify that I am not a relative,
12 employee, attorney or counsel of any of the parties,
13 nor am I a relative or employee of any of the parties'
14 attorney or counsel connected with the action.
15
16       Dated this 25th day of June, 2014.
17
18
19
20 RENEE D. WAISHWELL
   NOTARY PUBLIC, STATE OF FLORIDA
21  COMMISSION NO:  FF 104122
    EXPIRATION:  APRIL 08, 2018
22
23
24
25

Page 74

1          DEPOSITION ERRATA SHEET
2  Page #| Line #| Change               |Reason

... (errata sheet blank lines) ...

24  SIGNATURE:_____DATE:_____
25        RAMON FERNANDEZ      153141

Page 75

1          DEPOSITION ERRATA SHEET
2
3  Page #| Line #| Change               |Reason

... (errata sheet blank lines) ...

24  SIGNATURE:_____DATE:_____
25        RAMON FERNANDEZ      153141

